1  EDWARD R. REINES (Bar No. 135960)
   edward.reines@weil.com
2  DEREK C. WALTER (Bar No. 246322)
   derek.walter@weil.com
3  MICHELE A. GAUGER (Bar No. 281769)
   michele.gauger@weil.com
4  WEIL, GOTSHAL & MANGES LLP
   Silicon Valley Office
5  201 Redwood Shores Parkway
   Redwood Shores, CA  94065
6  Telephone: (650) 802-3000
   Facsimile: (650) 802-3100
7

8  Attorneys for Plaintiffs and Counterclaim
   Defendants ILLUMINA, INC. and VERINATA
   HEALTH, INC.
9

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| VERINATA HEALTH, INC.,<br><br>and<br><br>THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY<br><br>             Plaintiffs and<br>             Counterclaim-Defendants,<br><br>      v.<br><br>ARIOSA DIAGNOSTICS, INC.,<br><br>and<br><br>LABORATORY CORPORATION OF AMERICA HOLDINGS,<br><br>             Defendants and<br>             Counterclaim-Plaintiffs. | Case No. 3:12-cv-05501-SI (consolidated with Case No. 3:14-cv-01921-SI and Case No. 3:15-cv-02216-SI)<br><br>**PLAINTIFFS AND COUNTERCLAIM DEFENDANTS ILLUMINA, INC. AND VERINATA HEALTH, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>**PUBLIC REDACTED VERSION**<br><br>Judge: Hon. Susan Illston |
| ILLUMINA, INC.,<br><br>             Plaintiff,<br><br>      v.<br><br>ARIOSA DIAGNOSTICS, INC.,<br><br>             Defendant. | |

ILLUMINA, INC.,

               Plaintiff,

    v.

ARIOSA DIAGNOSTICS, INC., AND
ROCHE MOLECULAR SYSTEMS, INC.,

            Defendants.

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION ............................................................................................................ 1

II. ASSIGNOR ESTOPPEL .............................................................................................. 1

    A.    There Is No Genuine Issue That Ariosa Is In Privity With Oliphant And Stuelpnagel ................................................................................................ 2

    B.    Oliphant And Stuelpnagel Are Inventors ............................................... 3

III. ARIOSA'S CONTRACT COUNTERCLAIMS ......................................................... 8

    A.    There Was No Breach Of Contract As A Matter Of Law ....................... 9

        1.    The Agreement Grants No Express License To The '794 Patent .............. 9

        2.    The Agreement Disclaims All Implied Licenses ..................................... 12

        3.    The Agreement Does Not Prohibit Filing Suit For Patent Infringement ................................................................................................ 14

    B.    Ariosa's Alleged Damages Are Barred by the Parties' Agreement's To Limit Liability ........................................................................................ 14

    C.    Ariosa Cannot Show That Illumina's Conduct Caused Its Damages.................. 17

IV. ARIOSA'S GOOD FAITH AND FAIR DEALING CLAIM ................................. 18

    A.    Ariosa Cannot Use the Implied Covenant of Good Faith And Fair Dealing To Rewrite Illumina's Obligations Under the Agreement ................................... 19

    B.    Illumina Did Not Interfere With Ariosa's Right to Purchase Goods Under the Agreement ............................................................................................ 20

V. ARIOSA'S LICENSE DEFENSE............................................................................... 21

    A.    The Agreement Does Not Convey An Express or Implied License ..................... 21

    B.    Any License Terminated Upon Expiration of the Agreement .............................. 21

VI. CONCLUSION............................................................................................................ 21

1

**TABLE OF AUTHORITIES**

2

**PAGE(S)**

3

CASES

4

*Carma Developers (Cal.), Inc. v. Marathon Dev. California, Inc.,*
   2 Cal. 4th 342 (1992)..................................................................................... 20

5

*CAZA Drilling (Ca.) Inc. v. TEG Oil & Gas U.S.A., Inc.,*

6

   142 Cal. App. 4th 453 (2006) ........................................................................ 15

7

*Diamond Scientific v. Ambico,*
   848 F.2d 1222 (Fed. Cir. 1998) ....................................................................... 2

8

*Fi Teq Inc. v. Venture Corp.,*
   169 F. Supp. 3d 948 (2016) ........................................................................... 16

9

*Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.,*

10

   209 Cal. App. 4th 1118 (2012) ...................................................................... 16

11

*Hebert v. Rapid Payroll, Inc.,*
   No. CV 02-4144 DT (PJWx), 2005 WL 6172659 (C.D. Cal. Feb. 9, 2005)............................ 16

12

*Indigo Grp. USA, Inc. v. Polo Ralph Lauren Corp.,*

13

   No. CV-11-5883-MWF (CWX), 2014 WL 12573380 (C.D. Cal. Mar. 17, 2014 ...................... 13

14

*Inter–Mark USA, Inc. v. Intuit, Inc.,*
   No. C-07-04178 JCS, 2008 WL 552482 (N.D. Cal. Feb.27, 2008) ........................................ 19

15

*Lewis Jorge Const. Mgmt., Inc. v. Pomona Unified School Dist.,*
   34 Cal. 4th 960 (Cal. 2004) ........................................................................... 16

16

*LG Elecs., Inc. v. Bizcom Elecs., Inc.,*

17

   453 F.3d 1364 (Fed. Cir. 2006) ...................................................................... 12

18

*Lucent Techs. Inc. v. Gateway, Inc.,*
   470 F. Supp. 2d 1187 (S.D. Cal. 2007) ............................................................ 13

19

*Markborough California, Inc. v. Superior Court,*

20

   227 Cal. App. 3d 705 (1991) .......................................................................... 15

21

*Masimo Corp. v. Philips Elecs. N. Am. Corp.,*
   Nos. 09-80-LPS, 11-742-LPS, 2016 WL 6542726 (D. Del. Oct. 31, 2016) ........................... 12

22

*Mentor Graphics Corp. v. EVE-USA, Inc.,*
   851 F.3d 1275 (Fed. Cir. 2017) ........................................................................ 2

23

*Mentor Graphics Corp. v. Quickturn Design Sys., Inc.,*

24

   150 F.3d 1374 (Fed. Cir. 1998) ......................................................................... 2

25

*Peregrine Pharm., Inc. v. Clinical Supplies Mgmt., Inc.,*
   No. SACV 12-1608 JGB ANx, 2014 WL 3791567 (C.D. Cal. July 31, 2014) ...................... 17

