REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

1
IRELL & MANELLA LLP
David I. Gindler (117824)
2
dgindler@irell.com
Andrei Iancu (184973)
3
aiancu@irell.com
4
Sandra L. Haberny (260977)
shaberny@irell.com
5
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
6
Telephone:   (310) 277-1010
7
Facsimile:   (310) 203-7199

8
Attorneys for Defendant and
Counterclaim-Plaintiff
9
ARIOSA DIAGNOSTICS, INC.

10

11
UNITED STATES DISTRICT COURT

12
NORTHERN DISTRICT OF CALIFORNIA

13
SAN FRANCISCO DIVISION

| | |
|---|---|
| 14 VERINATA HEALTH, INC., | Lead Case No. 3:12-cv-05501-SI |
| 15 | Case No. 3:14-cv-01921-SI |
| Plaintiff and | Case No. 3:15-cv-02216-SI |
| Counterclaim-Defendant, | |
| 16 | |
| 17 vs. | **ARIOSA DIAGNOSTICS, INC.'S** |
| | **OPPOSITION TO PLAINTIFFS AND** |
| 18 ARIOSA DIAGNOSTICS, INC., | **COUNTERCLAIM DEFENDANTS** |
| | **ILLUMINA, INC. AND VERINATA** |
| 19 Defendant and | **HEALTH, INC.'S MOTION FOR** |
| Counterclaim-Plaintiff. | **SUMMARY JUDGMENT [D.I. 395]** |
| 20 ILLUMINA, INC., | |
| 21 | Judge:  Hon. Susan Illston |
| Plaintiff and Counterclaim- | |
| 22 Defendant | Date:      October 12, 2017 |
| | Time:     10:00 a.m. |
| 23 vs. | Ctrm.:     1, 17th Floor |
| 24 ARIOSA DIAGNOSTICS, INC., | |
| 25 Defendant and Counterclaim- | |
| Plaintiff. | |
| 26 | |

27

28

ARIOSA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

10290434

Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

| | |
|---|---|
| ILLUMINA, INC., | ) |
| | ) |
| Plaintiff and Counterclaim-Defendant | ) |
| | ) |
| | ) |
| vs. | ) |
| | ) |
| ARIOSA DIAGNOSTICS, INC., | ) |
| | ) |
| Defendant and Counterclaim-Plaintiff. | ) |
| | ) |
| | ) |
| | ) |

ARIOSA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

10290434

Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ........................................................................................ 1

II.  Illumina's Motion On ASSIGNOR ESTOPPEL SHOULD BE DENIED ........................ 2

    A.   Drs. Stuelpnagel And Oliphant's Invention Is Not Included In The '794 Patent ......................................................................................... 3

    B.   The Equities Weigh Against Estoppel ................................................. 9

III. ILLUMINA'S MOTION ON THE COUNTERCLAIMS SHOULD BE DENIED ......... 11

    A.   Factual Background ........................................................................ 11

        1.   Illumina's Investment in Ariosa ............................................... 11

        2.   The Ariosa-Illumina Sale and Supply Agreement ("SSA") .......... 12

        3.   Illumina Buys Verinata And Breaches Its Obligations To Ariosa ... 13

    B.   Illumina's Breach Of Contract ......................................................... 14

        1.   The SSA Licensed Ariosa To The '794 Patent ......................... 14

        2.   Ariosa Had An Express License To The '794 Patent ................. 17

        3.   Alternatively, Ariosa Has An Implied License to the '794 Patent ... 19

        4.   Illumina Breached Its License To Ariosa Under The '794 Patent By Suing For Patent Infringement ......................................... 22

        5.   Illumina Cannot Absolve Itself From Liability For Its Willful Injury To Ariosa ............................................................... 22

        6.   Illumina's Conduct Caused Ariosa's Damage ........................... 23

    C.   Breach of Covenant of Good Faith and Fair Dealing............................ 24

IV.  ILLUMINA'S MOTION ON ARIOSA'S Affirmative Defenses SHOULD BE DENIED .................................................................................................. 25

V.   CONCLUSION ....................................................................................... 25

ARIOSA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

10290434

- i -

Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

1

2

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

3

4

**Cases**

5
*Airis SFO, LLC v. City & Cty. of S.F.*,
   No. A121855, 2010 WL 3687508 (Cal. Ct. App. Sept. 22, 2010)............................................25

6

7
*BlueGem Sec., Inc. v. Trend Micro Inc.*,
   No. 09-1492, 2010 WL 11505702 (C.D. Cal. June 8, 2010) ....................................................22

8

9
*Brinderson-Newberg Joint Venture v. Pac. Erectors*,
   971 F.2d 272 (9th Cir. 1992)....................................................................................................21

10
*Civic Ctr. Dr. Apts. Ltd. v. S.W. Bell Video Servs.*,
   295 F. Supp. 2d 1091 (N.D. Cal. 2003) ...................................................................................22

11

12
*De Forest Radio Tel. & Tel. Co. v. United States*,
   273 U.S. 236 (1927) .................................................................................................................19

13

14
*Diamond Sci. Co. v. Ambico, Inc.*,
   848 F.2d 1220 (Fed. Cir. 1988)..............................................................................................2, 3

15
*Hebert v. Rapid Payroll, Inc.*,
   No. 02-4144, 2005 WL 6172659 (C.D. Cal. Feb. 9, 2005)......................................................23

16

17
*Inter-mark USA, Inc. v. Intuit, Inc.*,
   No. C-07-04178, 2008 WL 552482, at *7 (N.D. Cal. Feb. 27, 2008)......................................24

18

19
*Leading Edge Tech. Corp. v. Sun Automation, Inc.*,
   No. H-90-2316, 1991 U.S. Dist. LEXIS 20766 (D. Md. Sept. 24, 1991) ..................................8

20
*Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified School Dist.*
   34 Cal. 4th 960 (2004)..............................................................................................................23

21

22
*In re Longi*,
   759 F.2d 887 (Fed. Cir. 1985) ...................................................................................................7

23
*Med. Designs, Inc. v. Med. Tech., Inc.*,
   786 F. Supp. 614 (N.D. Tex. 1992)..........................................................................................10

24

25
*MedImmune, Inc. v. Centocor, Inc.*,
   409 F.3d 1376 (Fed. Cir. 2005), *vacated on other grounds*, 549 U.S. 1163
   (2007) .......................................................................................................................................22

26

27
*Mentor Graphics Corp. v. EVE-USA, Inc.*,
   No. 2015-1470, 2017 U.S. App. LEXIS 16854 (Fed. Cir. Sept. 1, 2017)
   (Moore, J., concurring)..........................................................................................................9, 10

28

ARIOSA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

10290434

- ii -

Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

*Q.G. Prods., Inc. v. Shorty, Inc.*,
  992 F.2d 1211 (Fed. Cir. 1993) ............................................................................3, 9

*Racine & Laramie, Ltd. v. Dep't of Parks & Recreation*,
  11 Cal. App. 4th 1026 (1992) .............................................................................24, 25

*Shamrock Techs., Inc. v. Med. Sterilization, Inc.*,
  903 F.2d 789 (Fed. Cir. 1990) .............................................................................3, 9

*Storek & Storek Inc. v. Citicorp Real Estate*,
  100 Cal. App. 4th 44 (2002) ................................................................................24

*Sutcliffe v. Wells Fargo Bank, N.A.*,
  283 F.R.D. 533 (N.D. Cal. 2012) ........................................................................21

*TransCore, LP v. Elec. Transaction Consultants Corp.*,
  563 F.3d 1271 (Fed. Cir. 2009) ..........................................................................22

*Trovan, Ltd. v. Sokymat Sa*,
  299 F.3d 1292 (Fed. Cir. 2002) ............................................................................8

*Virnetx Inc. v. Apple Inc.*,
  No. 6:12-CV-855, 2016 WL 1117604 (E.D. Tex. Mar. 22, 2016) ..........................9

*Waller v. Truck Ins. Exch., Inc.*,
  11 Cal. 4th 1 (1995) ............................................................................................24

*Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*,
  103 F.3d 1571 (Fed. Cir. 1997) ..........................................................................19

*Westinghouse Elec. & Mfg. Co. v. Formica Insulation Co.*,
  266 U.S. 342 (1924) .............................................................................................3

*Winbond Elec. Corp. v. ITC*,
  262 F.3d 1363 (Fed. Cir. 2001) ..........................................................................20