26

*R.B. Matthews, Inc. v. Transamerica Transp. Services, Inc.,*

27

   945 F.2d 269 (9th Cir. 1991).......................................................................... 16

28

*Roots Ready Made Garments v. Gap Inc.,*
   No. C 07-03363 CRB, 2008 WL 4078437 (N.D. Cal. Aug. 29, 2008) ............................... 19, 20

*Semiconductor Energy Lab. Co. Ltd. v. Chi Mei Optoelecs Corp.*,
   531 F. Supp. 2d 1084 (N.D. Cal. 2007) ................................................................................. 12

*Song fi v. Google Inc.*,
   No. 14-cv-5080, 2015 U.S. Dist. LEXIS 75272 (N.D. Cal. June 10, 2015) ........................... 20

*Storek & Storek Inc. v. Citicorp Real Estate*,
   100 Cal. App. 4th 44 (2002) .................................................................................................. 18

*Troyk v. Famers Group, Inc.*,
   171 Cal. App. 4th 1305 (Cal. Ct. App. 2009) ........................................................................ 17

*Vu v. California Commerce Club, Inc.*,
   58 Cal. App. 4th 229 (1997) .................................................................................................. 17

**STATUTES AND REGULATIONS**

Cal. U. Com. Code § 2719(3) ...................................................................................................... 15

Fed. R. Civ. P. 56(a) ...................................................................................................................... 1

## NOTICE OF MOTION AND MOTION

TO DEFENDANT ARIOSA DIAGNOSTICS, INC. AND ALL ATTORNEYS OF RECORD, PLEASE TAKE NOTICE that on October 12, 2017, Plaintiffs Illumina, Inc ("Illumina") and Verinata Health, Inc. ("Verinata") will and hereby do respectfully move for summary judgment that Ariosa Diagnostics, Inc. ("Ariosa") is barred from challenging the validity of U.S. Patent No. 7,955,794 ("the '794 patent") pursuant to the doctrine of assignor estoppel. Illumina and Verinata also move for summary judgment on the grounds that Ariosa's license defense and counterclaims for breach of contract and the duty of good faith and fair dealing fail as a matter of law.  This motion is based on the following Memorandum, the supporting materials, the pleadings in this action, and any other matters the Court deems proper.   The relief requested is the dismissal with prejudice of Ariosa's invalidity defense and counterclaims, its license defense and its breach of contract claims.

1

## I.    INTRODUCTION

2      Pursuant to Federal Rule of Civil Procedure 56(a), Illumina respectfully moves this Court

3  for summary judgment on two topics.

4          1.  Ariosa Diagnostics, Inc. ("Ariosa") is barred from challenging the validity of
              U.S. Patent No. 7,955,794 ("the '794 patent") pursuant to the doctrine of
5              assignor estoppel.

6          2.  Ariosa's license defense and counterclaims for breach of contract and the duty
              of good faith and fair dealing fail as a matter of law.
7

8  For the reasons stated below, there are no genuine issues of material fact to preclude summary

9  judgment in Illumina's favor on both of these issues.

10

## II.    ASSIGNOR ESTOPPEL

11      Ariosa is infringing the '794 patent with its Harmony prenatal diagnostic test.  Ariosa

12  should know better because two key developers of the infringing test, Arnold Oliphant and John

13  Stuelpnagel, are inventors of that patent.  The '794 patent is part of a family of patents that covers

14  Illumina's GoldenGate product, one of Illumina's early flagship products that generated over $250

15  million in revenue and helped pave the way for Illumina's long-term success.  To this day,

16  Oliphant and Stuelpnagel take credit for their role in inventing GoldenGate, even to the point of

17  excluding the contributions of their former co-workers who are also named on the patent.  *See* Ex.

18  1 [Oliphant Tr.] at 187:21-188:3.

19      At the time of their invention, Oliphant and Stuelpnagel assigned their "entire right, title

20  and interest" in the '794 patent to Illumina for "good and valuable consideration."  Ex. 2 at

21  ILMNAA00007312.  This was not done carelessly.  Both individuals were experienced industry

22  scientists knowledgeable about IP.  Stuelpnagel was so experienced that he had been placed in

23  charge of Illumina's patenting activities, and he supervised the Illumina in-house attorney that

24  handled day-to-day patent prosecution work.  *See* Ex. 3 at 71:8-16, 137:2-6, 142:13-21.  Oliphant

25  even ████████████████████████████████████████████████████████

26  Ex. 1 at 268:10-17.

27      After leaving Illumina, both Oliphant and Stuelpnagel went on to found Ariosa, where they

28  played an integral role in developing Ariosa's infringing Harmony prenatal test.  Rather than

develop a new technology for Harmony, or pay Illumina for the patented products it sells, they incorporated the GoldenGate technology they had developed years earlier for Illumina.  When Illumina identified Harmony as infringing, Ariosa attempted to challenge the validity of the '794 patent, with Stuelpnagel playing a key role.  After failing to invalidate the '794 patent in an IPR, Ariosa now wishes to take a second crack at the '794 patent in this Court.

The doctrine of assignor estoppel, however, precludes this.  "Without **exceptional circumstances** (such as an express reservation by the assignor of the right to challenge the validity of the patent or an express waiver by the assignee of the right to assert assignor estoppel), one who assigns a patent surrenders with that assignment the right to later challenge the validity of the assigned patent."  *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 150 F.3d 1374, 1378 (Fed. Cir. 1998).[1]  Assignor estoppel does not only apply to the inventor assignors; "estoppel also operates to bar other parties in privity with the assignor, such as a corporation founded by the assignor," *Diamond Scientific v. Ambico*, 848 F.2d 1222, 1224 (Fed. Cir. 1998), or infringers who avail themselves "of the inventor's knowledge and assistance to conduct infringement."  *Brocade Communications Systems, Inc. v. A10 Networks, Inc.*, No. 10-CV-03428-LHK, 2012 WL 2326064, at *4 (N.D. Cal. June 18, 2012) (citing *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 839 (Fed. Cir. 1991)).  The Federal Circuit recently "emphasized the continued vitality of the doctrine of assignor estoppel."  *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1283 (Fed. Cir. 2017) (affirming grant of summary judgment that assignor estoppel applies).