**Statutes**

25 U.S.C. § 116(a) ...................................................................................................9

35 U.S.C. § 116 ........................................................................................................8

35 U.S.C. § 121 ........................................................................................................7

Cal. Civ. Code § 1641 ............................................................................................21

Cal. Civ. Code §1668 .............................................................................................22

Cal. Civ. Code § 3360 ...........................................................................................23

ARIOSA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

10290434

- iii -

Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

1    **I.      INTRODUCTION**

2           In its arguments regarding assignor estoppel, Illumina fails to prove that the balance of

3    equities tips in its favor. Indeed, Illumina seeks to expand the doctrine far beyond what it was

4    intended to accomplish. Assignor estoppel exists to bar one who assigns rights to an invention

5    from later challenging the validity of that invention in derogation of the title assigned. Illumina

6    argues that U.S. Patent No. 7,955,794 (the "'794 patent") claims an invention that its former

7    employees, John Stuelpnagel and Arnold Oliphant, assigned to Illumina before they moved on to

8    work for Ariosa. But Ariosa has presented ample evidence that the issued claims of the '794 patent

9    do not recite the invention that Drs. Stuelpnagel and Oliphant assigned to Illumina—and that their

10   invention is in fact reflected in the claims of a different patent. Moreover, Ariosa has never used

11   the invention that Drs. Stuelpnagel and Oliphant assigned to Illumina. To bar Ariosa (as a privy)

12   from challenging the validity of the *different* invention claimed in the '794 patent would not

13   protect any equitable interest of Illumina. Yet it would be tremendously unfair to Ariosa. The

14   facts, which here must be viewed in the light most favorable to Ariosa, all weigh against applying

15   assignor estoppel.

16          Illumina's arguments regarding Ariosa's Counterclaims are also fatally flawed because

17   Illumina filed suit against Ariosa in breach of the rights Illumina granted to Ariosa.

18

19                                                      This included details on its DANSR library

20   preparation assay, which is an integral part of the Harmony test and which Illumina now accuses

21   of infringing the '794 patent. In January 2012, Ariosa and Illumina entered into a Sale and Supply

22   Agreement ("SSA"). The SSA included an express license to "Core" Illumina intellectual property

23   rights that "pertain to" Ariosa's use of Illumina's sequencers and reagents.

24

25

26

27                                                      Although the '794 patent issued seven months

28   before the SSA was signed, Illumina never suggested that Ariosa needed a license to the '794

ARIOSA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

10290434                                          - 1 -

Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

1  patent for its DANSR assay, which Illumina was well aware of based on the ███████

2  ███████████████ as recited in the SSA.

3      The Illumina-Ariosa relationship significantly deteriorated after Illumina acquired Ariosa's

4  competitor, Verinata, the following year. Now that Ariosa was a commercial adversary, and

5  knowing that Ariosa was dependent on Illumina as its sole supplier of sequencers and reagents,

6  Illumina began manufacturing pretextual claims that Ariosa breached the SSA. Then, the day after

7  Ariosa announced the pricing for its forthcoming IPO, Illumina sued Ariosa for infringement of

8  the '794 patent in breach of the rights it granted under the SSA.

9      In its motion for summary judgment on Ariosa's Counterclaims, Illumina argues that the

10  SSA conferred no rights to the '794 patent because that patent supposedly does not "pertain to"

11  Ariosa's "use" of Illumina's sequencers. Br.[1] at 9-11, 13-14. This remarkable argument flies in the

12  face of Illumina's own infringement contentions. Claim 1 of the '794 patent, the only independent

13  claim, recites a multi-step method. Illumina alleges that Ariosa infringed this method through its

14  use of Illumina's sequencers. Indeed, for version 1 of the Harmony test, Illumina's infringement

15  expert relies solely on Ariosa's use of Illumina's sequencers to meet steps (f) and (g) of the claim.

16  Ex. 40 (Cooper Rpt.) at ¶¶ 127, 136. To meet the other steps of the claim, he relies on Ariosa's

17  DANSR library preparation assay, *the purpose of which is to produce inputs to Illumina's*

18  *sequencers*. The notion that the '794 patent, as Illumina itself has interpreted it, does not "pertain

19  to" Ariosa's use of Illumina's sequencers is not credible, much less an issue that can be resolved

20  against Ariosa on summary judgment. Illumina's motion for summary judgment should be denied.

21  **II.    ILLUMINA'S MOTION ON ASSIGNOR ESTOPPEL SHOULD BE DENIED**

22      Assignor estoppel may, under certain circumstances, arise from the assignment of "rights

23  to [one's] inventions." *Diamond Sci. Co. v. Ambico, Inc.*, 848 F.2d 1220, 1226 (Fed. Cir. 1988).

24  Determining whether it applies, however, requires that a court balance the equities. *Id.* at 1225

25

26  [1] "Br." herein refers to Plaintiffs' memorandum, at D.I. 395. "Ex." herein refers to the exhibits (nos. 1-19) filed with the 9/1/2017 Declaration of Sandra L. Haberny, D.I. 404, 405 and 409, and

27  the exhibits (nos. 20-61) concurrently filed with the 9/15/2017 Declaration of Sandra L. Haberny In Support Of Ariosa Diagnostics, Inc.'s Oppositions To Plaintiffs And Counterclaim Defendants

28  Illumina, Inc. And Verinata Health, Inc.'s Motion For Summary Judgment And Illumina, Inc.'s Anti-SLAPP Motion.

ARIOSA'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT        Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI
10290434    - 2 -

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

1  ("Our analysis must be concerned mainly with the balance of equities between the parties"); *see*

2  *also Shamrock Techs., Inc. v. Med. Sterilization, Inc.*, 903 F.2d 789, 793 (Fed. Cir. 1990)

3  ("Assignor estoppel is an equitable doctrine … that is mainly concerned with the balance of the

4  equities between the parties.").

5       The Supreme Court has instructed that, in balancing the equities, "the scope of the right

6  conveyed in the assignment of patent rights before the granting of the patent 'is much less

7  certainly defined than that of a granted patent, and the question of the extent of the estoppel

8  against the assignor of such an inchoate right is more difficult to determine than in the case of the

9  patent assigned after its granting.'" *Diamond Sci.*, 848 F.2d at 1226 (quoting *Westinghouse Elec.*

10 *& Mfg. Co. v. Formica Insulation Co.*, 266 U.S. 342, 352-53 (1924)). Thus, "the range of relevant

11 and competent evidence in fixing the limits of the subsequent estoppel should be more liberal than

12 in the case of an assignment of a granted patent." *Id.* As the Federal Circuit has explained, the

13 Supreme Court "did not advocate a liberal definition of the invention in favor of the assignee."

14 *Q.G. Prods., Inc. v. Shorty, Inc.*, 992 F.2d 1211, 1213 (Fed. Cir. 1993). "Rather the Court

15 advocated admission of *more evidence* to determine carefully the limits of the estoppel . . . [i]n

16 other words, because the bounds of the invention are less certain, the Court recommended

17 consideration of *ample evidence* to define the assignor's representations." *Id.* (emphasis added).

18      Illumina has not presented "ample" undisputed "evidence" sufficient to tip the balance of

19 equities here. Illumina claims that "Ariosa is barred from challenging the validity of . . . the '794

20 patent[] pursuant to the doctrine of assignor estoppel." Br. at 1. But its factual bases for this are

21 hotly disputed. Illumina's arguments are also at odds with the policies underlying the doctrine—

22 and if granted, would work a tremendous injustice to Ariosa and stifle innovation and competition

23 in the non-invasive prenatal testing field. Illumina's motion should be denied.

24      **A.    Drs. Stuelpnagel And Oliphant's Invention Is Not Included In The '794 Patent**

25      Ariosa has put forth significant evidence demonstrating that Drs. Stuelpnagel and Oliphant

26 are not inventors of any of the '794 patent claims, which is an absolute requirement for assignor

27 estoppel to apply here. *See, e.g., Diamond Sci.*, 848 F.2d at 1226; Ex. 20 (Cantor Rpt.) at ¶¶ 337-

28 367. This disputed issue of fact alone is fatal to Illumina's motion.