The only issues relevant to assignor estoppel are (1) privity and (2) the status of Oliphant and Stuelpnagel as inventors on the '794 patent.  There is no evidence that would preclude summary judgment.

### A.     There Is No Genuine Issue That Ariosa Is In Privity With Oliphant And Stuelpnagel

The existence of privity among Ariosa and Stuelpnagel/Oliphant cannot be debated. Ariosa's interrogatory responses in this case document their involvement in Ariosa and the

---

[1] Emphasis supplied unless otherwise noted.

development of the Harmony test.  *See* Ex. 4.  In SEC filings, Ariosa has described Stuelpnagel and Oliphant as co-founders of Ariosa.  *See* Ex. 5 at 87-88. Ariosa's website proudly listed Stuelpnagel and Oliphant as members of its management team, and explained that Stuelpnagel served as Executive Chairman and that Oliphant served as the current Chief Scientific Officer. *See* Ex. 6 at 1.  On his LinkedIn profile, Stuelpnagel continues to identify himself as a "co-founder" of Ariosa.  Ex. 7.  Ariosa further asserted on its website that Dr. Oliphant "led development of the company's proprietary assay platform," which infringes the '794 patent.  Ex. 6 at 1.

Both Stuelpnagel and Oliphant are named authors on peer reviewed literature describing Ariosa's product, and are listed as co-inventors on numerous Ariosa patent applications that touch on all aspects of Ariosa's product.  *See, e.g.*, Exs. 36-45.  Sworn deposition testimony confirms the firsthand role that Drs. Oliphant and Stuelpnagel played in the development of Ariosa's infringing product.  Ex. 1 at 86:19-87:18, 98:17-20, 99:7-101:2.  Oliphant confirmed his overarching role in "more than a thousand" relevant experiments related to the development of Ariosa's sole product. *Id.* at 87:6-15.  Likewise, Oliphant confirmed his role as the leader of the numerous teams that developed Ariosa's product. *Id.* at 99:17-100:8; *see also id.* at 94:19-95:2; 99:7-18.  Similar to Oliphant, Stuelpnagel testified that he has "been involved in most aspects of Ariosa."  Ex. 8 at 36:3-4; *see also* Ex. 3 at 42:6-11  And Ariosa has relied upon Stuelpnagel as a litigation declarant, presenting him as an individual with deep knowledge as to Ariosa's product and business.  *See* Ex. 9.

### B.     Oliphant And Stuelpnagel Are Inventors

The only issue that Ariosa disputes with any vigor is whether Oliphant and Stuelpnagel are inventors on the '794 patent, despite the fact that they named on the patent.  Any contention that they are not bona fide inventors is proven false many times over by their own deposition testimony, the record of Patent Office proceedings, and the testimony of Ariosa's own experts.

As noted above, Oliphant and Stuelpnagel embrace their status as inventors of Illumina's GoldenGate assay, which embodies the '794 patent and generated more than $250 million in revenue for Illumina.  *See* Ex. 1 [Oliphant Tr.] at 187:21-188:3; Ex. 3 [Stuelpnagel Tr.] at 126:16-22; Ex. 10 [Cantor Report] ¶¶ 351-52.  There is no genuine dispute that GoldenGate embodies the

'794 patent.   The embodying features of GoldenGate are detailed in the report of Illumina's expert, *see* Ex. 12 ¶¶ 343-346, and Ariosa did not even bother cross-examining him on this during deposition.  *See* Ex. 13 at 307:10-308:21; *see also* Ex. 11 at 113:5-11, 114:9-116:8, 141:19-142:24 (testimony of inventor Kenneth Kuhn confirming that the '794 patent is GoldenGate).  Because Oliphant and Stuelpnagel are inventors of the GoldenGate assay, and because GoldenGate is an embodiment of the '794 patent, Oliphant and Stuelpnagel must be inventors on the '794 patent.

Ariosa cannot identify any genuine issue of fact to rebut this argument.  At most, Ariosa submits an opinion from its technical expert, Dr. John Quackenbush, purportedly disputing that GoldenGate embodies the '794 patent.   Quackenbush, however, never even analyzed whether there is any element in the claims of the '794 patent that is not present in Golden Gate:



Ex.14 at 252:1-6.

Instead, Dr. Quackenbush presents ████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████ Unsubstantiated testimony on legal issues that outside-counsel force-fed to its unqualified technical expert cannot create a genuine issue of fact.[2]

Ultimately, the direct testimony from Oliphant and Stuelpnagel establishes beyond doubt they are correctly identified as inventors on the '794 patent, especially as inventors of Claims 19 and 20.  Specifically, Dr. Oliphant confirmed that he and Stuelpnagel invented the key "singular idea" for GoldenGate of using an extension reaction followed by ligation reaction.  This concept appears verbatim in the issued claims of the '794 patent:

---

[2] Illumina will be seeking to exclude Dr. Quackenbush's testimony on this issue.

| Oliphant's Testimony | Issued Claims 19 and 20 of the '794 Patent |
|---|---|
| John and I had a singular idea, really, for the invention, and that was we could separate the oligonucleotides, *do an extension and ligation*, and that was the basis of the contribution of John and my's conversation. Ex. 1 at 192:7-12; *see also id.* at 246:22-25. | 19. The method of claim 9, 11 or 13, wherein step (d) further comprises extending said other probes with a polymerase and *forming extended probes and ligating* said extended probes to said probes.<br><br>20. The method of claim 9, 11 or 13, wherein step (d) further comprises extending said probes with a polymerase and *forming extended probes, and ligating said extended probes* to said other probes. |

Ariosa's expert on the inventorship issue, Dr. Charles Cantor, agreed that ███████

████████████████████████████████████████████████████████████████████████████

██  █████████████████████████████████████████████████████████████████████████

██  ██████████████████████████████████████████████████████████████████████████

██  █████████████████████

█████████████████████████████████████████████████████████████████████████████

██████████  Ex. 17 at 268:8-18 (inventor Jian Bing Fan confirms that Oliphant and

Stuelpnagel's contribution was extension and ligation); Ex. 18 at 130:3-20 (inventor Richard Shen

explains that Oliphant possibly contributed extension and ligation).  Specifically recited in claim

19, this "singular idea" is necessarily present in all the independent claims of the '794 patent.

There can thus be no genuine dispute that Oliphant and Stuelpnagel are bona fide inventors.