ARIOSA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

10290434                                          - 3 -

Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

1    Drs. Stuelpnagel and Oliphant both testified that they are not inventors of the claims that

2    issued in the '794 patent. Ex. 22 (Stuelpnagel Tr.) at 123:8-11, 126:7-127:20; Ex. 23 (Oliphant

3    Tr.) at 245:7-249:8; Ex. 26 (Stuelpnagel Decl.) at ¶¶ 8-11, 14-15; Ex. 27 (Oliphant Decl.) at ¶¶ 8-

4    11, 14-15. Ariosa's expert, Dr. Charles Cantor, also confirmed that no documents, inventor

5    notebooks, or non-speculative testimony evidence an inventive contribution by Dr. Stuelpnagel or

6    Dr. Oliphant to the patent. Ex. 20 (Cantor Rpt.) at ¶¶ 353-356, 366; *see also* Ex. 24 ███████ at

7    127:5-24; 129:24-130:23; Ex. 25 ███████ at 161:11-24, 162:14-163:3, 163:24-164:6, 165:1-14.

8    Illumina contends that Drs. Stuelpnagel and Oliphant are properly named inventors on the

9    '794 patent claims because they came up with a "singular idea"—allele-specific extension-

10   ligation—which was allegedly an inventive contribution to the claims. Br. at 5. Illumina further

11   alleges that this "singular idea" is recited in claims 19 and 20. *Id.* at 4-5. But Ariosa's expert,

12   Dr. Cantor, carried out an inventorship analysis explaining why this "singular idea" of

13   Drs. Stuelpnagel and Oliphant is not recited in the '794 patent claims. Ex. 20 (Cantor Rpt.) at

14   ¶¶ 337-367. Drs. Stuelpnagel and Oliphant also have submitted declarations concurrently with this

15   Opposition explaining their allele-specific extension-ligation idea and why it is incompatible with

16   the subject matter claimed in the '794 patent. Ex. 26 (Stuelpnagel Decl.) at ¶¶ 2-14; Ex. 27

17   (Oliphant Decl.) at ¶¶ 2-14. Critically, the allele-specific extension-ligation method that Drs.

18   Stuelpnagel and Oliphant invented requires a "perfect complementarity" element that is absent

19   from, and antithetical to, the claims of the '794 patent. Ex. 26 (Stuelpnagel Decl.) at ¶¶ 4-7, 13

20   (explaining perfect complementarity requirement and incompatibility with the claims of the '794

21   patent); Ex. 27 (Oliphant Decl.) at ¶¶ 4-7, 13 (same); Ex. 20 (Cantor Rpt.) at ¶¶ 342, 344-345,

22   357-367 (same).

23   Illumina nevertheless attempts to bring Drs. Stuelpnagel's and Oliphant's allele-specific

24   extension-ligation invention into the scope of the '794 patent claims by alleging that it is

25   "synonymous with" the notion of "genotyping," and that the '794 patent claims cover

26   "genotyping." Br. at 5-8. This is a mischaracterization. Genotyping is a broad and generic concept.

27   Scientists have been practicing it for decades, and there are countless ways to do it. *See, e.g.*, Ex.

28   28 (Quackenbush Tr.) at 151:22-152:8. Drs. Stuelpnagel and Oliphant have never contended that

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

1  they invented "genotyping," nor has Illumina until now made such a broad and unsupportable

2  allegation.

3       Even if Drs. Stuelpnagel's and Oliphant's idea were a *form* of genotyping, it is not one that

4  is claimed in the '794 patent or the subject of asserted claims in this case. Illumina cites to

5  deposition testimony of Drs. Cantor and Stuelpnagel for the proposition that "the '794 patent

6  discloses genotyping embodiments," and therefore Drs. Stuelpnagel and Oliphant are inventors.

7  Br. at 7. But nothing about that testimony suggests that *allele-specific extension-ligation*, which

8  requires the *perfect complementarity* element as explained in Dr. Cantor's report and

9  Drs. Stuelpnagel's and Oliphant's declarations, is claimed in the '794 patent. Ex. 26 (Stuelpnagel

10 Decl.) at ¶¶ 2-13; Ex. 27 (Oliphant Decl.) at ¶¶ 2-13; Ex. 20 (Cantor Rpt.) at ¶¶ 342-345, 357.

11      Illumina also alleges that Drs. Stuelpnagel and Oliphant are inventors because they

12 contributed to Illumina's "GoldenGate" product, and GoldenGate is covered by the '794 patent.

13 Br. at 1-2, 3-4.[2] But Illumina's only support for this argument is the testimony of its expert and

14 another named inventor. *Id.* Illumina completely ignores the reports and deposition testimony of

15 Ariosa's experts demonstrating that GoldenGate does *not* embody the '794 patent. For example:

16    • Opinions and Testimony of Dr. Quackenbush: *See* Ex. 29 (Quackenbush Rpt.) at

17         ¶¶ 332-334 (explaining that GoldenGate uses allele-specific extension-ligation not

18         covered by the '794 patent); *id.* at ¶¶ 335-344; Ex. 28 (Quackenbush Tr.) at 145:23-

19         146:18 (testifying that Figure 13 of the '794 patent is a description of GoldenGate, but

20         is not covered by the '794 patent claims); *id.* at 147:5-149:14 (similar); *id.* at 245:3-

21

22 _____

   [2] From this, Illumina makes an insurmountable logical leap, asserting that assignor estoppel should

23 require Ariosa to "pay Illumina for the patented product it sells," because Ariosa allegedly
   "incorporated the GoldenGate technology." Br. at 1-2. This is both irrelevant and demonstrably

24 false. Illumina's own expert has opined that GoldenGate requires, among other things, allele-
   specific extension-ligation—which the accused Harmony test indisputably does not do. *See, e.g.*,

25 Ex. 40 (Cooper Rpt.) at ¶ 345 ("As the [GoldenGate] Assay Workflow document explains . . . the
   enzymes that are used to carry out this process include both a polymerase (for the extension) and

26 a ligase (for the ligation)."); Ex. 30 (GoldenGate Assay Workflow), at 1; Ex. 23 (Oliphant Tr.) at
   125:13-126:21 (explaining that GoldenGate uses "an extension by polymerase" for extension-

27 ligation, and that the Harmony DANSR assay "does not use a polymerase" or "have an analog to

28 the polymerase" to perform such extension).

ARIOSA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

10290434

- 5 -

Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

246:11 (describing particular features of the '794 patent claims not present in GoldenGate); *id.* at 252:1-253:4 (explaining that the '794 patent claims and GoldenGate are "very different assays"); *id.* at 252:24-253:4 (noting that "Illumina never licensed the '794 patent with the GoldenGate assay").

- <u>Opinions and Testimony of Dr. Cantor</u>: Ex. 31 (Cantor Tr.) at 25:18-22 (testifying that "GoldenGate[] is covered by a separate patent" than the '794 patent, and that "there is a fundamental difference" between the two); *id.* at 27:3-10 ("GoldenGate … [is] different from what's described in the '794" and listing differences); *id.* at 52:8-21 ("I think the GoldenGate assay is patentably distinct from what's in the '794…").

Illumina further points to an obviousness-type double patenting ("ODP") rejection and terminal disclaimer made during prosecution to support its argument. Br. at 6. Illumina contends that this ODP rejection and terminal disclaimer prove that Drs. Stuelpnagel and Oliphant are inventors of the '794 patent because they are also named inventors on U.S. Patent No. 7,582,420 (the "'420 patent") over which the ODP rejection and disclaimer were made. *Id.*; Ex. 64 ('420 patent) Illumina again ignores critical facts, including aspects of the prosecution history, and misapplies the law.

Illumina filed U.S. Patent Application No. 10/177,727 (the "'727 application")—the application from which the '794 patent ultimately issued—with 11 original claims, naming Drs. Stuelpnagel and Oliphant among others as inventors. Ex. 20 (Cantor Rpt.) at ¶ 339; Ex. 21 (Godici Rpt.) at ¶¶ 53, 55. Claims 1-3 and 10 are the claims that ultimately issued in the '794 patent. *Id.* Drs. Stuelpnagel and Oliphant testified that they made an inventive contribution to claim 5 of the original '727 application, but did not make an inventive contribution to (and therefore are not inventors of) claims 1-3 and 10 of that application. Ex. 22 (Stuelpnagel Tr.) at 173:19-174:8, 176:7-8; Ex. 23 (Oliphant Tr.) at 187:14-188:23, 263:17-23; Ex. 26 (Stuelpnagel Decl.) at ¶¶ 2-13, 15; Ex. 27 (Oliphant Decl.) at ¶¶ 2-13, 15. Drs. Stuelpnagel and Oliphant further testified that claim 5 is the claim that embodies their allele-specific extension ligation invention. Ex. 22 (Stuelpnagel Tr.) at 174:21-175:15, 176:12-23; Ex. 23 (Oliphant Tr.) at 264:13-265:1; Ex. 26 (Stuelpnagel Decl.) at ¶¶ 8-9, 15; Ex. 27 (Oliphant Decl.) at ¶¶ 8-9, 15. Notably, claim 5 is

ARIOSA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
10290434                                                                - 6 -

Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

nearly identical to claim 1 of U.S. Patent Application No. 60/341,827 (the "'827 application"), to which the '727 application claimed priority, and which names *only* Drs. Stuelpnagel and Oliphant as inventors. *See* Ex. 20 (Cantor Rpt.) at ¶¶ 339-342; Ex 33 ('827 application).