Ariosa's only attempt to rebut this record is a confusing legal argument that, when

unwound, does not stand up to scrutiny.  The premise of Ariosa's position is that Oliphant and

Stuelpnagel invented only what Ariosa refers to as an "allele-specific" extension and ligation

reaction.  *See, e.g.,* Ex. 10 [Cantor Report] ¶¶ 350-52.  This is synonymous with a technique

referred to as "genotyping."  *See, e.g.,* ███████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████  Ariosa

contends that genotyping is not claimed in the '794 patent, but is instead claimed in a parent of the

'794 that issued as U.S. Patent No. 7,582,420 ("the '420 patent").  *See, e.g.,* Ex. 10 [Cantor

1    Report] ¶ 361.  According to Ariosa, Oliphant and Stuelpnagel are inventors on only the '420

2    patent—and not the '794 patent—because only the '420 patent claims genotyping.  *See, e.g.*, Ex.

3    19 [Godici Report] ¶¶ 136, 138; Ex. 15 [Quackenbush Report] ¶ 342; Ex. 14 [Quackenbush Tr.] at

4    146:25-147:4, 152:15-19.  This is without merit.

5         In fact, Oliphant and Stuelpnagel's status as inventors of the '420 patent confirms that they

6    are also inventors on the '794 patent.  During prosecution of the '794 patent, the Patent Office

7    rejected the claims over the '420 patent for obviousness-type double patenting, stating the '794

8    patent was "not patentably distinct" from the '420 patent.  *See* Ex. 20 at 4.  To overcome this

9    rejection, Illumina filed a terminal disclaimer shortening the life of the '794 patent so that it did

10   not extend beyond the life of the '420 patent.  *See* Ex. 34 at 8.  If, in fact, the claims of the '420

11   patent are "not patentably distinct" from the claims of the '794 patent, and if Oliphant and

12   Stuelpnagel are inventors on the '420, then it is difficult to understand how Ariosa can contend

13   they are not also inventors on the '794 patent.

14        Notably, Ariosa submitted an expert report from Nicholas Godici, former USPTO

15   Commissioner of Patents, to opine on the prosecution history of the '794 patent and its relevance

16   to inventorship.  He ***ignored*** the terminal disclaimer and the Patent Office's finding that the claims

17   of the '420 patent are "not patentably distinct" from the claims of the '794 patent.[3]  *See* Ex. 21 at

18   58:12-62:14, 67:20-25, 140:2-142:5.  Mr. Godici's failure to address the most relevant aspects of

19   the prosecution history bearing on inventorship demonstrates that there is no legitimate argument

20   that assignor estoppel does not apply.

21        Further, any contention that the claims of the '794 patent do not cover genotyping was

22   repeatedly undermined by the testimony of Ariosa's own witnesses, including the inventors

23

24

25   _____

26   [3] Although Mr. Godici was hired by Ariosa to opine on inventorship for the purposes of the
     assignor estoppel issue, Mr. Godici testified that he was not even aware of the doctrine.  *See* Ex. 21
27   at 70:1-3 ("**Q.** Are -- are you aware of the doctrine of assignor estoppel?  **A.** No, I don't believe I
     am.").  Mr. Godici's opinions are defective in many respects, and Illumina will be seeking to
28   exclude his testimony.

1 | themselves.  Ariosa's primary expert on the inventorship issue, Dr. Charles Cantor, confirmed 

---

<sup>4</sup> Figure 13 and the examples at columns 54-55 of the '794 patent were the very sections of the patent that the patentees pointed to as support for adding what was originally numbered as claim 21, but what ultimately issued as claim 19 of the '794 patent. *See* Ex. 35 [Oct. 30, 2007 RCE] at 8 (citing support at original application page 6, lines 8-16 (the description of Fig. 13), Figure 13, and application page 67, lines 1-24 (corresponding to the issued patent at 54:58-55:27)).

1

2

3

4

5

6            ████████████  *see also* Ex. 22 [Cantor Reexam. Decl.] ¶ 104 (Dr. Cantor opines that an

7    allele-specific extension ligation reaction meets the requirement of claim 2).  If, as Ariosa

8    contends, Stuelpnagel and Oliphant invented genotyping, and if the claims cover genotyping as a

9    preferred embodiment, then Stuelpnagel and Oliphant are necessarily inventors such that assignor

10   estoppel applies.

11                    **III.    ARIOSA'S CONTRACT COUNTERCLAIMS**

12          In response to Illumina's infringement claims based on the '794 patent, Ariosa asserts

13   counterclaims for breach of contract.  *See* Ex. 23 ¶¶ 71-79.  Ariosa alleges that Illumina breached

14   a January 4, 2012 Sale and Supply Agreement (the "Agreement") between Ariosa and Illumina for

15   the sale of DNA sequencing products (sequencers and reagents).  *See* Ex. 26 [Sale and Supply

16   Agreement].  The Agreement expired on its own terms in January 2015.  *See* Ex. 24 [Ariosa First

17   Supp. Resp. to Interrog. No. 38] at 8-9.

18          Ariosa's theory of contract liability has nothing to do with whether Illumina fulfilled its

19   duty to supply goods under the Agreement.  Indeed, there is no dispute that Illumina fulfilled all

20   such duties throughout the three-year term of the Agreement.  Rather, Ariosa contends that by

21   entering into the Agreement, Illumina expressly and/or impliedly licensed the patents-in-suit to

22   Ariosa.  Ariosa contends that Illumina then "breached the Agreement by bringing a lawsuit against

23   Ariosa for infringement of the '794 patent."  *See* Ex. 23 ¶ 75.  Ariosa is now seeking damages in

24   the extraordinary amount of roughly $100 million for this alleged breach of contract.

25          Ariosa's claim fails for three reasons.  First, the filing of a lawsuit cannot constitute a

26   breach.  Second, Ariosa cannot show that it is entitled to any of its claimed damages given the

27   limitation of liability clause in the Agreement.  Third, Ariosa cannot show that Illumina's alleged

28   breach caused the damages it now claims.  Each is addressed in turn.

1

**A.      There Was No Breach Of Contract As A Matter Of Law**

2      To succeed on its breach of contract claim, Ariosa must show that Illumina (1) failed to do

3  something the contract required it to do or (2) did something that the contract prohibited it from

4  doing.  *See* CACI Jury Instruction No. 303.  Yet, it is undisputed that for months after the filing of

5  the lawsuit and until January 2015—when the Agreement expired—Illumina provided the

6  sequencers and reagents it agreed to provide under the Agreement for the full three-year term.