During prosecution of the '727 application, the USPTO made a restriction requirement on the ground that pending claims 1-3 and 10 recited an invention that is patentably distinct from that of claims 4-9 and 11 (which include claim 5).[3] Ex. 20 (Cantor Rpt.) at ¶ 348. Illumina withdrew claims 4-9 and 11, and prosecuted them as a separate application that issued as the '420 patent. *Id.* at ¶ 349. When Illumina did so, it removed from the '727 application (and the ultimately issued '794 patent) the only inventive contribution that Drs. Stuelpnagel and Oliphant made. *See* Ex. 26 (Stuelpnagel Decl.) at ¶¶ 2-14; Ex. 27 (Oliphant Decl.) at ¶¶ 2-14; Ex. 20 (Cantor Rpt.) at ¶¶ 350-367. The only patent that ended up including their invention is the '420 patent. *Id.*

Illumina ignores all of that, and simply contends that the later ODP rejection proves that Drs. Stuelpnagel and Oliphant must be inventors on the '794 patent. Br. at 6. But Illumina miscomprehends the import of an ODP rejection. "A double patenting rejection precludes one person from obtaining more than one valid patent for either (a) the 'same invention,' or (b) an 'obvious' modification of the same invention." *In re Longi*, 759 F.2d 887, 892 (Fed. Cir. 1985). Although two sets of claims may be deemed "not patentably distinct" for purposes of ODP, it does not follow that they are the *same* invention, with the *same* inventorship. Claim sets can be found "not patentably distinct" where, as here, one set is "an 'obvious' modification" of the invention claimed in the other. *Id.* As the Federal Circuit has explained, "[f]undamental to this [ODP] doctrine is the policy that the public should . . . be able to act on the assumption that upon the expiration of the patent it will be free to use not only the invention claimed in the patent but also *modifications or variants* which would have been obvious to those of ordinary skill in the art at the time the invention was made, taking into account the skill of the art and prior art other than the invention claimed in the issued patent." *Longi*, 759 F.2d at 892-93 (emphasis added).

---

[3] Patent examiners issue "restriction requirements" when a patent application claims more than one independent and distinct invention. This requires the applicant to choose only one of the multiple inventions to pursue in the patent application. The other inventions may be pursued in divisional applications. 35 U.S.C. § 121; Ex. 21 (Godici Rpt.) at ¶¶ 36, 44, 67.

ARIOSA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

10290434                                    - 7 -

Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

1    At best, the ODP rejection here shows that the '794 patent claims—"taking into account

2   the skill of the art and prior art other than the invention claimed in the issued ['420] patent"—

3   recite "modifications or variants which would have been obvious to those of ordinary skill in the

4   art at the time the invention was made." *See id.* But it does not prove that the '794 and '420

5   patents claim the same invention, or that Drs. Stuelpnagel and Oliphant are inventors of the claims

6   of the '794 patent. Moreover, that Illumina has never accused Ariosa of infringing the '420 patent

7   is telling proof that the '794 and '420 patents claim different inventions—particularly insofar as

8   the Harmony test is concerned.

9    Other courts have refused to apply assignor estoppel in analogous circumstances. For

10   example, in *Leading Edge Tech. Corp. v. Sun Automation, Inc.*, No. H-90-2316, 1991 U.S. Dist.

11   LEXIS 20766, at *21 (D. Md. Sept. 24, 1991), the court denied a summary judgment motion for

12   assignor estoppel on grounds that "material issues of fact exist concerning the identity between the

13   assigned invention and the invention or inventions claimed in the patents in suit." The *Leading*

14   *Edge* court held that, like here, the assigned invention and the asserted claims "although similar,

15   cannot be deemed identical as a matter of law," and thus the "[p]laintiff … failed to carry its

16   burden of demonstrating as a matter of law that the assigned invention is the same as that claimed

17   in the patents in suit." *Id.* at *22; *id.* at *22-23 (further holding that "[c]ompeting inferences can be

18   drawn from the complicated factual background" and "prosecution history" of the patents in suit).

19   The *Leading Edge* court thus denied the motion because "[w]hether the equities in the case are

20   sufficient to permit the application of assignor estoppel involves disputed questions of fact." *Id.*

21    Further, even assuming Drs. Stuelpnagel and Oliphant invented some subject matter

22   recited in the claims of the '794 patent (they did not), any claims embodying that subject matter

23   are not at issue in this case. The only invention they are alleged to have made is the allele-specific

24   extension-ligation technique. Illumina itself contends only that claims 19 and 20 of the '794 patent

25   recite an "extension-ligation" embodiment (although Illumina does not and cannot contend that it

26   is allele-specific). Br. at 4. Claims 19 and 20 have not been asserted in this case.

27    "Because co-inventors need not make a contribution to the subject matter of every claim of

28   the patent, 35 U.S.C. § 116, inventorship is determined on a claim-by-claim basis." *Trovan, Ltd. v.*

ARIOSA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
10290434
- 8 -
Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

1    *Sokymat Sa,* 299 F.3d 1292, 1302 (Fed. Cir. 2002) (citation omitted). Even if Drs. Stuelpnagel and

2    Oliphant were inventors on claims 19 and 20 of the '794 patent (they are not), it would not mean

3    they are inventors of the entire breadth of claim 1 from which those claims depend. *See Virnetx*

4    *Inc. v. Apple Inc*., No. 6:12-CV-855, 2016 WL 1117604, at *3 (E.D. Tex. Mar. 22, 2016) ("If the

5    inventive entity of an independent claim is accurate, a claim that depends from it may not have the

6    same inventive entity. *See* 25 U.S.C. § 116(a). For instance, an inventor may contribute to a patent

7    by conceiving a limitation that is only present in a dependent claim."). It would only mean that

8    they are inventors of a narrower embodiment not being challenged here.

9        For at least these reasons, genuine disputes of fact preclude summary judgment.

10       **B.      The Equities Weigh Against Estoppel**

11       Illumina's motion also fails because it attempts to mask the primary concern of the

12   assignor estoppel inquiry—which is "the balance of equities between the parties"—by misstating

13   the relevant authority. Br. at 2; *see also Shamrock*, 903 F.2d at 793. Illumina appears to argue that

14   assignor estoppel should apply by default to an assignor of a patent, or a company he founded,

15   with only two exceptions: where there is an "express reservation by the assignor of the right to

16   challenge the validity of the patent or an express waiver by the assignee of the right to assert

17   assignor estoppel." Br. at 2. This is not the law. If and when assignor estoppel applies is fact-

18   dependent, and requires a balancing of the equities based on those facts. *Shorty*, 992 F.2d at 1213.

19       The equities plainly weigh against assignor estoppel here. That is the only outcome

20   consistent with the policy underlying the doctrine: that "fair dealing should prevent [one] from

21   derogating from the title he has assigned." *Mentor Graphics Corp. v. EVE-USA, Inc.*, No. 2015-

22   1470, 2017 U.S. App. LEXIS 16854, at *9 (Fed. Cir. Sept. 1, 2017) (Moore, J., concurring).

23   Drs. Stuelpnagel and Oliphant do not contend that *their invention*—for which they assigned title—

24   has no value. An invalidation of the asserted claims would not nullify the invention for which

25   Drs. Stuelpnagel and Oliphant assigned title to Illumina. Even if Drs. Stuelpnagel and Oliphant

26   were deemed to have assigned title to claims 19 and 20 of the '794 patent (they should not be),

27   those dependent claims would survive this litigation, because their validity has not been

28   challenged. Thus, Drs. Stuelpnagel and Oliphant would not be derogating from any "title" that

ARIOSA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

10290434                                        - 9 -

Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

1   they assigned, and Illumina would still have the full benefit of the assignment for which it

2   bargained. Illumina loses nothing if assignor estoppel is not applied, but would gain an undeserved

3   windfall if it were applied.