7  Ariosa does not allege, nor could it, that Illumina failed to meet its sales and support obligations

8  under the sales and supply Agreement (i.e., liability is not alleged under prong (1)).

9      Ariosa instead alleges that Illumina breached the Agreement by filing suit against Ariosa.[5]

10  According to Ariosa, the Agreement provides Ariosa with an express and/or implied license to the

11  '794 patent.  *See* Ex. 23 ¶ 28.  There was no license granted for any of the patents-in-suit under the

12  plain language of the Agreement and, as addressed below, filing a lawsuit for infringement is not

13  prohibited under the Agreement.  Ariosa's claim thus fails as a matter of law.

14

**1.      The Agreement Grants No Express License To The '794 Patent**

15      The Agreement is a supply agreement for DNA sequencing goods, not a broad IP license.

16  *See* Ex. 26 at 1-3, Ex. A.  At most, the Agreement provides Ariosa with an express—but very

17  limited—grant of IP rights from Illumina to use the Goods sold in § 3(a).  That provision states

18  that ███████████████████████████████████████████████████████

19  ███████████████████████████████████████████████████████████

20  ███████████████████████████████████████████████████████████

21  ██████████████      *Id.* at § 3(a).  This is the **only** grant of rights in the Agreement.   Under this

22  provision, only the Goods actually purchased under the agreement would be covered by the grant

23  of IP Rights.[6]   Other products not purchased from Illumina or products that Ariosa develops

24  ───────────────────────

25  [5] Ariosa also contends that Illumina breached the duty of good faith and fair dealing by sending
26  Ariosa a notice letter when Ariosa was in breach of the Agreement.  This issue is addressed below
    in Part IV

27  [6] Goods is defined in § 1 of the Agreement as "any and all of the Consumables, Hardware and
28  Software supplied hereunder as set forth on Exhibit A, as may be amended from time to time in

1    itself—such as the accused products in this litigation—are not covered by this grant of rights

2    under the plain language.

3         The rest of the agreement also makes this clear.  Core IP Rights in Goods are expressly

4    defined as ████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████████████████

13   ███████████████████████████████████████████████████████  *Id.* at § 3(c).

14       ████████████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████████████████

22   ███████████████████████████████████████████████████████████

23       Regardless, all the IP rights discussed in the Agreement must "pertain to the Goods."

24   Therefore, because Ariosa purchased only goods related to Illumina's DNA sequencing

25   equipment, it could not have acquired any rights beyond those necessary to use Illumina's DNA

26

27   _____

28   accordance with Section 32(h)."  *Id.* § 1.  These are the only Goods covered by and purchased by
     Ariosa under the Agreement.

1    sequencing equipment and reagents.  It did not purchase goods from Illumina related to the

2    accused assay in this case, and so did not acquire any IP rights from Illumina with regards to it.

3    This makes sense: there would be no reason for Illumina to give a purchaser of goods the rights to

4    IP that are unrelated to the goods the purchaser is actually buying.

5         Although the '794 patent pertains to Illumina's GoldenGate product (which Ariosa

6    mimicked with its "home-brew" accused DANSR assay rather than purchase from Illumina[7]), it

7    does not cover the sequencing equipment and reagents that Ariosa purchased under the

8    Agreement.  In discovery responses, Ariosa has steadfastly refused to explain how or why the '794

9    patent could possibly constitute either a Core IP Right in Goods or even a Secondary IP Right in

10   Goods given that it did not purchase the GoldenGate product from Illumina, and has refused to

11   explain how the '794 patent pertains to the Goods it purchased under the Agreement.  *See* Ex. 30

12   [Ariosa 7th Resp. to Interrog. No. 29] at 15-17.[8]

13        Yet, Ariosa's technical expert confirmed during deposition that ████████████████

14   ████████████████████████████████████████████████████████████████████████

15   ████████████████████████████

16      ██   ████████████████████████████████████████████████

17      ████████████████████████

18      ██   ████████████████████████████████

19   Ex. 14 [Quackenbush Tr.] at 333:19-22.  It is thus undisputed that the '794 patent does not

20   "pertain to the Goods," and that Ariosa was not granted an express license to the '794 patent in the

21   Agreement.

22

23   ───────────────────

24   [7] Ariosa's former CEO, for instance, acknowledged that ████████████████████████████
     ████████████████   *See* Ex. 32 [Song Tr.] at 311:10-22.

25   [8] Ariosa's license theory has always been inconsistent with the basic terms of the Agreement.  For

26   instance, the Agreement is clear that Secondary IP Rights in Goods are "expressly excluded from
     Core IP Rights in Goods," such that Core and Secondary IP rights are mutually exclusive.  Ex. 26

27   § 1. ████████████████████████████████████████████████████████████████████
     ████████████████████████████████████████████████████████  This makes no sense,

28   and reflects the fact that Ariosa's license theory is without basis.

1    **2.    The Agreement Disclaims All Implied Licenses**

2        In shotgun style, Ariosa next contends that it received an implied license to the '794 patent

3    based on § 4(a), which states: "███████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████  *See* Ex. 26 § 4(a); *see also* Ex. 24 [Ariosa First

7    Supp. Resp. to Interrog. No. 38] at 9.

8        Under California law, which governs the Agreement (*see* Ex. 26 § 32(f)), an implied

9    license cannot be found where an agreement expressly sets forth the scope of the licenses granted

10   therein and disclaims any implied license.  *See, e.g.*, *Semiconductor Energy Lab. Co. Ltd. v. Chi*

11   *Mei Optoelecs Corp.*, 531 F. Supp. 2d 1084, 1115 (N.D. Cal. 2007) ("In light of these express

12   disclaimers, no license can be implied.") (quoting *LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d

13   1364, 1369 (Fed. Cir. 2006)); *see also Masimo Corp. v. Philips Elecs. N. Am. Corp.*, Nos. 09-80-

14   LPS, 11-742-LPS, 2016 WL 6542726, at *7 (D. Del. Oct. 31, 2016) (stating that "[a]n implied

15   license will not be found where the applicable licensing agreement has an 'express disclaimer'

16   limiting the scope of the license," and noting that the agreement in that case "contain[ed] such an

17   express disclaimer, stating that nothing in this agreement will be considered a license from either

18   [p]arty..., except as expressly provided in the license grants.'").