4           It would be most unfair to Ariosa if it were estopped from challenging the invalid patent

5   claims assigned by *former co-workers* of Drs. Stuelpnagel and Oliphant, simply because *Illumina*

6   decided to improperly combine too many inventions into the same patent application. *See* Br. at 2-

7   3. Ariosa had no input into any of Illumina's patent prosecution decisions, and it would be

8   inequitable to bind Ariosa by them. Moreover, applying assignor estoppel to Ariosa would be

9   contrary to the purpose of the doctrine, which is to "prevent[] an individual and those in privity

10  with him from invalidating *his own invention*." *Med. Designs, Inc. v. Med. Tech., Inc*., 786 F.

11  Supp. 614, 617–18 (N.D. Tex. 1992) (emphasis added).

12          Drs. Stuelpnagel and Oliphant had in mind what they invented—allele-specific extension-

13  ligation—when they moved from Illumina to Ariosa. They did not develop any method that

14  employed that technique at Ariosa. Indeed, it is undisputed that Harmony does not use extension-

15  ligation at all. *See* footnote 2 *supra*. Moreover, Drs. Stuelpnagel and Oliphant were not the only

16  scientists who worked on developing Harmony at Ariosa. Ex. 23 (Oliphant Tr.) at 99:8-100:8; Ex.

17  35 (Sparks Tr.) at 59:1-65:15; Ex. 36 (Zahn Tr., 10/17/2014) at 344:4-345:20, 361:6-16, 363:13-

18  23, 366:22-367:2, 369:22-370:1, 390:6-13; Ex. 37 (Struble Tr., 10/31/2014) at 129:13-132:3. And

19  as Dr. Stuelpnagel testified, Ariosa's team designed something *different* than what he and

20  Dr. Oliphant invented at Illumina—

21                                                              Ex. 22 (Stuelpnagel Tr.) at 222:20-223:4.

22          Applying assignor estoppel here also would undermine public policy interests, including

23  by "interfer[ing] with employee mobility." *See Mentor Graphics*, 2017 U.S. App. LEXIS 16854,

24  at *7. If estoppel were to apply as broadly as Illumina urges, Drs. Stuelpnagel and Oliphant could

25  be precluded from developing a whole host of technologies anywhere other than in Illumina's

26  laboratories, simply because their former co-workers obtained invalid patents that cover them.

27  Moreover, applying assignor estoppel in this situation would encourage employers (like Illumina)

28  to be overly inclusive in combining inventions and naming inventors on patent applications in

ARIOSA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

10290434

- 10 -

Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

1  order to hamper the ability of their employees to leave and develop competing innovations. *See*

2  Ex. 22 (Stuelpnagel Tr.) at 170:5-8, 190:11-191:6 █████████████████████████████████

3  ████████████████████████████████████████████████████████████████████████████████████████.

4  **III.    ILLUMINA'S MOTION ON THE COUNTERCLAIMS SHOULD BE DENIED**

5         **A.    Factual Background**

6               **1.    Illumina's Investment In Ariosa**

7         In 2010, Ariosa (formerly known as "Tandem" and later as "Aria") ████████████

8  ████████████████████████████████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████████████████████████████████████

17 ████████████████████████ Ex. 48 ██████████████████ at ILMNA00241202-205;

18 Ex. 41 (Song Tr.) at 140:3-7, 142:15-143:3, 147:24-149:5, 155:7-169:25; Ex. 22 (Stuelpnagel Tr.)

19 at 220:12-232:1, 236:22-242:14. ████████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████████████████████████████████████

27 [4] Sequencing-based version 1 is the only version of Harmony for which Ariosa used Illumina's

28 sequencers, and thus the only version relevant to Ariosa's license claims on which its
   counterclaims are based. Accordingly, all references to Harmony in this section refer to version 1.

ARIOSA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

10290434                                          - 11 -

Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

1

2

3

4

5 The '794 patent is part of this patent family—indeed, Illumina contends it claims

6 the same invention. *See* Section II.A *supra*.

7 Ex. 49 (Naclerio Tr.) at 126:8-13.

8    **2.**  **The Ariosa-Illumina Sale And Supply Agreement ("SSA")**

9  In parallel, the parties began negotiating an SSA  The negotiations were

10 thorough and extensive. Ex 63 ( Email). The primary negotiators for Illumina were

11 Crane Harris, Director of Business Development, and Nick Naclerio, Senior VP for Corporate and

12 Venture Development, and for Ariosa, Ken Song, CEO, and John Stuelpnagel, Executive

13 Chairman. Ex. 42 (Harris Tr.) at 34:24-35:1. Jay Flatley, Illumina's CEO, was also involved. Ex.

14 68 (Flatley Tr.) at 176:23-177:10. Illumina drafted an initial Memorandum of Understanding

15 ("MOU"), which was converted into a draft SSA, which was then further negotiated, revised and

16 ultimately executed on January 4, 2012. Ex. 42 (Harris Tr.) at 137:22-138:1.

17

18 *Id.* at 193:3-10. Instead, Illumina broadly granted a license to

19

20

21

22

23

24

25

26

27 The SSA defines "Secondary IP Rights" as

28

ARIOSA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
10290434
- 12 -
Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

1

2

3                                                                          Nevertheless, Illumina did not

4  identify any Secondary IP Rights

5

6

7

8

9

10

11

12

13        "Core" and "Secondary" IP Rights in Goods together encompass the totality of "Illumina

14  Intellectual Property Rights that *pertain to the Goods (and use thereof)*."

15              **3.      Illumina Buys Verinata And Breaches Its Obligations To Ariosa**

16        In January 2013, Illumina announced that it would acquire Verinata, a competitor of

17  Ariosa. Ex. 43 ("Illumina to Acquire Verinata for up to $450M," GenomeWeb). Ariosa's

18  exclusive supplier had now become a direct competitor. Troubled by this development, Ariosa

19  immediately met with senior Illumina officials, who assured Ariosa that Illumina would continue

20  to honor its commitments under the SSA. Ex. 49 (Naclerio Tr.) at 80:3-20.

21        These assurances proved hollow. Instead, Illumina began to assert that Ariosa was

22  breaching the SSA by reporting fetal sex to customers. Ex. 65 (2/8/2013 Email); Ex. 51

23  (1/10/2014 Letter).

24

25                        a protocol expressly permitted under the SSA

26                                *See* Ex. 44 (SSA) at § 1 ("Customer Field of Use" defined as "cell-free

27  detection of fetal chromosomal aneuploidies having a length greater than one megabase …"); Ex.

28  66 (2/5/2013 Email); Ex. 48                        at  ILMNA00241208

ARIOSA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
10290434                              - 13 -

Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

In late 2013, Ariosa began preparing for an IPO to raise capital and expand its business. Ex. 41 (Song Tr.) at 189:11-190:6.

Within hours of that announcement, Illumina sent a letter to Ariosa stating that it was revoking all previous offers to amend the SSA and reserved its right to terminate the agreement. Ex. 52 (4/24/2014 Letter). The letter made no mention of the '794 patent, nor indicated any need for Ariosa to license the patent. *Id.* The next day, Illumina filed the '794 patent infringement action and issued a press release to maximize the public impact. Ex. 60 (Illumina Press Release). The timing of Illumina's actions was not a coincidence. Illumina intended to, and did, disrupt Ariosa's plans to launch an IPO by threatening to terminate the SSA and asserting a claim for infringement at precisely the moment Ariosa announced pricing for its IPO. Now embroiled in a patent infringement suit brought by its sole supplier, Ariosa was forced to cancel its IPO and was ultimately purchased by Roche. Ex. 61 (Roche Media Release).

**B.     Illumina's Breach Of Contract**

**1.     The SSA Licensed Ariosa To The '794 Patent**

As noted above, under the SSA, "Core" and "Secondary" IP Rights in Goods together encompass all "Illumina Intellectual Property Rights that pertain to the Goods (and use thereof)."