19   ████████████████████████████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████████████████████████████

22   ███████████████████████████████████  The parties specifically agreed that no implied licenses

23   were granted thereunder.  Accordingly, as a matter of law, no implied license can be found.

24       Even had the parties not expressly disclaimed any implied licenses, however, Ariosa still

25   could not meet its burden to show that Illumina granted it an implied license.  To show an implied

26   license, the alleged infringer must show that "(1) the patentee, through statements or conduct, gave

27   an affirmative grant of consent or permission to make, use, or sell to the alleged infringer; (2) the

28   alleged infringer relied on that statement or conduct; and (3) the alleged infringer would, therefore,

1   be materially prejudiced if the patentee is allowed to proceed with its claim."  *See Lucent Techs.*

2   *Inc. v. Gateway, Inc.*, 470 F. Supp. 2d 1187, 1193 (S.D. Cal. 2007).

3          Ariosa argues that Illumina's statement in § 4(a) that Illumina was "███████████

4   ████████████████████████████████████████████████████████████████████████████

5   ██████████████████████████████████████ constitutes an affirmative grant to make, use, or

6   sell under the '794 patent because that patent supposedly constitutes Secondary IP Rights in

7   Goods necessary to perform the Fetal Aneuploidy Service.  *See* Ex. 23 ¶ 28.  This statement,

8   however, is narrowly limited to the "Goods" sold by Illumina being used in accordance to the

9   product documentation provided with the Goods (such as instructions for use provided by

10  Illumina).  It does not apply to products Ariosa develops itself or purchases elsewhere.  Here,

11  Illumina is not accusing the "Goods" it sold to Ariosa of infringing the '794 patent.  It is accusing

12  Ariosa's "home brew" product that was not purchased from Illumina.  Thus, the '794 patent does

13  not pertain to the use of the Goods sold and cannot fall within the Secondary IP Right in Goods

14  under the plain language of the Agreement.  *See supra* pp. 10-11.

15         Further, § 4(a) does not grant any express license to such IP rights and certainly does not

16  support Ariosa's far-fetched reading of an implied license.  Interpreting § 4(a) as conveying a

17  license to Illumina's IP would improperly negate the language in § 3 limiting the license grant. *See*

18  *Indigo Grp. USA, Inc. v. Polo Ralph Lauren Corp.*, No. CV-11-5883-MWF (CWX), 2014 WL

19  12573380, at *5 (C.D. Cal. Mar. 17, 2014), ("No specific contractual provision, however, may be

20  viewed in isolation. The contract must be interpreted 'in the context of the entire agreement's

21  language, structure, and stated purpose.'") (internal citation omitted).

22         The plain language of § 4(a) makes clear that ████████████████████████████████

23  ████████████████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████████████████████

28  ████████████████████████████████████ Nothing in § 4(a) implies or suggests that Illumina is

1   granting a license under the Secondary IP Rights in Goods, much less under the '794 patent,

2   which does not even fall into that category.

3        **3.**     **The Agreement Does Not Prohibit Filing Suit For Patent Infringement**

4        In its breach of contract counterclaim, Ariosa asserts that the "Agreement obligates

5   Illumina to refrain from asserting the '794 patent against Ariosa in connection with the

6   Harmony™ Prenatal Test." Ex. 23 ¶ 75.

7        Yet, the Agreement does not contain a covenant not to sue or any other provision

8   prohibiting Illumina from suing Ariosa on any patent. The Agreement does not require a meet and

9   confer between the parties, mediation, or any other pre-condition to filing suit. Thus, even if

10  Ariosa were arguably granted a license to the '794 Patent, nothing in the Agreement prohibits

11  Illumina from filing suit to enforce that patent. Therefore, the filing of a complaint cannot

12  constitute a breach of the Agreement. If Ariosa believes the Agreement provides it with a license,

13  its remedy is to assert a license defense, which it has asserted (and which fails for the reasons

14  discussed in this brief). Any issues regarding whether such a license exists under the Agreement

15  is resolved in Court in the context of the infringement analysis, but merely asserting a patent in

16  Court does ***not*** give rise to a separate claim for breach of contract—here by seeking $100 million

17  plus in damages—absent clear language in the Agreement prohibiting the filing of a lawsuit.

18       **B.**     **Ariosa's Alleged Damages Are Barred by the Parties' Agreement's To Limit
      Liability**
19

20       Ariosa must also show that there are ascertainable damages to Ariosa as the result of

21  Illumina's alleged failure to perform under the Agreement. *See* CACI Jury Instruction No. 303.

22  Ariosa cannot show any damages that are recoverable under the Agreement. This is an

23  independent ground to dismiss Ariosa's breach of contract claims.

24       Ariosa does not contend that it suffered any direct damages due to Illumina's alleged

25  breach. For example, it does not contend that it did not actually receive the Goods it ordered, or

26  that the Goods Illumina delivered were not of the quality promised. Rather, Ariosa seeks to

27  recover losses that would constitute special, indirect or consequential damages: lost proceeds or

28  lost business value that may have resulted from the canceled IPO, the cost of the IPO, lost profits

1  related to the failure to secure distribution partners, and costs associated with accelerating certain

2  products. *See* Ex. 23 ¶¶ 69-71.

3      But recovery of these types of damages is expressly precluded by Section 18 of the

4  Agreement, which provides:



15     A limitation of liability clause such as § 18—which was negotiated between two

16  sophisticated commercial entities—is valid and enforceable under California law.  *See* Cal.

17  Comm. Code § 2719(3) ("Consequential damages may be limited or excluded unless the limitation

18  or exclusion is unconscionable."); *CAZA Drilling (Ca.) Inc. v. TEG Oil & Gas U.S.A., Inc.*, 142

19  Cal. App. 4th 453, 467 (2006); *Markborough California, Inc. v. Superior Court*, 227 Cal. App .3d

20  705, 714 (1991).  All the losses Ariosa claims—lost proceeds or lost business value that may have

21  resulted from the cancelled IPO, the cost of the IPO, lost profits related to the failure to secure

22  distribution partners, and costs associated with accelerating certain substitute products—are

23  expressly disclaimed in § 18, which precludes recovery ████████████████████████

24  ████████████████████████████████████████Ariosa's claimed damages are barred for this

25  reason.