ARIOSA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
10290434

- 14 -

Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

1  Ex. 44 (SSA) at § 1. Thus, with respect to all "Illumina Intellectual Property" that "pertain[s] to

2  the Goods (and use thereof)" in the "Customer Field of Use," the SSA grants Ariosa ████

3  ████████████████████████████████████████████████████████████████████

4  ████████████ There can be no dispute the '794 patent was "Illumina Intellectual Property" as

5  of the effective date of the SSA. *See* Case No. 3:14-cv-01921, D.I. 1, at ¶¶ 3, 12-13 ████

6  ████████████████████████████████████ Ex. 44 (SSA) at Ex. A. And in its motion,

7  Illumina makes no argument, nor could it credibly do so, that Harmony is outside the "Customer

8  Field of Use."

9      Thus, the central question presented in Illumina's motion is whether the '794 patent

10  "pertains to" Ariosa's "use" of Illumina's HiSeq sequencer and reagents in connection with the

11  Harmony test. If it does, then Ariosa either had an express license to the patent (as "Core IP Rights

12  in Goods") or an express representation ██████████████████████████████████

13  ████████████████████████████████████ Either way, Illumina wrongfully

14  sued Ariosa on a patent to which it was expressly granted rights. Illumina contends that the '794

15  patent is ██████████████████████████ does not "pertain to" Ariosa's use

16  of Illumina's sequencers. Illumina's own infringement theory refutes that argument.

17      As noted above, ████████████████████████

18  ████████████████████████████████

19  ████████████████████████████████

20  ████████████████████████████████

21  ████████████████████████ The figure to the right is an "assay system overview" for the

22  Harmony test from Ariosa's ████████████. Ex. 48 at

23  ILMNA00241208. As depicted, the Harmony test included "target region

24  enrichment" followed by "detection (sequencing)." ████████████████

25  ████████████████████████████ about its "target region enrichment," which

26  comprises the accused DANSR assay.

27      Claim 1 of the '794 patent, the only independent claim in the patent, recites a method for

28  "determining whether a sample contains at least 100 different target sequences," comprising steps

ARIOSA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

10290434

- 15 -

Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

1   (a) through (g). In its infringement contentions and expert report, Illumina claims that aspects of

2   Ariosa's "target region enrichment" process and "detection (sequencing)" process, *using Illumina'*

3   *sequencers*, together satisfy method steps (a) through (g) of the '794 patent. In particular,

4   Illumina's infringement expert, Dr. Cooper, contends that Ariosa uses an Illumina sequencer to

5   "determin[e] whether a sample contains at least 100 different target sequences"—the very purpose

6   of the claimed method—and *relies solely on Ariosa's use of Illumina's sequencers* to meet steps

7   (f) and (g) of the claim. Ex. 40 (Cooper Rpt.) at ¶¶ 127, 136-139.

8        Step (f) requires immobilizing different amplicons to a "second solid support." Dr. Cooper

9   contends Ariosa practices this step by "sequencing on an Illumina HiSeq instrument." *Id.* at ¶ 127.

10  Specifically, Dr. Cooper contends that "an Illumina flow cell is the 'second solid support' to

11  which the amplicons are immobilized" in Harmony, version 1. *Id.* As his evidence, Dr. Cooper

12  cites *Illumina's own documentation* produced in this case, titled "Illumina Technology Spotlight:

13  Illumina® Sequencing" *Id*. Step (g) claims a "detecting" step, which Dr. Cooper equates with

14  "sequencing" using Illumina's sequencers. He explains that, after Ariosa immobilizes amplicons

15  on an Illumina flow cell, "the sequence identities of each amplicon are read via Illumina

16  sequencing chemistry." *Id.* at ¶ 136. Illumina's infringement contentions likewise rely on Ariosa's

17  use of Illumina's sequencers for these claim steps.[5]

18       To meet the other steps of the claim, Dr. Cooper relies on Ariosa's target region

19  enrichment, which comprises the DANSR library preparation assay. As Ariosa's "assay system

20  overview" diagram (above) depicts, this assay provides the input to the Illumina sequencer.

21  According to Dr. Cooper, it is precisely the DANSR assay's enrichment and amplification—the

22  purpose of which is to produce amplification products for ultimate sequencing in an Illumina

23

---

24  [5] Ex. 14 (6/20/2014 Patent L.R. 3-1 Discl., D.I. 405-20) Appx. A, pp. 10-13 (alleging infringement

25  of claim element 1(f) using Illumina "TruSeq v2 SR flow slide" and "TrueSeq v2 SR cluster-kit-flow-cell (Illumina)," referencing Illumina technical document "Technology Spotlight: Illumina

26  Sequencing" as evidence); *id.* at pp. 13-14 (alleging infringement of element 1(g): "The slide was processed on an Illumina HiSeq 2000 …," "The Accused Products perform this function by

27  processing the slide on an Illumina sequencer to identify the sequences of the different amplicons or complements of the different amplicons immobilized to the slide … to determine that the

28  sample contains at least 100 different target sequences."); Ex. 1 ('794 patent, D.I. 404-01) 69:8-12.

ARIOSA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

10290434                                          - 16 -

Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

1  sequencer—that Illumina contends practices the other steps of the '794 patent. *See, e.g. id.* at

2  ¶¶ 77, 82-106 , 116, 121-125.

3  Moreover, Ariosa's experts explained in their reports that in this field, it is necessary to

4  enrich and amplify DNA, as Harmony does in the DANSR assay, before it can be sequenced. Ex.

5  29 (Quackenbush Rpt.) at ¶¶ 74, 85; Ex. 20 (Cantor Rpt.) at ¶¶ 89; *see also* D.I. 398, at 3-7, for

6  technical background. Without this enrichment and amplification, "use" of "the Goods" for

7  "detection of fetal chromosomal abnormalities … using DNA sequencing" would be impossible,

8  as there would not be enough material to sequence. *See* Ex. 44 (SSA) at §§ 1, 3(a).

9  Under Illumina's own infringement theory, the '794 patent clearly "pertains to" Ariosa's

10  "use" of the "Goods … in the Customer Field of Use." *Id.* at § 2. The express rights and

11  representations Illumina provided in the SSA thus licensed Ariosa to the '794 patent.

### 2.    Ariosa Had An Express License To The '794 Patent

13  As noted above, all Illumina IP Rights that pertain to the Goods are either "Core" or

14  "Secondary." "Core IP Rights" are defined negatively: "Illumina Intellectual Property Rights that

15  pertain to the Goods (and use thereof . . .) *other than Secondary Illumina IP Rights*." Illumina

16  maintains that the '794 patent "does not even fall under th[e] category" of "Secondary IP Rights."

17  Br. at 13-14. In fact, one of several required conditions for constituting a "Secondary IP Right" is

18  that the IP must pertain to the use of the Goods "only with regard to particular field(s) or

19  application(s)." Ex. 44 (SSA) at § 1. The '794 patent is not limited to particular fields or

20  applications. *See, e.g.,* Ex. 1, D.I. 404-01 ('794 patent) at 11:50-60 ("one standard array,

21  comprising a finite set of capture probes can be made and used in any application"). Thus, the

22  '794 patent should be classified as Core IP to which Ariosa was expressly licensed.

23  In arguing against an express license, Illumina resorts to misstating the actual terms of the

24  SSA. For example, Illumina states that

27  Instead, it broadly

28  provides that Core IP Rights in Goods need only "pertain to" use of such Goods.

ARIOSA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
10290434

- 17 -

Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

1

2

3      Illumina also argues that "only the Goods actually purchased under the agreement would

4  be covered by the grant of IP rights," whereas the '794 patent "does not cover the sequencing

5  equipment and reagents that Ariosa purchased under the Agreement." Br. at 9, 11. But under this

6  argument, all method patents, including but not limited to the '794 patent, would be excluded,

7  because method claims do not cover goods, only the use of goods.

8      In view of the actual words of the SSA, Illumina's only argument on summary judgment

9  against Ariosa's express license theory is that the '794 patent does not "pertain to" Ariosa's "use"

10 of Illumina's sequencers. But that fails for the reasons set forth in the prior section.

11     Ariosa's express license theory is further supported by the testimony of Crane Harris,

12 Illumina's chief negotiator for the SSA and 30(b)(6) witness on this topic. During negotiations,

13 Ariosa asked Illumina

14

15

16

17                                                                    *Id.* (emphasis

18 added). Thus, after reviewing the Harmony test,

19

20                        This further confirms that Ariosa was expressly licensed to the '794 patent.

21     Finally, Illumina relies on a snippet of testimony from Dr. Quackenbush, but that

22 testimony does not relate to the question at hand. Dr. Quackenbush, Ariosa's non-infringement

23 expert, was testifying that Ariosa does not *infringe* the '794 patent. He was never asked whether,

24 *under Illumina's infringement theory*, the '794 patent *pertains to* Ariosa's use of Illumina's

25 sequencers. That is the relevant question here. And the answer is plainly "yes."