26     Ariosa's claimed losses are barred for the additional reason that they constitute special and

27  consequential damages, which are also expressly disclaimed in § 18.  Under California law,

28  "[c]ontractual damages are of two types—general damages (sometimes called direct damages) and

special damages (sometimes called consequential damages)." *Lewis Jorge Const. Mgmt., Inc. v. Pomona Unified School Dist.*, 34 Cal. 4th 960, 968 (Cal. 2004).  General or direct damages are "those that flow directly and necessarily from a breach of contract, or that are a natural result of a breach." *Id.*  Special or consequential damages, on the other hand, are "those losses that do not arise directly and inevitably from any similar breach of any similar agreement.  Instead, they are secondary or derivative losses arising from circumstances that are particular to the contract or to the parties." *Id.*; *see also R.B. Matthews, Inc. v. Transamerica Transp. Services, Inc.*, 945 F.2d 269, 274 (9th Cir. 1991) ("Consequential damages are those damages which did not arise within the scope of [plaintiff's] transactions with [defendant], but which stemmed in a foreseeable way from losses incurred by [plaintiff] as a result of [defendant's] breach….The profits that [plaintiff] lost from its resale of the refurbished trailers are one form of consequential damages.").

It cannot be disputed that Ariosa's claimed losses did not "arise directly and inevitably" from any breach of a sale and supply agreement.  The measure of direct damages that would generally be available under such an agreement is obvious—the value of the goods promised to be supplied.  Section 18 expressly limits Illumina's total exposure to direct damages up to the amount it received from Ariosa under the Agreement.  Ariosa's claimed losses for collateral effects on its IPO prospects or ability to secure third-party distribution fall squarely within the ambit of § 18's exclusion of special and consequential damages.

Accordingly, under the express terms of the Agreement, Ariosa is not entitled to damages based on purported collateral losses of company value, profits, business, or costs attributable to substitute products, and Illumina is entitled to summary judgment; the entirety of Ariosa's damages claim.  *See, e.g.*, *Hebert v. Rapid Payroll, Inc.*, No. CV 02-4144 DT (PJWx), 2005 WL 6172659, at *7 (C.D. Cal. Feb. 9, 2005) (granting partial summary judgment where the contractual limitation of liability barred plaintiff from recovering lost profits); *Fi Teq Inc. v. Venture Corp.*, 169 F. Supp. 3d 948, 956 (2016) (same); *Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.*, 209 Cal. App. 4th 1118, 1127 (2012) (limitation of liability provision barred damages sought for alleged breach of contract); *Peregrine Pharm., Inc. v. Clinical Supplies Mgmt., Inc.*, No. SACV

1  12-1608 JGB ANx, 2014 WL 3791567, at *11 (C.D. Cal. July 31, 2014) (applying limitation

2  provision to breach of contract damages).

3      **C.      Ariosa Cannot Show That Illumina's Conduct Caused Its Damages**

4          Even if Ariosa was not faced with limitation of liability in § 18 of the Agreement, Ariosa's

5  breach of contract claim fails because Ariosa cannot show that its damages ***resulted from***

6  Illumina's alleged failure to perform under the Agreement. *See* CACI Jury Instruction No. 303.

7  Under California law, "[i]mplicit in the element of damage is that the defendant's breach caused

8  the plaintiff's damage." *Troyk v. Famers Group, Inc.*, 171 Cal. App. 4th 1305, 1352 (Cal. Ct.

9  App. 2009). "Causation of damages in contract cases, as in tort cases, requires that the damages

10  be proximately caused by the defendant's breach, and that their causal occurrence be at least

11  reasonably certain." *Vu v. California Commerce Club, Inc.*, 58 Cal. App. 4th 229, 233 (1997).

12          The theory of Ariosa's counterclaims is that Illumina's lawsuit stopped it from proceeding

13  with an IPO it had planned for spring of 2014. Ariosa flatly states in its counterclaims that as "a

14  result of Illumina's lawsuit, Ariosa's IPO could not proceed as planned and the IPO was

15  withdrawn." Ex. 23 ¶ 76. Ariosa made similar assertions to the Federal Circuit. *See, e.g.*, Ex. 46

16  at 11 n.4 ("Faced with a lawsuit from its sole supplier, Ariosa canceled that roadshow and did not

17  proceed with the Initial Public Offering.").

18

19

20

21

22

23  Ex. 27 at 240:5-10. Ariosa's claim that Illumina's lawsuit stopped Ariosa from proceeding with

24  its IPO forms the basis for the lion's share of damages that Ariosa claims in this case.

25          But Ariosa's claims that Illumina's lawsuit halted Ariosa's IPO have now been exposed as

26  false.

27

28

[redacted] The filing of the lawsuit did not cause Ariosa to hold off on its IPO.

Notably, within a few months of cancelling its IPO, Roche, a multi-billion dollar multi-national company, acquired Ariosa for $625 million. [redacted] This puts to rest any contention that Illumina's lawsuit caused Ariosa's business value to suffer or that Ariosa suffered any other damages by foregoing the IPO.

## IV. ARIOSA'S GOOD FAITH AND FAIR DEALING CLAIM

Ariosa claims Illumina breached the covenant of good faith and fair dealing in two ways: (1) "by filing the '794 patent infringement claim against Ariosa;" and (2) "by asserting pretextual claims of breach of the Agreement." *See* Ex. 23 ¶ 85. California recognizes a covenant of good faith and fair dealing in every contract. *Storek & Storek Inc. v. Citicorp Real Estate*, 100 Cal. App. 4th 44, 55 (2002). Ariosa's counterclaim for breach of the covenant of good faith and fair dealing, however, fails as a matter of law because Illumina's alleged unfair conduct is predicated on alleged obligations not contained within the Agreement's actual terms. Ariosa also cannot show that Illumina's alleged breach deprived Ariosa of the benefits of the Agreement.

---

[9] [redacted]

A.    **Ariosa Cannot Use the Implied Covenant of Good Faith And Fair Dealing To Rewrite Illumina's Obligations Under the Agreement**

Ariosa improperly attempts to use the implied covenant of good faith and fair dealing to rewrite the Agreement to prohibit Illumina from suing Ariosa and notifying Ariosa when it is in breach.  Under California law, however, "the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract."  *Inter–Mark USA, Inc. v. Intuit, Inc.*, No. C-07-04178 JCS, 2008 WL 552482, at *7 (N.D. Cal. Feb.27, 2008).  "[W]here an implied covenant claim alleges a breach of obligations beyond the agreement's actual terms, it is invalid."  *Roots Ready Made Garments v. Gap Inc.*, No. C 07-03363 CRB, 2008 WL 4078437, at *7 (N.D. Cal. Aug. 29, 2008).