26     Thus, Illumina is not entitled to summary judgment on Ariosa's express license claim.

27

28

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

1

        **3.**        **Alternatively, Ariosa Has An Implied License To The '794 Patent**

2            If Ariosa were not expressly licensed to the '794 patent as "Core IP Rights," then the '794

3 patent would necessarily fall within "Secondary IP Rights in Goods." In that event, Illumina's

4 express representations ███████████████████████ at minimum, provided Ariosa an

5 implied license to the '794 patent. "[A]n implied license merely signifies a patentee's waiver of

6 the statutory right to exclude others from making, using, or selling the patented invention." *Wang*

7 *Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1580 (Fed. Cir. 1997). The parties'

8 "entire course of conduct" is relevant. *Id.* at 1580-82. "No formal granting of a license is necessary

9 in order to give it effect. Any language used by the owner of the patent or any conduct on his part

10 exhibited to another, from which that other may properly infer that the owner consents to his use

11 of the patent in making or using it, or selling it, upon which the other acts, constitutes a license

12 … " *De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236, 241 (1927).

13            Here, an implied license can easily be inferred from Illumina's words and conduct. As

14 noted above, ████████████████████████████████████████████

15 ███████████████████████ Ex. 48 (██████████████. At that meeting, Ariosa

16 even called out the family to which the '794 patent belongs and stated that its DANSR assay

17 steered clear of the inventions disclosed in that patent family. *Id.* Not only did Illumina stay mum

18 at the meeting, Ex. 49 (Naclerio Tr.) at 120:11-21, it then represented █████████████

19 ████████████████████████████████████████████████

20 ████████████████████████████████████████████████

21 ████████████████████████████████████ (emphasis added).

22            The testimony of Naclerio, Illumina's Senior VP, makes an implied license even more

23 apparent here. ████████████████████████████████████████

24 ████████████████████████████████████████████████

25 ████████████████ Ex. 49 (Naclerio Tr.) at 120:11-21. Yet Illumina said nothing at the meeting

26 and ███████████████████████, which Naclerio himself executed on behalf

27 of Illumina. Ex. 44 (SSA) at p. 21. It was only after Illumina purchased Verinata that Illumina

28 thought about asserting the '794 ██████████████████████████████

ARIOSA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

10290434

- 19 -

Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

1  Ex. 49 (Naclerio Tr.) at 50:25-52:6, 120:11-21, 136:2-25, 140:6-8. Based on Naclerio's

2  admissions, █████████████████████████████████████████████████████████

3  ██████████████ designed to lure Ariosa into believing that it would not face an infringement

4  suit under the '794 patent.

5      On this record, it was proper for Ariosa to infer that Illumina consented to Ariosa's

6  continued offering of Harmony as it previously disclosed to Illumina, without the need for an

7  additional, separate license to the '794 patent. Taken as a whole, the SSA was intended to enable

8  Ariosa to conduct and sell the Harmony test—its only product. Indeed, ████████████ Illumina

9  was an investor in Ariosa and thus had an interest in its success. In light of the parties'

10  relationship, █████████████████████ makes clear that Ariosa did not *need* any further

11  rights from Illumina for Harmony. Illumina thus "communicat[ed] that [Ariosa] will not be

12  disturbed by the plaintiff patentee in the activities in which the former is currently engaged."

13  *Winbond Elec. Corp. v. ITC*, 262 F.3d 1363, 1374 (Fed. Cir. 2001).

14      Illumina raises three counterarguments to Ariosa's implied license claim. First, Illumina

15  again argues that ███████████████████████████████████████████████████

16  ██████████████████████████████████████████████████████████████████████

17  █████████████ But this argument fails for all of the reasons set forth above.

18      Second, Illumina argues that ████████████████████████████████████████

19-28 (redacted)

24      Third, Illumina argues that ██████████████████

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

1

2

3

4

5

6         Illumina's interpretation

7

8                                                          Indeed, under Illumina's interpretation, it could

9   have immediately claimed that Ariosa was in breach of the SSA for failing to obtain a license to

10  the '794 patent, and could have sued Ariosa for infringement the next day. Such a bizarre

11  interpretation would render Illumina's assurance            a dead letter. Under California law, an

12  interpretation of a contract that would nullify one of the contract's provisions is rarely if ever

13  correct. *See e.g.*, *Sutcliffe v. Wells Fargo Bank, N.A.*, 283 F.R.D. 533, 551 (N.D. Cal. 2012)

14  (applying California law in part and rejecting a proposed interpretation that would "nullify other

15  express provisions" of an agreement); *Brinderson-Newberg Joint Venture v. Pac. Erectors*, 971

16  F.2d 272, 278-79 (9th Cir. 1992) (applying California law, and noting "[i]t is well settled that a

17  contract should be interpreted so as to give meaning to each of its provisions"); Cal. Civ. Code

18  § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if

19  reasonably practicable, each clause helping to interpret the other.").[6]

20         In sum, under Illumina's own infringement contentions, the '794 patent pertains to

21  Ariosa's use of Illumina's sequencers. As a result, Ariosa was either granted an express license to

22  the '794 patent as "Core IP Rights" under § 3(a) of the SSA, or an implied license to the patent

23                                              in light of Illumina's overall conduct, statements and silence.

24  Either way, Illumina's patent infringement suit against Ariosa under the '794 patent was barred.

25

26

27

28
---

[6] None of the cases on which Illumina relies involved a party that provided express assurances that the other party did not need any further IP rights for its contemplated activity.

ARIOSA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

10290434                                      - 21 -

Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

1

### 4.   Illumina Breached Its License To Ariosa Under The '794 Patent By Suing For Patent Infringement

2

3      Illumina contends that because the SSA "does not contain a covenant not to sue," it could

4  not have breached the SSA. Br. at 14. This is false. "[A] license is, by its nature, an agreement not

5  to litigate. A licensor agrees to receive royalties or other consideration from the licensee in

6  exchange for a covenant not to sue or disturb the licensee's activities." *MedImmune, Inc. v.*

7  *Centocor, Inc.*, 409 F.3d 1376, 1379 n.1 (Fed. Cir. 2005), *vacated on other grounds*, 549 U.S.

8  1163 (2007); *see also TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1275

9  (Fed. Cir. 2009) ("As a threshold matter, a patent license agreement is in essence nothing more

10  than a promise by the licensor not to sue the licensee."). For the reasons explained above, Ariosa

11  either had an express or implied license to the '794 patent. In either case, the premise of Illumina's

12  argument—that "nothing in the Agreement prohibits Illumina from filing suit to enforce that

13  patent" (Br. at 14)—is wrong.

### 5.   Illumina Cannot Absolve Itself From Liability For Its Willful Injury To Ariosa

15      Illumina contends that § 18 should be interpreted so broadly that it precludes Ariosa from

16  obtaining *any* recovery. Br. at 14.

17

18

19      But if that were the case, then § 18 imposes a complete exemption

20  from liability. So interpreted, the SSA's requirement to supply Ariosa with Goods and provide IP

21  rights for three years is illusory. This renders § 18 unenforceable under Cal. Civ. Code §1668,

22  which provides that "[a]ll contracts which have for their object, *directly or indirectly*, to exempt

23  anyone from responsibility for his own . . . willful injury to the person or property of another . . .

24  are against the policy of the law." *BlueGem Sec., Inc. v. Trend Micro Inc.*, No. 09-1492, 2010 WL

25  11505702, at *7-8 (C.D. Cal. June 8, 2010) (emphasis in original); *id.* (striking limitation of

26  liability clause in contract case under section 1668 because it "effective[ly] exempt[s defendant]

27  from any true liability for wrongdoing."); *Civic Ctr. Dr. Apts. Ltd. v. S.W. Bell Video Servs.*, 295

28  F. Supp. 2d 1091, 1106 (N.D. Cal. 2003) (section 1668 applies to breach of contract claims;

ARIOSA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

10290434

- 22 -

Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

1   finding factual dispute whether limitation of liability provision was enforceable). The jury could

2   readily conclude that Illumina willfully injured Ariosa's business after Illumina became a

3   competitor with the acquisition of Verinata.