The Agreement in no way obligated Illumina to refrain from suing Ariosa.  As described in Part III.A.3 above, the Agreement does not prohibit Illumina from filing a lawsuit to assert the '794 patent.  Likewise, the Agreement does not contain a covenant not to sue, a precondition to filing suit or any other provision prohibiting Illumina from suing Ariosa.  *See generally* Ex. 26.  Although Ariosa contends it has an affirmative license defense, this does not give it an affirmative action for breach of contract.  If it did, virtually every license dispute could be turned into a breach of contract claim based on the filing of an infringement suit – with boundless consequential damages arguments.  Without specific prohibitions in the Agreement precluding such conduct, the filing of a patent infringement action cannot be a proper ground for Ariosa's breach of good faith and fair dealing claim. *See Inter-Mark.*, 2008 WL 552482, at *6 ("In order to state a claim for breach of an implied covenant of good faith and fair dealing, the specific contractual obligation from which the implied covenant of good faith and fair dealing arose must be alleged.").

Likewise, the Agreement did not prohibit Illumina from notifying Ariosa if it believes Ariosa is in breach.  In fact, Illumina is required to do so by section 29(c)(ii) of the Agreement, which provides that ███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████Ex. 26 § 29(c)(ii).  The covenant of good faith and fair dealing cannot deprive a

party of rights expressly granted by the written terms of the contract.  *See Carma Developers (Cal.), Inc. v. Marathon Dev. California, Inc.*, 2 Cal. 4th 342, 374 (1992) ("[I]mplied terms should never be read to vary express terms .... As to acts and conduct authorized by the express provisions of the contract, no covenant of good faith and fair dealing can be implied which forbids such acts and conduct.").  Illumina's clear contractual right to act as it did rules out Ariosa's claim to the extent it is predicated on the Notices of Breach.  *See Song fi v. Google Inc.,* No. 14-cv-5080, 2015 U.S. Dist. LEXIS 75272, at *16-17 (N.D. Cal. June 10, 2015) ("[I]f defendants were given the right to do what they did by the express provisions of the contract there can be no breach.") (citations omitted).

**B.      Illumina Did Not Interfere With Ariosa's Right to Purchase Goods Under the Agreement**

As explained above in Parts III.A.1 and III.A.2, the Agreement did not grant Ariosa a license to any of the patents-in-suit.  Therefore, any contention that Illumina interfered with Ariosa's license rights in bad faith by asserting the '794 patent must fail.

Moreover, neither Illumina notifying Ariosa when it is in breach nor filing the '794 patent infringement action frustrated Ariosa's right to purchase the Goods under the Agreement. Illumina did not terminate the Agreement, nor Ariosa's right to purchase the Goods thereunder, until the Agreement expired by its terms in January 2015. *See* Ex. 25 (reminding Ariosa that the Agreement expires January 4, 2015, and providing notice that Illumina did not intend to renew the Agreement and will cease supplying the Goods upon its expiration).  Illumina continued to supply the Goods and Ariosa continued to purchase and receive them pursuant to the terms of the Agreement long after Illumina had sent the notices of breach and filed the lawsuit. *See id.*

Therefore, Ariosa's bargained-for benefit under the Agreement—i.e., purchasing and receiving the Goods for a three year period—was not disrupted by Illumina sending the notices of breach or filing this lawsuit.  Accordingly, the court should grant summary judgment in Illumina's favor on Ariosa's breach of good faith and fair dealing claims.  *See Roots Ready Made Garments,* 2008 WL 4078437, at *7 (granting defendant's motion for summary judgment on plaintiff's good faith and fair dealing claim).

1    Even beyond these points, the no license, damages limitation and causation analysis

2    regarding the breach of contract claim apply equally to this claim.

3                              **V.    ARIOSA'S LICENSE DEFENSE**

4        **A.    The Agreement Does Not Convey An Express or Implied License**

5    Ariosa's license defense on the '794 patent fails for the reasons set forth above in Parts

6    III.A.1 and III.A.2.  Ariosa also claims that it is licensed not just to the '794 patent but also the

7    other asserted patent in this case, U.S. Patent No. 8,318,430 ("the '430 patent").  This defense is

8    based on the same rationale as Ariosa's claim to an implied license to the '794 patent.  *See* Ex. 3

9    [Stuelpnagel Tr.] at 273:7-11; Exh. 24 [Ariosa First Supp. Resp. to Interrog. No. 38] at 23-24, 27.

10   Verinata originally asserted the '430 patent against Ariosa in November 2012—*after* the

11   Agreement was entered into and ***before*** Illumina even acquired Verinata.  *See* Dkt. No. 22. Thus,

12   Ariosa contends that the Agreement granted Ariosa a license to a patent that had not yet issued and

13   that Illumina would not even own until long after it issued.  Given the implausibility of this far-

14   fetched theory, it comes as no surprise that Ariosa can point to no language in the Agreement that

15   would provide it with an express or implied license to the '430 Patent.

16   As discussed above in Part III.A.2, the Agreement disclaims all implied licenses, so there

17   cannot be any license whatsoever to the '430 patent.

18       **B.    Any License Terminated Upon Expiration of the Agreement**

19   Even if the Court were somehow to conclude that there was a license grant in the

20   Agreement, any and all such licenses terminated when the Agreement ended in 2015 and Ariosa

21   ceased buying Goods from Illumina.  Any licenses in the Agreement are incident to Ariosa's

22   purchase of Goods from Illumina, and any claim that Illumina granted a perpetual license that

23   extended beyond the contract and Ariosa's use of the Goods is without basis.

24

25                              **VI.    CONCLUSION**

26   For the foregoing reasons, Illumina's motion should be granted.

27

28

1    Dated: September 1, 2017                         WEIL, GOTSHAL & MANGES LLP

2

3

4                                          By:  _____/s/ Edward R. Reines_____
                                                      Edward R. Reines
5                                               Attorneys for Plaintiffs and
                                                Counterclaim Defendants
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28