4          Even if § 18 were enforceable, it would merely impose a *cap* on damages. Section 18 states

5

6                                                          Ex. 44 (SSA) at § 18. Ariosa paid Illumina at least

7                         under the SSA. Ex. 59 (Yee Decl.) at ¶ 3. At a minimum, then, Ariosa may seek at

8   least                   in damages from Illumina under its counterclaims. Illumina's cited authority is

9   in agreement. *Hebert v. Rapid Payroll, Inc.*, No. 02-4144, 2005 WL 6172659, at *7 (C.D. Cal.

10  Feb. 9, 2005) (limitation of liability clause "limits Plaintiff's claimable damages to the amount of

11  payments made by Plaintiff to [defendant]") (emphasis added).

12         Finally, without any basis, Illumina claims that Ariosa is only seeking consequential

13  damages. That is not true. Ariosa has alleged direct damages as a result of Illumina's breach.

14  Direct damages are damages "that flow directly and necessarily from a breach of contract, or that

15  are a natural result of a breach." *Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified School Dist.*

16  34 Cal. 4th 960, 968 (2004). Ariosa paid Illumina                   under the SSA. But Ariosa had to

17  abandon the Illumina Goods after Illumina breached the license it granted Ariosa by suing Ariosa

18  for its use of those very Goods. Illumina's breach thus deprived Ariosa the benefit of its

19       bargain under the SSA. Illumina's breach also caused Ariosa direct damages in the form of

20  the costs Ariosa incurred to accelerate its switch to a different platform. These are all plainly

21  recoverable forms of direct damages flowing directly from the breach.[7] *See id.*

22              **6.     Illumina's Conduct Caused Ariosa's Damage**

23         Illumina also misrepresents the events surrounding its scuttling of Ariosa's IPO. Illumina

24  argues that Ariosa                                                          . Br. at

25  18. Not so. Illumina conflates the effects of two of its own separate breaches. On April 24, 2014,

26

27  ───────────────────────
    [7] Even had Ariosa not suffered quantifiable damages—which it certainly has—it would be entitled
28  at minimum to nominal damages. *See* Cal. Civ. Code § 3360 ("When a breach of a duty has
    caused no appreciable detriment to the party affected, he may yet recover nominal damages.").

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

1   Illumina sent a letter to Ariosa accusing it of breach and indicating that it may terminate the SSA

2   prematurely. Ex. 52 (4/24/2014 Letter) ███████████████████████████████████████████████

3   █████████. As discussed in the next section, this accusation breached Illumina's obligations

4   under the covenant of good faith and fair dealing. ████████████████████████████████████

5   █████████████████████   Ex. 58 (Gilliam Tr.) at 123:4-12; Ex. 41 (Song Tr.) at 195:2-10.

6        The next day, Illumina sued Ariosa under the '794 patent in breach of its license grants to

7   Ariosa. Ariosa had no choice but to *cancel* the IPO in light of that lawsuit, as Ariosa's former

8   CEO, Ken Song, testified. He explained that the filing of the '794 patent lawsuit ███████████

9   ██████████████████████████████████████ (Ex. 41 (Song Tr.) at 200:8-17); *see also*

10  Ex. 58 (Gilliam Tr.) at 123:4-12, 155:8-10 (testifying that ███████████████████████████

11  █████████████████████████████████████████████████████████████████████████████████

12  ██████████████████████████████████   A patent infringement suit filed by Ariosa's sole

13  supplier, which would take years to resolve, made an IPO impossible for practical purposes.

14       **C.    Breach Of Covenant Of Good Faith And Fair Dealing.**

15       California law recognizes a covenant of good faith and fair dealing in every contract.

16  *Storek & Storek Inc. v. Citicorp Real Estate*, 100 Cal. App. 4th 44, 55 (2002). The covenant is

17  based on "the long-standing rule that neither party will do anything which will injure the right of

18  the other to receive the benefits of the agreement." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1,

19  36 (1995). Indeed, the covenant is useful in exactly situations as here, where a party to a contract

20  attempts to frustrate "the other party's rights to the benefits of the contract" even though they may

21  claim that the conduct does "not technically transgress[] the express covenants" of the contract.

22  *Racine & Laramie, Ltd. v. Dep't of Parks & Recreation*, 11 Cal. App. 4th 1026, 1031-32 (1992).[8]

23       Illumina contends that Ariosa cannot "rewrite Illumina's obligations under the agreement"

24  and argues that because the contract does not explicitly bar Illumina from bringing an

25  infringement action, it cannot be a violation of the covenant to do so. Br. at 19. But as discussed

26  _____

27  [8] None of the cases cited by Illumina suggest otherwise. In *Inter-mark USA, Inc. v. Intuit, Inc.*, the plaintiff's claim was dismissed because the parties did not have a contract and the plaintiff brought

28  a breach of contract claim *based* on the breach of good faith and fair dealing. No. C-07-04178, 2008 WL 552482, at *7 (N.D. Cal. Feb. 27, 2008). Here, Ariosa and Illumina had a valid contract.

ARIOSA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
10290434
- 24 -
Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

1  above in Section III.B.4 *supra*, the agreement *did* provide a covenant not to sue—the explicit or

2  implied license to the '794 patent. And even if Illumina were correct, this is the exact purpose of

3  the covenant of good faith and fair dealing—where a party attempts to "frustrate" the other party

4  through conduct that does not "technically" breach any express covenants, the conduct breaches

5  the covenant of good faith and fair dealing. *Racine & Laramie*, 11 Cal. App. 4th at 1031-32.

6      The SSA provided for more than just a simple transfer of sequencers and related

7  products—it also involved the transfer of IP rights needed to *use* those Goods in the Harmony test.

8  Indeed, the entire purpose of the SSA for Ariosa was to use the Illumina Goods to conduct and sell

9  the Harmony test. Through its pretextual assertions of breach culminating in its April 24, 2014

10  letter and its filing of the '794 patent litigation the very next day, Illumina plainly injured Ariosa's

11  rights to the benefits of the agreement. Illumina—which had become a competitor of Ariosa's

12  after acquiring Verinata—intentionally frustrated Ariosa's ability to use those Goods for the

13  Harmony test, for which Ariosa had bargained and paid Illumina ███████ Ex. 59 [Yee Decl.]

14  at ¶ 3. Illumina's actions clearly frustrated the purpose and intent of the SSA and were motivated

15  by Illumina's desire to drive Ariosa from the marketplace, rather than cooperate. *See Racine &*

16  *Laramie*, 11 Cal. App. 4th at 1031-32 (1993) (party breached covenant by frustrating purpose of

17  contract); *Airis SFO, LLC v. City & Cty. of S.F.*, No. A121855, 2010 WL 3687508, at *12 (Cal.

18  Ct. App. Sept. 22, 2010) (party breached covenant by undertaking actions that were "contrary to

19  the contract's purposes and the parties' legitimate expectations"). Thus, Ariosa is not rewriting

20  Illumina's obligations; it is seeking compensation for being deprived the benefits of the SSA.

21  **IV.   ILLUMINA'S MOTION ON ARIOSA'S AFFIRMATIVE DEFENSES SHOULD BE**
22  **DENIED**

23      For the same reasons stated above in Section III.B.1-3 *supra*, Illumina is not entitled to

24  summary judgment on Ariosa's express and implied license affirmative defenses to Illumina's

25  infringement claims under the '794 patent.

26  **V.   CONCLUSION**

27      For the reasons set forth above, Plaintiffs' motion for summary judgment should be denied.

28

ARIOSA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
10290434
- 25 -
Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI

REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL

1 │ September 15, 2017                              Respectfully submitted,

2 │                                                 IRELL & MANELLA LLP

3 │

4 │                                                 By:  */s/ Sandra L. Haberny*
   │                                                     ─────────────────────────
   │                                                     Sandra L. Haberny
5 │                                                     Attorneys for Defendant and Counterclaim-
   │                                                     Plaintiff ARIOSA DIAGNOSTICS, INC.

6 │

7 │

8 │

9 │

10 │

11 │

12 │

13 │

14 │

15 │

16 │

17 │

18 │

19 │

20 │

21 │

22 │

23 │

24 │

25 │

26 │

27 │

28 │

ARIOSA'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

10290434                                                                 - 26 -

Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI