IRELL & MANELLA LLP
David I. Gindler (117824)
dgindler@irell.com
Alan J. Heinrich (212782)
aheinrich@irell.com
Lisa S. Glasser (223406)
lglasser@irell.com
Sandra L. Haberny (260977)
shaberny@irell.com
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone:    (310) 277-1010
Facsimile:     (310) 203-7199

Attorneys for Defendant and
Counterclaim-Plaintiff
ARIOSA DIAGNOSTICS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| VERINATA HEALTH, INC., | Lead Case No. 3:12-cv-05501-SI |
| | Case No. 3:14-cv-01921-SI |
| Plaintiff and | Case No. 3:15-cv-02216-SI |
| Counterclaim-Defendant, | |
| | **ARIOSA DIAGNOSTICS, INC.'S,** |
| vs. | **NOTICE OF MOTION AND RENEWED** |
| | **MOTION FOR JUDGMENT AS A** |
| ARIOSA DIAGNOSTICS, INC., | **MATTER OF LAW UNDER RULE 50(b)** |
| | **AND MOTION FOR NEW TRIAL UNDER** |
| Defendant and | **RULE 59 ON ISSUES FOR WHICH** |
| Counterclaim-Plaintiff. | **PLAINTIFFS BORE BURDEN OF** |
| | **PROOF; MEMORANDUM IN SUPPORT** |
| ILLUMINA, INC., | |
| | Judge:  Hon. Susan Illston |
| Plaintiff and Counterclaim- | |
| Defendant | Hearing Date: April 6, 2018 |
| | Hearing Time: 9:00 am |
| vs. | Ctrm: 1, 17th Floor |
| ARIOSA DIAGNOSTICS, INC., | |
| | |
| Defendant and Counterclaim- | |
| Plaintiff. | |

1    ILLUMINA, INC.,                  )
                                          )

2             Plaintiff and Counterclaim-    )
            Defendant                 )

3                                           )

        vs.                                  )

4    ARIOSA DIAGNOSTICS, INC.,          )

5                                           )

            Defendant and Counterclaim-    )

6             Plaintiff.                 )

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page(s)**

NOTICE OF MOTION AND MOTION ............................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................... 1

I.    JMOL Of Non-Infringement, Or A New Trial, For Harmony V2 ...................... 1

    A.    Harmony V2 Does Not Practice Steps 1(a) And (b) Of The '794 Patent ................................................................................................................ 1

        1.    Ariosa Does Not Perform The "Providing" And "Contacting" Steps .................................................................... 1

        2.    There Is No Evidence That 100 Different Target Sequences Attach To A Bead, And Only *Thereafter* Hybridize To All Three Probes ...................................................................................... 2

            (a)    Undisputed Facts Concerning Harmony V2 ................... 3

            (b)    Dr. Cooper's Speculative Theory ................................... 3

            (c)    There Is No Evidence To Support Dr. Cooper's Theory ............................................................................ 4

        3.    Ariosa Is Entitled To A New Trial On Harmony V2 Infringement .................................................................................. 7

    B.    No Reasonable Jury Could Conclude That Harmony V2 Practices Steps 1(f) Or (g) Of The '794 Patent .......................................................... 9

        1.    Harmony V2 Does Not Literally Practice Steps 1(f) And (g) .................... 9

        2.    Harmony V2 Does Not Practice Steps 1(f) And (g) Under DOE .................................................................................................. 12

II.   The Court Should Grant JMOL Of Non-Infringement, Or A New Trial, For Harmony V1 .............................................................................................................. 15

    A.    Harmony V1 Does Not Perform Steps 1(a) And (b) Of The '794 Patent ................................................................................................................ 15

    B.    Harmony V1 Does Not Perform Step 1(f) Of The '430 Patent ............................ 16

III.  Ariosa Is Entitled To JMOL On Damages ........................................................ 19

    A.    There Is No Evidentiary Support For Damages On Harmony V2 ...................... 19

        1.    There Is No Evidence Every Harmony V2 Test Infringes ...................... 19

        2.    Plaintiffs' Damages Case Was Unmoored From Their Theory of Unintended, *De Minimis* Infringement ..................... 20

    B.    The Court Should Grant JMOL On All Damages, Or Grant A New

1

2

Page(s)

Trial, Because Plaintiffs Failed To Apportion ...................................................... 21

C.    Plaintiffs' Erroneous Lost Profits Case Skewed Damages .................................. 23

IV.    CONCLUSION ............................................................................................................. 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

4

**Cases**

5

*Am. Seating Co. v. USSC Grp., Inc.*,
    514 F.3d 1262 (Fed. Cir. 2008)................................................................................24

6

7

*Arthur A. Collins, Inc. v. N. Telecom Ltd.*,
    216 F.3d 1042 (Fed. Cir. 2000)..................................................................................5

8

9

*Chiron Corp. v. Genentech, Inc.*,
    363 F.3d 1247 (Fed. Cir. 2004)..................................................................................7

10

*Comark Commc'ns, Inc. v. Harris Corp.*,
    156 F.3d 1182 (Fed. Cir. 1998)................................................................................13

11

12

*Cordis Corp. v. Bos. Sci. Corp.*,
    658 F.3d 1347 (Fed. Cir. 2011)............................................................................7, 14

13

14

*Daubert v. Merrel Dow Pharms., Inc.*,
    509 U.S. 579 (1993)...................................................................................................7

15

*David Netzer Consulting Eng'r LLC v. Shell Oil Co.*,
    824 F.3d 989 (Fed. Cir. 2016)..................................................................................16

16

17

*Dawn Equip. Co. v. Ky Farms Inc.*,
    140 F.3d 1009 (Fed. Cir. 1998)................................................................................14

18

19

*Embrex, Inc. v. Serv. Eng'g Corp.*,
    216 F.3d 1343 (Fed. Cir. 2000)................................................................................21

20

*Ericsson, Inc. v. D-Link Sys., Inc.*,
    773 F.3d 1201 (Fed. Cir. 2014)................................................................................21

21

22

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
    879 F.3d 1299 (Fed. Cir. 2018)................................................................................21

23

*Generation II Orthotics Inc. v. Med. Tech. Inc.*,
    263 F.3d 1356 (Fed. Cir. 2001)................................................................................11

24

25

*Graver Tank & Mfg. Co. v. Linde Air Prods., Co.*,
    339 U.S. 605 (1950).................................................................................................14

26

27

*Kim v. ConAgra Foods, Inc.*,
    465 F.3d 1312 (Fed. Cir. 2006)..................................................................................5

28

*Koito Mfg. Co. v. Turn-Key-Tech, LLC*,
    381 F.3d 1142 (Fed. Cir. 2004)..................................................................................5

ARIOSA'S RULE 50(b) AND 59 MOTION ON ISSUES FOR WHICH
PLAINTIFFS BORE THE BURDEN OF PROOF

- iii -

Case No. 3:12-cv-05501-SI
Case No. 3:14-cv-01921-SI
Case No. 3:15-cv-02216-SI

*Lear Siegler, Inc. v. Sealy Mattress Co.*,
  873 F.2d 1422 (Fed. Cir. 1989) ................................................................................. 12

*Lucent Techs., Inc. v. Gateway, Inc.*,
  543 F.3d 710 (Fed. Cir. 2008) ..................................................................................... 6

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) ........................................................................... 19, 20

*Malta v. Schulmerich Carillons, Inc.*,
  952 F.2d 1320 (Fed. Cir. 1991) ................................................................................. 13

*Mars, Inc. v. Coin Acceptors, Inc.*,
  527 F.3d 1359 (Fed. Cir. 2008) ................................................................................. 25

*Montgomery Ward & Co. v. Duncan*,
  311 U.S. 243 (1940) ..................................................................................................... 8

*Murphy v. Long Beach*,
  914 F.2d 183 (9th Cir. 1990) ....................................................................................... 7

*nCube Corp. v. Seachange Int'l, Inc.*,
  436 F.3d 1317 (Fed. Cir. 2006) ................................................................................. 12

*NTP, Inc. v. Research in Motion, Ltd.*,
  418 F. 3d 1282 (Fed. Cir. 2005) ............................................................................. 1, 2

*Pharmastem Therapeutics v. Viacell, Inc.*,
  No. 02-148 GMS, 2004 WL 2898061 (D. Del. Dec. 14, 2004), *aff'd in relevant
  part*, 491 F.3d 1342 (Fed. Cir. 2007) ....................................................................... 20

*Pixion, Inc. v. Citrix Sys., Inc.*,
  887 F. Supp. 2d 881 (N.D. Cal. 2012) (Illston, J.) ................................................. 5, 6

*Tex. Instruments, Inc. v. Cypress Semiconductor Corp.*,
  90 F.3d 1558 (Fed. Cir. 1996) ............................................................................. 11, 13

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) ........................................................................... 23, 25

*VirnetX, Inc. v. Cisco Sys., Inc.*,
  767 F. 3d 1308 (Fed. Cir. 2014) ................................................................................. 21

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
  520 U.S. 17 (1997) ..................................................................................................... 14

*Warsaw Orthopedic, Inc. v. NuVasive, Inc.*,
  778 F.3d 1365 (Fed. Cir. 2015) ........................................................................... 24, 25

*Waymo LLC v. Uber Techs., Inc.*,

No. 17-00939 WHA, 2017 WL 5143890 (N.D. Cal. 2017) ........................................25

*Whitserve, LLC v. Comput. Packages, Inc.*,
   694 F.3d 10 (Fed. Cir. 2012) ....................................................................................5

**Rules**

Fed. R. Civ. P. 50(b) ....................................................................................................1

Fed. R. Civ. P. 59 .........................................................................................................1

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on April 6, 2018, at 9:00 am or as soon thereafter as the matter may be heard by the Honorable Judge Susan Illston in Courtroom 1, 17th floor of the United States District Court for the Northern District of California, 450 Golden Gate Ave, San Francisco, CA 94102, Defendant and Counterclaim Plaintiff Ariosa Diagnostics, Inc. ("Ariosa") hereby moves for renewed judgment as a matter of law ("JMOL") pursuant to Fed. R. Civ. P. 50(b) on issues for which Plaintiffs bore the burden of proof (infringement and patent damages) and for a new trial pursuant to Fed. R. Civ. P. 59. The jury verdict that Harmony Version 2 ("V2") infringes the '794 patent and that Harmony Version 1 ("V1") infringes the '794 and '430 patents, and the jury's damages verdict, are not supported by substantial evidence, and alternatively, are against the great weight of the evidence. Plaintiffs' presentation of misleading argument and multiple violations of Court orders also warrant a new trial on infringement and patent damages.

This Motion is based on this notice of motion and supporting memorandum of points and authorities, the testimony and evidence admitted at trial, all pleadings, exhibits, and records in this action, and such other evidence and argument as may be submitted to the Court in connection with this Motion or that the Court may take notice or otherwise consider.

**MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiffs prevailed on infringement based on a confusing and misleading trial presentation as well as speculative and conclusory expert testimony. The jury verdict and damages award are not based on substantial evidence, and, at minimum, are against the great weight of the evidence.

**I.     JMOL OF NON-INFRINGEMENT, OR A NEW TRIAL, FOR HARMONY V2**

The jury verdict that Harmony V2 infringes the '794 patent is not supported by substantial evidence. No reasonable jury could have found that Harmony V2 practices steps 1(a), (b), (f) and (g) of the '794 patent. Alternatively, Ariosa is entitled to a new trial on Harmony V2 infringement.

**A.     Harmony V2 Does Not Practice Steps 1(a) And (b) Of The '794 Patent**

**1.     Ariosa Does Not Perform The "Providing" And "Contacting" Steps**

To establish infringement of the '794 patent, Plaintiffs had the burden to prove Ariosa performs each step of Claim 1. *NTP, Inc. v. Research in Motion, Ltd.*, 418 F. 3d 1282, 1318 (Fed.

1   Cir. 2005) ("[T]he use of a process necessarily involves doing or performing each of the steps

2   recited."). Steps 1(a) and (b) recite a "providing" step followed by a "contacting" step: (a) *first*

3   "*providing* a sample which may contain at least 100 different single-stranded target sequences

4   attached to a first solid support," and *then* (b) "*contacting* said target sequences with a probe set …

5   such that different double-stranded hybridization complexes are formed." Ex. 513 ('794 Patent) [1].

6   The Court ruled step 1(a) must be performed before step (b). Ex. A (Trial Tr.) 1855:7-13. The

7   undisputed evidence established that in V2, Ariosa does not perform the "providing" and

8   "contacting" steps of the '794 patent at all, much less as claimed in the recited order.

9         Instead of *providing* single-stranded target sequences *attached* to a first solid support and

10   then *contacting* said target sequences with a probe set, as Claim 1 requires, Ariosa starts the assay

11   by providing target sequences *unattached* to a solid support, and then contacts those *unattached*

12   target sequences with a probe set during a two-hour hybridization ("annealed DNA") step. Ex. 66

13   (Harmony V2 Standard Operating Procedure ("SOP")) at 14 (§ 13.4). Only then—*after* contacting

14   the unattached target sequences with a probe set—does Ariosa add the solid support (streptavidin

15   beads). *Id.* at 14 (§ 13.5). This was undisputed at trial. Plaintiffs' expert, Dr. Cooper, admitted that

16   "[i]n Version 2 of Harmony, the attachment step where the beads are added comes after the step

17   where the probes are added." Trial Tr. 1005:3-6; *id.*, 964:6-8 ("they first add the probes … they

18   allow that two hours to go, and then they introduce the streptavidin beads."). Ariosa does nothing

19   to "contact[]" single-stranded target sequences already attached to a solid support "with a probe

20   set." *Id.* As a result, Ariosa does not "perform[] each of the steps recited" in Harmony V2 and thus

21   does not infringe the '794 patent. *NTP, Inc.*, 418 F. 3d at 1318.

22

### 2.   There Is No Evidence That 100 Different Target Sequences Attach To A Bead, And Only *Thereafter* Hybridize To All Three Probes

23

24         Plaintiffs could not, as the law requires, base their infringement case on evidence that

25   Ariosa performs the recited steps, since Ariosa does not do so. Instead, Plaintiffs built an

26   infringement case around confusion, speculation, and the guesswork of their expert, Dr. Cooper.

27

28          [1] "Ex." refers to exhibits to the Declaration of Sandra L. Haberny, filed concurrently with and in support of Ariosa's Motions.

### (a)     Undisputed Facts Concerning Harmony V2

For each target sequence that Harmony seeks to analyze, the assay uses three distinct probes—a left, middle, and right probe—each with sequences complementary to adjacent parts of the target. Trial Tr. 953:4-5, 20-22 (Dr. Cooper). Harmony requires that all three probes hybridize to the target to carry out the next step, in which the three probes are all ligated (enzymatically joined) together. *Id.*, 1699:9-10 (Dr. Cooper) ("If they're not all three hybridized and in proximity, then the ligation can't be successful"). If even one of the three probes fails to hybridize, there is no ligation. *Id.* Importantly, the left and right probes include priming sites necessary for the next step after ligation, which is to amplify (copy) the ligation product. And if there is no product of ligation that can be copied, nothing can be detected in the later steps of the assay. As a result, all three probes must hybridize to the target for it ultimately to be detected. *Id.*, 1011:13-18 (Dr. Cooper) (to be detected, the targets would have to "hybridize to all three probes").

As noted above, in Harmony V2 there is an isolated two-hour hybridization step prior to the addition of any beads (solid support). Ex. 66 at 14 (§ 13.4); Trial Tr. 1004:15-18 (Dr. Cooper). During this hybridization step, the probes are added in significant molar excess as compared to the (unattached) target sequences: for every target sequence molecule, there are at least 10 million complementary probes. Trial Tr. 1070:1-2 (Dr. Oliphant) ("There are 10 million oligonucleotides for every target molecule in the DANSR test."). Only after the two-hour hybridization step, the beads are added. After that, the solution is washed to remove molecules that did not attach to beads. Ex. 66 at 14 (§ 13.5); Trial Tr. 972:13-16 (Dr. Cooper).

### (b)     Dr. Cooper's Speculative Theory

Testifying about the hybridization step as described in the Harmony V2 SOP (Ex. 66), Dr. Cooper admitted that the "***the goal of this*** is to put in and ***allow hybridization to occur before the solid support***." Trial Tr. 1003:14-19. Because the claim requires contacting with a probe set target sequences that are already attached to a solid support (the bead), it is undisputed that Harmony V2 was designed to perform the assay in a non-infringing manner. *See id.*, 1001:17-18 (Dr. Cooper) ("the probes are added; and the cartoon is illustrating that the goal is to achieve hybridization"). Despite these admissions, Dr. Cooper concocted an infringement theory based on speculation

1    about an admittedly unintended reaction as to what might have gone wrong during the

2    hybridization step and which involved, at most, a miniscule fraction of target sequences.

3         Specifically, Dr. Cooper speculated that "at least 100" single-stranded target sequences

4    (1) fail to hybridize with even one probe during the two-hour hybridization step, despite the ten

5    million-to-one ratio of probes to targets, and then attach to a bead as single-stranded sequences,

6    and (2) only then, *for reasons he never explained*, after failing to hybridize for two hours, the

7    targets hybridize to all three probes in the minutes before the solution is washed, and then carry on

8    to completion in the assay. Both conditions are required for infringement under Dr. Cooper's

9    theory; otherwise the probes complementary to the target sequences would not be ligated,

10   amplified, and ultimately detected, as required to complete the claimed method.

11                    **(c)      There Is No Evidence To Support Dr. Cooper's Theory**

12        Nearly all of Dr. Cooper's testimony on steps 1(a) and (b) for Harmony V2 focused on the

13   first condition—that at least 100 different target sequences fail to hybridize to a single probe

14   during the hybridization step, and then attach to beads as single-stranded sequences. This was a

15   sideshow. Even if Plaintiffs had actually proved that this happens (they did not), ***this would still***

16   ***not suffice to prove infringement.*** Plaintiffs also had to prove the second condition: that those

17   target sequences—which did not hybridize with a single probe during the two-hour hybridization

18   step—somehow hybridize with all three probes *after* attaching to a bead, and then proceed through

19   all of the numerous subsequent steps to finally be detected. This was a critical missing link in

20   Plaintiffs' theory: unless all three probes hybridize to the target sequence after it attaches to a bead

21   while single-stranded, the target would not be detected and hence there could be no infringement.

22        Dr. Cooper presented no evidence to support his theory that at least 100 different target

23   sequences *first* attach to a bead *and then hybridize to all three probes*—despite having failed to

24   hybridize to a single probe during the two-hour hybridization step. Tellingly, Dr. Cooper

25   conducted no experiments and offered no empirical data to support his conjecture. Instead,

26   Dr. Cooper showed the jury an animated video that Plaintiffs' litigation team created to dramatize

27   his theory, without any evidence that it actually occurs. Trial Tr. 1014:19-23. Dr. Cooper simply

28   stated, without support: "And then they allow continued time to proceed. And that would, in fact,

1    allow those now—those single-stranded fragments that are now attached to a solid support to

2    contact and hybridize with their oligos." *Id.*, 965:1-4. He offered no explanation as to why these

3    target sequences would fail to hybridize with any probe during the two hours before the beads are

4    added, but then suddenly hybridize to all three probes in the minutes thereafter before the wash.

5    He did not identify (nor could he) how many of these target sequences would hybridize with all

6    three probes after attaching to a bead. And he did not testify (nor could he) that such post-

7    attachment hybridization happens with every sample that Ariosa runs in Harmony V2.

8            When pressed at trial about his reliance on his made-up animation instead of actual lab

9    experiments to determine what actually occurs in Harmony V2, Dr. Cooper complained that "[he]

10   would have no capacity to get Ariosa's internal lab samples or products." *Id.*, 1014:17-18. This

11   excuse is unavailing. Plaintiffs' litigation decision not to request or test Harmony V2 lab samples

12   does not dispose of their obligation to produce actual evidence of infringement. *See Kim v.*

13   *ConAgra Foods, Inc.*, 465 F.3d 1312, 1320 (Fed. Cir. 2006) (affirming JMOL of no infringement

14   where expert "offered conclusory testimony that the additional ingredients would not have

15   materially affected the pertinent characteristics of the bread [but] did not support this

16   determination with any examinations or tests *of the actual accused products*.") (emphasis added).

17   Nor did Plaintiffs offer testimony from a single fact witness supporting Dr. Cooper's speculation.

18           This Court denied summary judgment to Ariosa regarding non-infringement by Harmony

19   V2 based on Plaintiffs' representation that Dr. Cooper would "base[] this conclusion on, inter alia,

20   the amount of cfDNA used in Harmony V2, the temperature applied, the mass of a DNA

21   nucleotide, the number of target sequences and their approximate length, and other witness

22   testimony." D.I. 517 at 29:13-21. At trial, Dr. Cooper wholly failed to do so. Dr. Cooper offered

23   no explanation—based on temperature, mass, number and length of sequences, or any other

24   conditions—for his conclusion that at least 100 target sequences will suddenly hybridize to all

25   three probes in the minutes after the beads are added. Instead, Dr. Cooper merely offered the

26   conclusory testimony quoted above, which does not amount to substantial evidence as a matter of

27   law. *See, e.g., Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 24 (Fed. Cir. 2012)

28   ("general and conclusory testimony is not enough to be even substantial evidence in support of a

1  verdict"); *Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1152 (Fed. Cir. 2004) (same);

2  *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1046 (Fed. Cir. 2000) ("[I]t is well

3  settled that an expert's unsupported conclusion on the ultimate issue of infringement is insufficient

4  to raise a genuine issue of material fact…."); *cf. Pixion, Inc. v. Citrix Sys., Inc.*, 887 F. Supp. 2d

5  881, 889-90 (N.D. Cal. 2012) (Illston, J.) (granting summary judgment of no infringement where

6  patentee "simply [] offer[ed] an opinion of an expert that states, in effect, that the critical claim

7  limitation is found in the accused device").

8      Finally, Dr. Cooper's testimony that at least 100 different target sequences will not

9  hybridize at all during the hybridization step was internally inconsistent with his conclusory

10 testimony that those same sequences will hybridize with all three probes after the beads are added.

11 To explain the first part of his theory, Dr. Cooper emphasized the difficulty of achieving

12 hybridization in V2 due to "the complexity of this reaction." *Id.*, 1674:11-12 ("But what we have

13 to keep in mind is the complexity of this reaction."); *id.*, 1673:3-8 ("so really it's a highly complex

14 mixture"); *id.*, 1674:14-1675:3 (same). In Dr. Cooper's telling, multiple conditions in Harmony

15 V2 conspire against hybridization: "loads of incorrect interactions," "random collisions," and an

16 "overwhelm[ing] concentration of the wrong probes." *Id.*, 968:16-19, 966:14-967:6, 1012:25-

17 1013:5. These alleged conditions led Dr. Cooper to the conclusion that the "reaction would be

18 relatively slow, because it takes a while in that soup of—that sort of messy soup—to get the

19 correct probe target pairing." *Id.*, 1675:7-10. This explanation stands in stark contrast to the

20 second part of Dr. Cooper's theory: that after allegedly failing to hybridize with even one probe

21 during the *two-hour* hybridization step, these at least 100 target sequences would suddenly

22 hybridize with all three of their respective probes in the *minutes* following addition of the beads.

23     The second part of Dr. Cooper's theory is irreconcilable with the first. If the hybridization

24 reaction is so complex and slow that at least 100 target sequences fail to hybridize with any probes

25 during the *two-hour* hybridization phase, as Dr. Cooper posits, why would these same target

26 sequences suddenly hybridize with all three probes in the *minutes* after attaching to a bead?

27 Dr. Cooper offered no explanation or theory whatsoever, and never even addressed this question.

28 His testimony on these issues was fundamentally inconsistent. In short, it is unproven that any

target sequence that failed *to hybridize with a single probe* during the two-hour hybridization step would then, after attaching to a bead, suddenly hybridize with all three cognate probes and proceed through the rest of the assay.

Dr. Cooper's speculative and inconsistent testimony—for which he cited no evidentiary support—cannot justify a finding of infringement. *See, e.g., Lucent Techs., Inc. v. Gateway, Inc.*, 543 F.3d 710, 722-24 (Fed. Cir. 2008) (affirming finding of no infringement as a matter of law where patentee's infringement evidence "established only uncertainty and speculation," expert "did not know at what rates" infringement occurred and "did not ever observe" infringement). Because there is no substantial evidence that Ariosa performs steps 1(a) and (b) of the '794 patent in Harmony V2, the Court should grant JMOL of non-infringement. *See Cordis Corp. v. Bos. Sci. Corp.*, 658 F.3d 1347, 1358 (Fed. Cir. 2011) ("find[ing] very little evidence to support the jury's verdict" of infringement and thus affirming JMOL of non-infringement).

### 3.    Ariosa Is Entitled To A New Trial On Harmony V2 Infringement

Alternatively, the jury verdict that Harmony V2 infringes the '794 patent is against the great weight of the evidence for all of the foregoing reasons. In addition, a new trial is particularly warranted given that Plaintiffs based their infringement case on testimony from Dr. Cooper that lacked any indicia of reliability. *See Daubert v. Merrel Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993). Dr. Cooper admitted his speculative theory about Harmony V2 infringement (1) has not been tested (Trial Tr. 1014:16-19); (2) does not find support in journals subject to peer review or publication (*id.*, 1010:10; Ex. B (Cooper Depo. Tr. 221:6-13)); (3) lacks any indication of what the potential error rate would be (Trial Tr. 1007:17-19, 1008:22; Ex. C (Cooper Depo. Tr. 227:11-24)); and (4) has not been generally used or accepted by the scientific community (Trial Tr. 1009:13-21). As a result, at minimum, Ariosa is entitled to a new trial on Harmony V2 infringement. *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1258 (Fed. Cir. 2004) ("A trial court should grant a motion for a new trial if ... the verdict is contrary to the great weight of the evidence.") (citing *Murphy v. Long Beach*, 914 F.2d 183, 186 (9th Cir. 1990)).

Ariosa is also entitled to a new trial because Plaintiffs introduced evidence on the doctrine of equivalents ("DOE") for steps 1(a) and (b) *in violation of the Court's prior rulings*. The Court

1  repeatedly ruled that Plaintiffs could not present a DOE theory for steps 1(a) and (b). *See* D.I. 329;

2  D.I. 417 at 37:2-6; Ex. D (Pretrial Conf. (Dec. 20, 2017) Tr.) 106:2-107:2. The Court also ruled

3  that Plaintiffs could not present expert testimony from the IPRs to argue DOE, and further ruled

4  that if Plaintiffs believe IPR testimony "is relevant to another issue, they shall request specific

5  relief ***prior to*** presenting such testimony." D.I. 547 at 6:12-13 (emphasis added).

6      Plaintiffs violated these rulings by improperly arguing equivalency for those steps—and

7  doing so by presenting IPR testimony without first seeking relief from the Court. *See, e.g.*, Trial

8  Tr. 1422:19-1423:4; *id.*, 1429:5-19 (reading Dr. Ward depo.) ("'[Q.] Could you explain what was

9  the basis of your testimony that it didn't matter whether you did Step A first or Step B first of

10 Claim 1 of the '794 patent?' … [A.] 'There's not a significant difference in both approaches.'").

11     Plaintiffs then compounded these violations by using the improperly-introduced IPR

12 testimony to represent as fact a known falsehood—namely, that Ariosa hired many experts who

13 disagreed with its non-infringement position prior to finding "Dr. Quackenbush [who] was the one

14 that would give [Ariosa] this testimony." Trial Tr. 1896:21-1897:12 (Plaintiffs' closing); *id.*,

15 1903:13-19 (Plaintiffs' closing) (misleading argument that Prof. Quackenbush's non-infringement

16 opinion was inconsistent with IPR testimony from Dr. Ward—whom counsel referred to as "one

17 of their experts that's off"—that had nothing to do with either version of Harmony; "We know

18 they had Dr. Ward as an expert. We know they paid Dr. Fu as an expert. Those two didn't show

19 up.") *id.*, 960:13-15 (Dr. Cooper testifying that he "reviewed deposition testimony from a Dr. Fu,

20 who—and I understand will not testify in this case, but was an expert witness for Ariosa"); *id.*,

21 1901:25-1902:2 (Plaintiffs' closing) ("By the way, you didn't hear any other experts that we

22 shopped around…"); *id.*, 1971:11-19 (Plaintiffs' closing) ("… Dr Ward, who you didn't see here,

23 because he's a former expert …"; "They – that wasn't the only one. Dr. Fu, another expert that

24 they shooed away…"). Plaintiffs were well aware that the IPR proceeding did not involve

25 questions of infringement and that Ariosa's IPR experts never even received any information

26 about the way in which either version of the Harmony test worked or works. *See, e.g.*, Trial Tr.

27 957:5-14. The Court's rulings should not be permitted to be so flagrantly violated. A new trial is

28 the only way to remove the taint of Plaintiffs' improper arguments and evidence.

1        A court may also grant a new trial upon "substantial errors in … instructions to the jury."

2    *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). Here, the jury instructions

3    included an improper DOE instruction indicating that DOE was available to all elements of the

4    '794 patent claims. *See* D.I. 622 at 7:3 (Ariosa's objection). But the Court expressly ruled on three

5    separate occasions that DOE was not available to Plaintiffs on the order of steps 1(a) and (b). *See,*

6    *e.g.*, D.I. 517 at 37. Given the impact of that error when coupled with Plaintiffs' counsel's

7    repeated violation of this Court's orders, a new trial should be granted.

### B.    No Reasonable Jury Could Conclude That Harmony V2 Practices Steps 1(f) Or (g) Of The '794 Patent

10        In addition to Plaintiffs' failure to prove that Harmony V2 practiced steps 1(a) and (b) of

11    the '794 patent, Plaintiffs also failed to present substantial evidence that Harmony V2 practices

12    steps 1(f) and (g) either literally or under DOE. These steps recite, respectively, "immobilizing

13    said different amplicons to a second solid support" and "detecting said different amplicons

14    immobilized to said second solid support, thereby determining whether the sample contains at

15    least 100 different target sequences." Ex. 513. Critically, both of these steps are required to be

16    performed with "*amplicons*."

17        The claimed "amplicons" are produced in step 1(e), which recites: "contacting said

18    modified probes with: (i) at least a first primer that hybridizes to said universal priming site;

19    (ii) NTPs; and (iii) an extension enzyme; *wherein said different modified probes are amplified and*

20    *forming different amplicons*." *Id.* (emphasis added). The Court construed the "modified probe"

21    being amplified as "an enzymatically altered polynucleotide which contains a universal priming

22    site and is capable of substantially hybridizing to a target sequence." D.I. 199 at 9. The Court

23    further construed "wherein said different modified probes are amplified and forming different

24    amplicons" as: "wherein the different modified probes are replicated, in whole or in part, to yield

25    amplification products of each of the different modified probes." *Id.* at 11. As a result, under the

26    Court's construction, whatever is replicated—whether in whole or part—is the recited "amplicon."

### 1.    Harmony V2 Does Not Literally Practice Steps 1(f) And (g)

28        The evidence uniformly confirms that in Harmony V2, there is no immobilization or

detection of "amplicons" as required by steps 1(f) and (g). First, the undisputed evidence is that in Harmony V2, each modified probe—"which contains a universal priming site and is capable of substantially hybridizing to a target sequence," *see* D.I. 199 at 9—is replicated **in whole**. *See, e.g.*, Trial Tr. 1072:14-1073:12 (Dr. Oliphant testimony that modified probes are replicated in whole in V2); *id.*, 1398:15-1400:5 (same testimony from Prof. Quackenbush). Dr. Cooper admitted that "Ariosa doesn't replicate only a part of the modified probe; Ariosa replicates the entire modified probe," and that what is amplified includes "two universal priming sites" and "sequence that's complementary to the target." *Id.,* 1623:19-1624:12; *id.*, 1027:16-1029:20 (same). Under the Court's construction, then, the claimed "amplicons" in Harmony V2 are copies of the entire modified probe, which is replicated *in whole*, including its universal priming sites and complementary target sequence.

It is also undisputed that, contrary to the requirements of steps 1(f) and (g), Harmony V2 does not "immobilize . . . amplicons" as construed by the Court. *See* D.I. 199 at 11. As Dr. Cooper admitted, in Harmony V2 "the amplicon is cut up … [a]nd most of it is thrown away." Trial Tr. 1030:2-24. Instead of immobilizing amplicons, Harmony V2 only immobilizes readout cassettes. *Id.*, 1624:23-1625:2 (Dr. Cooper) ("Q. Sir, the Readout Cassette is the only thing that's attached to the microarray. Correct? A. Yes."). Unlike amplicons, a readout cassette "lacks the universal priming site, and lacks the sequence that's complementary to the target sequence." *Id.*, 1030:17-24 (Dr. Cooper). Readout cassettes are created through the enzymatic *destruction* of amplicons *after* replication. Dr. Oliphant explained that a "restriction enzyme" "chop[s] up" what is produced by amplification, and only a "cassette" that "does not have a left universal PCR priming site or a right universal PCR priming site" is "appl[ied] to the array." *Id.*, 1074:17-1075:25; *id.*, 1374:18-1375:2, 1400:6-23 (same testimony from Prof. Quackenbush). Readout cassettes and amplicons are indisputably different. For example, Dr. Cooper himself admitted that "literal amplicons can be copied" in Harmony V2, whereas readout cassettes lack the priming sites required for copying. *Id.*, 1033:2-5, 1031:5-9; *id.* 1075:17-21.

In sum, amplicons—*i.e.*, copies of the modified probes, which are replicated *in whole* in Harmony V2—are never immobilized to a solid support. Instead, as Dr. Cooper again admitted,

1   "the Readout Cassette is the only thing that's attached to the [second solid support]," but "the rest

2   of the amplicon is destroyed." *Id.*, 1624:23-1625:2. As a result, there is no literal infringement

3   under the Court's claim constructions as a matter of law.

4        Plaintiffs' literal infringement case was based on an interpretation of "amplicon" that was

5   contrary to the Court's claim constructions. Dr. Cooper testified that, under his theory, an

6   "amplicon" is something that can be created *after* completion of the claimed amplification step

7   and *following* the enzymatic destruction of what was actually replicated during amplification. *Id.*,

8   1030:4-15; *id.*, 1624:23-1625:2. In contrast, the Court's construction makes clear that whatever is

9   replicated—in whole or in part—is the amplicon. Plaintiffs' attempt to replace this Court's well-

10  reasoned construction with Dr. Cooper's contrary interpretation fails and underscores why JMOL

11  is required here. *Tex. Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1564-65

12  (Fed. Cir. 1996) (expert testimony inconsistent with proper claim construction was *not* substantial

13  evidence to support jury verdict of literal infringement).

14       Finally, Ariosa is entitled to JMOL of non-infringement for Harmony V2 for the separate

15  and independent reason that it does not practice step 1(g), which requires "detecting said different

16  amplicons *immobilized to said second solid support*." Ariosa respectfully requests that the Court

17  revisit its claim construction ruling on this issue in its summary judgment order. D.I. 517 at 41-42.

18  The plain language of the claim requires that detection occur while the amplicons are

19  immobilized. The claim language was amended to add the highlighted language to the original

20  language simply requiring "detecting said amplicons." The added language must not be read out of

21  the claim. *Generation II Orthotics Inc. v. Med. Tech. Inc.*, 263 F.3d 1356, 1365 (Fed. Cir. 2001)

22  (construction may "not revise or ignore the explicit language of the claims"). It is undisputed that

23  in Harmony V2, detection occurs only after the readout cassettes—even assuming, contrary to the

24  facts, that they are amplicons—are removed from the array (second solid support). For example,

25  Dr. Cooper admitted that after the fluorescent probes are ligated to the array, the readout cassettes

26  are "no longer need[ed]" and are "wash[ed] away." Trial Tr. 982:9-13. Only then, after the readout

27  cassettes are removed from the array, is a "picture of this image" taken, which Dr. Cooper

28  identifies as satisfying the claimed "detecting" step. *Id.* Thus, the readout cassettes are not

1   immobilized to the array during the detecting step, and step 1(g) is not performed.

2   **2.    Harmony V2 Does Not Practice Steps 1(f) And (g) Under DOE**

3   Plaintiffs also failed to prove infringement of steps 1(f) and (g) under DOE. The evidence

4   at trial demonstrated that there are substantial differences between immobilizing readout cassettes

5   as done in Harmony V2 versus immobilizing amplicons as claimed in the '794 patent. The

6   function, way and result between the two could not be more different, as evidenced by the

7   undisputed testimony of Dr. Oliphant: Ariosa tried using both, and determined that immobilizing

8   amplicons **did not** work for Harmony V2, but immobilizing readout cassettes does. Asked if

9   Ariosa would "get data or any useful information at all" if Harmony V2 "immobilized the

10  amplicons rather than the cassettes," Dr. Oliphant testified, "No, it's not useful. We tried it. It

11  doesn't work." *Id.*, 1078:7-12; *id.*, 1076:22-1077:1 ("Q. Now, why go through all of this trouble?

12  Why not just apply the amplicon on the array? A. Well, you're right, it is trouble. And, in fact, it

13  would be easier if we could do that. ***But we tried it and it really doesn't work***."). Dr. Oliphant

14  detailed the significant differences between readout cassettes and amplicons in terms of their size,

15  kinetics and steric hindrance, and how those differences resulted in readout cassettes that worked

16  in Harmony V2 and amplicons that did not. *Id.*, 1076:22-1077:21; Ex. 1655.

17  Plaintiffs' expert, Dr. Cooper, did not dispute Dr. Oliphant's testimony that immobilizing

18  amplicons instead of readout cassettes did not work in Harmony V2. Trial Tr. 1625:3-19; *id.*,

19  1677:1-9. In light of these undisputed facts, no reasonable jury could find that a non-functional

20  "amplicon" is substantially the same as a functional readout cassette. They produce opposite

21  results—the latter works in Harmony V2, the former does not.

22  Faced with these undisputed facts, Plaintiffs built a DOE theory around conclusory and

23  irrelevant testimony from Dr. Cooper. First, Dr. Cooper merely rehashed his literal infringement

24  opinion under the guise of DOE. For example, asked whether there is "any similarity … between a

25  full amplicon and a cleaved amplicon that further supports" his opinion that they perform

26  substantially the same function, Dr. Cooper testified: "Yes, they're both amplicons, and they're

27  both DNA molecules that hybridize with similar kinds of properties." *Id.*, 1682:7-16. But this

28  merely assumes literal infringement—that readout cassettes and amplicons "are both amplicons."

1    Bootstrapping DOE to an opinion on literal infringement fails as a matter of law. "The evidence

2    and argument on the doctrine of equivalents cannot merely be subsumed in plaintiff's case of

3    literal infringement." *nCube Corp. v. Seachange Int'l, Inc.*, 436 F.3d 1317, 1325 (Fed. Cir. 2006)

4    (quoting *Lear Siegler, Inc. v. Sealy Mattress Co.*, 873 F.2d 1422, 1425 (Fed. Cir. 1989)).

5         Second, Plaintiffs solely relied on Dr. Cooper's conclusory testimony as to the alleged

6    similarity between amplicons and readout cassettes without providing the required "particularized

7    testimony and linking argument as to the 'insubstantiality of the differences.'" *Tex. Instruments*,

8    90 F.3d at 1567. For example, Dr. Cooper testified that amplicons and readout cassettes hybridize

9    with "similar kinds of properties," but he failed to identify those properties, much less demonstrate

10   the absence of any substantial differences with respect to those properties. Trial Tr. 1682:12-16.

11        To the contrary, Dr. Cooper's only testimony specifically addressing "properties" of

12   hybridizing shows that there *are* differences, and important differences at that. It is undisputed that

13   amplicons are substantially longer than readout cassettes in Harmony V2. *Id.*, 1075:8-10

14   (Dr. Oliphant) ("but the part that concerns us now is a part we'll call the 'cassette.' This is a small

15   fraction of the amplicon"); *id.*, 1624:23-1625:19 (Dr. Cooper) (acknowledging "rest of the

16   amplicon is destroyed" and no "reason to dispute [Dr. Oliphant's] testimony"). Dr. Cooper

17   admitted that "size" of an oligonucleotide would "be one important factor among a variety of

18   factors that ultimately dictate how" immobilization works in Harmony V2. *Id.*, 1033:18-1035:22.

19   He further testified that in fact one "would want to optimize" for this size effect. *Id.* But Dr.

20   Cooper did not explain, much less with the required particularity, why the size difference between

21   the small readout cassette and much longer amplicons would be insubstantial. Indeed, Dr. Cooper

22   admitted that he "do[es] not specifically explain or account for size difference in [his] doctrine of

23   equivalents argument," other than to make the conclusory statement that "it's an insubstantial

24   difference." *Id.*, 1035:17-22. But "mere generalized testimony as to equivalence is insufficient as a

25   matter of law to support a jury verdict finding infringement under the doctrine of equivalents."

26   *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1188 (Fed. Cir. 1998); *Malta v.

27   Schulmerich Carillons, Inc.*, 952 F.2d 1320, 1327 (Fed. Cir. 1991) (affirming JMOL of non-

28   infringement under DOE; rejecting "offhand and conclusory statements" as "not sufficiently

particularized evidence" to support "the technical issue of equivalency").

Dr. Cooper's testimony that readout cassettes and amplicons both "lead to substantially the same result" because they "lead[] to detection of the amplicons…" is equally conclusory. Trial Tr. 1682:22-1683:1. This is part and parcel of Dr. Cooper's theory that a readout cassette is equivalent to an amplicon because it serves as a "surrogate" for the amplicon. *Id.*, 979:21-980:6. But even if a readout cassette could be deemed a "surrogate" for an amplicon, it still must be substantially the same as an amplicon to fall under DOE. As discussed above, there are substantial differences between a readout cassette and an amplicon. Indeed, even Dr. Cooper does not dispute Dr. Oliphant's testimony that in Harmony V2, immobilizing amplicons did not work, but immobilizing readout cassettes did. *Id.*, 1625:3-19.

Third, Dr. Cooper relied on an irrelevant Ariosa patent application to support his DOE opinion. Ex. 727. Dr. Cooper pointed to claim 18 in that application, which recited immobilizing an entire amplification product (*i.e.*, an amplicon) to an array, and remarked that it is "hard to imagine that they would have claimed an invention that they knew didn't work." *Id.*, 1681:12-20. This was another sideshow. The issue for DOE is not whether immobilizing an actual amplicon would never work for any assay; instead, the issue is whether, in *the specific context of Harmony V2*, immobilizing readout cassettes "performs substantially the same function in substantially the same way to obtain the same result" as immobilizing amplicons as claimed. *Graver Tank & Mfg. Co. v. Linde Air Prods., Co.*, 339 U.S. 605, 608 (1950) (quotation omitted). Dr. Cooper in fact admitted that "Version 2 of Harmony doesn't use that Claim 18." Trial Tr. 1700:7-11. The law is clear that infringement by equivalence is to be determined by comparing the claimed elements of the patent *to the accused process*—not, for example, to alternative embodiments an accused infringer may have included in a patent application. *See, e.g., Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997) (under DOE, accused device "may … be found to infringe if there is 'equivalence' between *the elements of the accused product or process* and the claimed elements of the patented invention") (emphasis added); *Dawn Equip. Co. v. Ky Farms Inc.*, 140 F.3d 1009, 1015 (Fed. Cir. 1998) ("[T]o establish infringement under the doctrine of equivalents, the *accused device* must be shown to include an equivalent for each literally absent

1   claim limitation") (emphasis added).

2         In sum, no reasonable juror could find that Harmony V2 practices steps 1(a), (b), (f) or (g),

3   and the Court should grant JMOL of non-infringement for Harmony V2. *Cordis*, 658 F.3d at 1357

4   (affirming grant of JMOL of non-infringement; "[t]he question is not whether there is literally *no*

5   *evidence* supporting the unsuccessful party, but whether there is evidence upon which a reasonable

6   jury could properly have found its verdict."). At a minimum, a new trial on the issue of

7   infringement of the '794 patent by Harmony V2 is warranted.

8   **II.     THE COURT SHOULD GRANT JMOL OF NON-INFRINGEMENT, OR A NEW
           TRIAL, FOR HARMONY V1**

9

10        **A.     Harmony V1 Does Not Perform Steps 1(a) And (b) Of The '794 Patent**

11        As with Harmony V2, Ariosa did not perform the "providing" (1(a)) and "contacting"

12  (1(b)) steps of the '794 patent in Harmony V1. Ariosa did not *first* "provid[e] a sample which may

13  contain at least 100 different single-stranded target sequences attached to a first solid support"

14  (1(a)), and *then* "contact[] said target sequences with a probe set comprising more than 100

15  different single-stranded probes … such that different double-stranded hybridization complexes

16  are formed." Ex. 513 ('794 Patent) at cl. 1(a) and (b). Steps 1(a) and (b) are separate steps and,

17  according to the Court, must be performed in the recited order. Trial Tr. 1855:6-13. However, as

18  Dr. Cooper admitted, Harmony V1 is performed using one step, where by the probes and solid

19  support are added simultaneously to the sample containing the target sequences. *Id.*, 1017:4-11

20  ("Q. So that's explaining that, in fact, the beads and the probes are added simultaneously in

21  Version 1; correct? A. That's right."). To be sure, the parties disputed whether, in this mixture of

22  simultaneously added ingredients, the target sequences first bind to the probes or to the beads. But

23  that dispute is irrelevant. All of the claims of the '794 patent are method claims, and Ariosa simply

24  did not follow a two-step method in Harmony V1. For this reason alone, the Court should enter

25  JMOL of non-infringement of the '794 patent for Harmony V1 (or in the alternative a new trial).

26

27

28

### B.   Harmony V1 Does Not Perform Step 1(f) Of The '430 Patent

The undisputed evidence confirms Harmony V1 does not perform '430 patent, step 1(f):

> (f) for each of the plurality of maternal blood samples, **determining the presence or absence of a fetal aneuploidy** comprising **using a number of enumerated sequence reads corresponding to the first chromosome and a number of enumerated sequence reads corresponding to the reference chromosome of (e)**.

Ex. 514 ('430 patent) at cl. 1. Step (e), in turn, recites:

> "for **each** of the plurality **of maternal blood samples, enumerating sequence reads** corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences selected from the first chromosome tested for being aneuploid and sequence reads corresponding to enriched and indexed fetal and maternal non-random polynucleotide sequences selected from the reference chromosome.

Plaintiffs' only theory at trial was that the claim's inclusion of the word "comprising" meant it was enough that, at some point in the Harmony V1 process, enumerated sequence reads of a "first chromosome" and a "reference chromosome" were somehow "use[d]." Trial Tr. 1450:17-1451:16 (Prof. Quackenbush cross-examination); *id.*, 1889:17-1891:5 (Plaintiffs' closing) ("So if we look back at it, 'comprising using a number,' you have to use them. It's not the only thing you have to use. You merely have to use them."). That argument far oversteps the settled legal meaning of the term "comprising."

"It is true that a method claim with the word 'comprising' appearing at the beginning generally allows for additional, unclaimed steps in the accused process, **but each claimed step must nevertheless be performed as written**." *David Netzer Consulting Eng'r LLC v. Shell Oil Co.*, 824 F.3d 989, 998 (Fed. Cir. 2016) (emphasis added). Here, step (f) does not require "merely using" enumerated sequence reads, as Plaintiffs' counsel misleadingly argued. Rather, it requires using those enumerated sequence reads in a very specific way—for "determining the presence or absence of a fetal aneuploidy." In addition, as recited in step (e), the enumerated sequence reads used to determine aneuploidy must be reads from *each* maternal sample. Ex. 514 at cl. 1(e) ("for each of the plurality of maternal blood samples, enumerating sequence reads …"). In other words, the determination of aneuploidy for any given maternal sample must be based on sequence reads from that maternal sample. As discussed below, Harmony V1 does not infringe the '430 patent

1   because (1) it does not use enumerated sequence reads from a first chromosome and a reference

2   chromosome to determine an aneuploidy risk score, and (2) it does not determine an aneuploidy

3   risk score for a given maternal sample based on sequence reads from that one sample.

4       Ninety-six maternal samples were sequenced simultaneously in Harmony V1. Trial Tr.

5   1348:15-21. The undisputed evidence at trial demonstrated that in Harmony V1, the enumerated

6   sequence reads generated from these samples were **not** used to determine aneuploidy. Rather,

7   through a process called "quantile normalization," they were ***discarded and replaced with***

8   ***different values*** based on median sequence counts ***accumulated across all 96 samples***. *Id.*,

9   1352:4-1356:6. As Ariosa bioinformatics scientist Dr. Wang explained, quantile normalization is a

10  "technique that ignores the actual values of the input," instead "only caring about what the ranks

11  of the individual numbers are." *Id.*, 1351:8-11. Dr. Wang walked the jury through an example of

12  how quantile normalization works in FORTE, and how it takes "all of the cleaned-up sequence

13  counts in the sample, and *replace[s] them* with just the median values" ***across all 96 samples in***

14  ***the sequencing run. Id.***, 1352:4-1356:6 (emphasis added). In so doing, quantile normalization

15  "completely eliminates" the enumerated sequence reads. *Id.*, 1356:4-7. In fact, after quantile

16  normalization, the enumerated sequence reads are no longer even recoverable. *Id.*, 1366:13-17

17  ("Q. So after this quantile normalization step and the other steps that FORTE undertakes, is it

18  possible to even recover the enumerated sequence reads from the sequencer? A. Probably the jury

19  can also see that it's impossible to recover what were the original input.").

20      Those quantile normalized values are then further transformed, and the resulting values are

21  ultimately used in a series of Monte Carlo simulations. *Id.*, 1356:15-17; *id.*, 1356:23-1357:8; *id.*,

22  1361:13-17 (Dr. Wang); *id*, 1413:7-16 (Prof. Quackenbush). Through those simulations, tens-of-

23  thousands of values are randomly selected to generate two probability models, a disomic model

24  and a trisomic model. *Id.*, 1357:9-14; *id.*, 1360:18-1361:17 (Dr. Wang). The trisomic model is

25  further modified based on pre-existing risk estimates, such as maternal and gestational age. *Id.*,

26  1361:18-1362:15; *id.*, 1412:22-1421:9 (Prof. Quackenbush). FORTE then uses those probability

27  models—not enumerated sequence reads or even quantile normalized values that replaced those

28  reads—to generate a risk score for aneuploidy. *Id.*, 1360:18-1362:15 (Dr. Wang).

1  Dr. Wang's testimony on FORTE stood undisputed. Dr. Cooper testified he had no

2 disagreement with how Dr. Wang explained (1) "how quantile normalization works in FORTE";

3 (2) "how FORTE does the Monte Carlo simulations"; and (3) "how FORTE uses those Monte

4 Carlo simulations to calculate a risk score." *Id.*, 1626:5-15. Dr. Wang's testimony demonstrates

5 that Harmony V1 did not use "enumerated sequence reads" to determine the presence or absence

6 of a fetal aneuploidy—those sequence reads are never input into the simulations that produce a

7 risk score, but instead are completely eliminated through the quantile normalization process.

8 Dr. Wang's testimony also demonstrates that FORTE did not use enumerated sequence reads from

9 "each" "maternal blood sample," as Claim 1 of the '430 patent further requires, to determine the

10 presence or absence of aneuploidy for that sample. Instead, the values input into FORTE to

11 determine a risk score for any given sample in a sequencing run represented median values across

12 all 96 samples in that run, not sequence reads from individual samples.

13  Finally, it was undisputed that Harmony V1 did not determine the presence or absence of a

14 fetal aneuploidy using enumerated sequence reads from a "reference chromosome," as step 1(f)

15 requires. The Court construed "reference chromosome" to mean "a chromosome different from the

16 particular chromosome that is being tested for aneuploidy." Trial Tr. 1855:3-5. But Plaintiffs

17 never adduced evidence of any such "reference chromosome" in Harmony. As alleged evidence of

18 a "reference chromosome," Dr. Cooper pointed only to a "proportion" that FORTE generates as a

19 preliminary step feeding into the determination of a risk score. *Id.*, 929:7-15; Ex. 461A at 3. This

20 proportion uses normalized mean values derived from a test chromosome (13, 18 or 21) in the

21 numerator, and the sum of normalized mean values derived from each of chromosomes 13, 18 and

22 21 in the denominator. Trial Tr. 929:7-15 (Dr. Cooper); *id.*, 1356:19-1357:5 (Dr. Wang).

23  The problem with Plaintiffs' infringement theory is that the same chromosome serves as

24 both the test chromosome (in the numerator) and as a reference chromosome (in the

25 denominator)—irrespective of whether 13, 18 or 21 is the test chromosome in the numerator

26 (because all of them are in the denominator). *Id.*, 929:7-15. This is contrary to the Court's claim

27 construction, pursuant to which a "reference chromosome" is "a chromosome different than the

28 particular chromosome that is being tested for aneuploidy. *Id.*, 1855:3-5. The Court's claim

1  construction is consistent with the testimony of Dr. Rava, a named inventor of the '430 patent,

2  who admitted that he "would never use the same chromosome as the chromosome I was trying to

3  measure a[s] the reference chromosome." *Id.*, 352:2-3. Accordingly, for this additional reason,

4  Harmony V1 does not practice claim element 1(f).

5      The Court should enter JMOL of non-infringement of the '430 patent, or alternatively

6  grant a new trial because the jury's infringement verdict is against the weight of the evidence.

7  **III.  ARIOSA IS ENTITLED TO JMOL ON DAMAGES**

8      Plaintiffs had the burden to prove the amount of their damages. *See Lucent Techs., Inc. v.*

9  *Gateway, Inc*., 580 F.3d 1301, 1324 (Fed. Cir. 2009) ("The burden of proving damages falls on the

10  patentee."). Plaintiffs failed to satisfy this burden.

11      **A.  There Is No Evidentiary Support For Damages On Harmony V2**

12      As explained above, Plaintiffs' infringement case against Harmony V2 for steps 1(a) and

13  (b) of the '794 patent was based on a theory that an infringing reaction may occur that, under

14  Plaintiff's own theory, is unintended by Ariosa and would only affect a miniscule number of

15  molecules in the sample. Plaintiffs introduced no evidence that Ariosa obtained any benefit from

16  any such unintended, *de minimis* infringement. Yet Plaintiffs' damages theory was completely

17  unmoored from their own infringement theory and is not supported by substantial evidence.

18      **1.  There Is No Evidence Every Harmony V2 Test Infringes**

19      Dr. Cooper offered no explanation for the second required condition for his infringement

20  theory: why any target sequences that failed to hybridize to a single probe during the two-hour

21  hybridization step would hybridize with all three probes after attaching to a bead. *See supra* at

22  § I.A.2. Most critically for damages purposes, Dr. Cooper provided no testimony that in every

23  sample Ariosa tests in Harmony V2, at least 100 target sequences will fail to hybridize to a single

24  probe during the hybridization step, but then will hybridize to all three probes after attaching to a

25  bead. ***Dr. Cooper thus presented no evidence that each and every Harmony V2 test performed by***

26  ***Ariosa infringes.*** Dr. Cooper's own testimony on the "complexity" of the hybridization reaction in

27  Harmony and his inability to quantify even a margin of error for his speculative theory, *see supra*

28  at § I.A.2(c), underscores why no reasonable juror could infer that that the unintended reaction he

1  posits necessarily occurs each time Ariosa runs a Harmony V2 test.

2      Even though Dr. Cooper made no claim, and offered no evidence, that every Harmony V2

3  test run infringes the '794 patent, Plaintiffs' damages expert, Mr. Malackowski, nonetheless

4  testified that Ariosa owes damages on every Harmony V2 test. Trial Tr. 1179:1-18 (damages

5  opinion applies to all 839,553 of Ariosa's tests, including all Harmony V2 tests); *id.*, 1240:12-15

6  (Malackowski agreeing that he "started with the total numbers…"). Mr. Malackowski simply

7  assumed that every Harmony V2 test infringes. *Id.* But there is no evidentiary basis for that

8  assumption. The jury thus had no basis on which it could quantify damages. *See Lucent Techs.*,

9  580 F.3d at 1334-35 (vacating and remanding damages award; "[n]o evidence describes how many

10 Microsoft Outlook users had ever performed the patented method or how many times. Lucent had

11 the burden to prove that the extent to which the infringing method has been used supports"

12 damages award); *Pharmastem Therapeutics v. Viacell, Inc.,* No. 02-148 GMS, 2004 WL 2898061,

13 at *4 (D. Del. Dec. 14, 2004), *aff'd in relevant part,* 491 F.3d 1342 (Fed. Cir. 2007) (granting

14 JMOL on damages because court "cannot determine which or how many of the defendants' units

15 infringe, *or how to quantify damages for infringement*.") (emphasis added). The Court should

16 grant JMOL of no damages for Harmony V2, or at minimum a new trial on this issue.

17
           **2.**      **Plaintiffs' Damages Case Was Unmoored From Their Theory of**
18                   **Unintended, *De Minimis* Infringement**

19     Plaintiffs' damages case was also devoid of any evidence of benefits Ariosa allegedly

20 obtained from the infringement Dr. Cooper posited. In fact, throughout trial, Dr. Cooper

21 emphasized the unintentional, *de minimis* nature of any such infringement. As Dr. Cooper

22 acknowledged, each Harmony V2 sample has "millions and millions of target sequence

23 fragments." Trial Tr. 965:10-13. Yet he testified repeatedly that out of these millions of target

24 sequences, as few as just 100 of them would allegedly undergo the steps of the claimed method.

25 *See, e.g.*, *id.*, 965:5-21; *id.*, 1603:25-1604:6; *id.*, 1047:11-1048:13. Indeed, when faced with the

26 speculative and conjectural nature of his infringement theory, Dr. Cooper retreated time and again

27 to this "100 issue" as his safe space. For example, after he was forced to acknowledge that his

28 guess of 1% unhybridized target sequences was "an admittedly imprecise estimate," *id.*, 1603-

1  1604, he argued "with respect to the question of whether there are at least 100, I am very confident

2  in that opinion." *Id.*, 1007:19-23; *see also id.*, 1009:23-1010:5. Dr. Cooper retreated to this safe

3  space because he acknowledged that the vast majority of target sequences hybridize before

4  attaching to a bead and thus undergo the intended non-infringing reaction. *Id.*, 1012:12-13.

5        A consequence of Plaintiffs' litigation decision to focus on this "100 issue" is that, even

6  under their own infringement theory, any infringement would be both unintended and *de minimis*.

7  The record is devoid of testimony from Dr. Cooper or any other witness that Ariosa derived any

8  benefit from as few as 100 target sequences that supposedly behave in the errant manner

9  Dr. Cooper theorized. Dr. Cooper never opined that these 100 errant target sequences lead to better

10 detection or have any other impact on the Harmony V2 assay. Nor could he, given that there are

11 millions of other target sequences that admittedly do not undergo the steps of the claimed method.

12 *Id.*, 965:14-15 (Dr. Cooper) (framing the question of infringement as "if a small percentage – if a

13 small fraction of the targets" would proceed according to the claims); *id.*, 1012:12-13 (Dr. Cooper)

14 ("the vast majority [of targets] would [first hybridize].").

15       A reasonable royalty award "must reflect the value attributable to the infringing features of

16 the product, and no more." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir.

17 2014). When only *de minimis* infringement is proven, courts should "preclude large (or perhaps

18 any) awards for minimal infringements." *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1352

19 (Fed. Cir. 2000) (Rader, J., concurring). Here, Plaintiffs made no attempt to tie damages to their *de*

20 *minimis* infringement theory. Indeed, Mr. Malackowski used the entire market value of Harmony

21 V2 as his royalty base. The Court should grant JMOL for this reason as well.

22
23       **B.     The Court Should Grant JMOL On All Damages, Or Grant A New Trial,
               Because Plaintiffs Failed To Apportion**

24       It is a bedrock principle of patent damages law that when an accused product or method

25 includes patented and non-patented components, a damages expert must properly apportion in

26 calculating reasonable royalties. The strict apportionment requirement "ensure[s] that a reasonable

27 royalty does not overreach and encompass components not covered by the patent." *VirnetX, Inc. v.*

28 *Cisco Sys., Inc.*, 767 F. 3d 1308, 1326 (Fed. Cir. 2014). The Federal Circuit recently reiterated the

1    importance of apportionment in overturning a jury's reasonable royalty award because the

2    patentee's expert "failed to apportion damages to the infringing functionality." *Finjan, Inc. v. Blue*

3    *Coat Sys., Inc.*, 879 F.3d 1299, 1302 (Fed. Cir. 2018).

4        Mr. Malackowski's damages testimony here tracks the analysis that the Federal Circuit

5    found legally insufficient in *Finjan*. Mr. Malackowski conceded at trial that Ariosa's Harmony test

6    includes significant non-patented features that contribute to its success:

> 7    Q.  All right.  One thing that we can agree on -- I think – is that Ariosa has indeed
>      made many contributions … to its success, including not only FORTE, but other
> 8    non-patented features of its products; correct? A. Correct. Q. And qualitatively,
>      you'd agree that Ariosa's contributions, that don't have anything to do with the
> 9    plaintiffs' patents, are significant; is that fair? A. I do. I do.

10   Trial Tr. 1258:24-1259:14. Indeed, it is undisputed that the Harmony test involves many features

11   beyond what is accused of infringement, including, for example, blood collection using a

12   proprietary preservative, and measuring cell-free DNA. *See, e.g.*, *id.*, 1277:9-14; *id.*, 1520:16-23.

13   The asserted patents also do not claim the FORTE algorithm, which is the heart of how Ariosa

14   calculates risk scores and one of the most valuable components of both versions of Harmony. The

15   details of FORTE are not alleged to be covered by either patent-in-suit. For example, Dr. Cooper

16   admitted that the '794 patent does not disclose "how you use that information that you detect

17   downstream; for example, it doesn't say you can take that information and then assess whether the

18   DNA indicates there's an aneuploidy." *Id.*, 1039:15-20. As for the '430 patent, Plaintiffs' theory

19   was that Harmony's mere use of sequence reads at some point in the process sufficed for

20   infringement because the claims recited the word "comprising." *See supra* at § II.B; Trial Tr.

21   1450:17-1451:16 (Prof. Quackenbush cross-examination); *id.*, 1889:17-1891:5 (Plaintiffs'

22   closing). Plaintiffs did not claim that the '430 patent covered how FORTE computes a risk score.

23   In his direct testimony on his '430 infringement opinion, Dr. Cooper did not refer to FORTE's use

24   of Monte Carlo simulations, how FORTE constructs disomic and trisomic probability models,

25   how FORTE uses the fetal fraction to ultimately calculate a risk score—in fact, he did not even

26   mention the name FORTE. *Id.*, 1043:20-1044:23. Further, the named inventors of the '430 patent

27   indisputably did not invent or disclose in the patent a risk score algorithm like FORTE. *Id.*,

28   355:19-22, 357:5-16 (Dr. Rava). The details of the FORTE algorithm are thus non-patented (by

1    Plaintiffs) components of Harmony and their value should have been apportioned out of damages.

2          However, Mr. Malackowski admitted that he did not adjust his proposed royalty to account

3    for non-patented features of Harmony: "Q. But with respect to the contributions made by Ariosa

4    to the success of its Harmony product, you did not ultimately calculate any quantitative adjustment

5    to your royalty calculation; correct? A. Correct." *Id.*, 1259:8-12. This Court previously held that it

6    would revisit Plaintiffs' failure to apportion "if evidence at trial shows the Harmony Test includes

7    unpatented features for which apportionment is required." D.I. 561 at 5. The trial record exposed

8    and confirmed this fundamental defect in Plaintiffs' theories.

9          Not only did Mr. Malackowski erroneously fail to apportion his royalty base, he

10   compounded that error by nearly doubling that base. He used as his royalty base what he called the

11   "expected reimbursement" of $761 for the Harmony test. Trial Tr. 1193:18-24. But it is

12   undisputed that Ariosa only received approximately half of that amount; the other half went to

13   distributors. *Id.*, 1246:3-8 (Mr. Malackowski agreeing Ariosa's average net sales price was

14   roughly half of $761). Plaintiffs' use of the $761 number was improper. For example, all pre-

15   hypothetical negotiation licenses in the record, including the license between Ariosa and Illumina,

16   are based on a percentage of *actual* net sales received by the licensee. *Id.*, 1242:10-21, 1244:18-

17   1245:4 (Mr. Malackowski). Plaintiffs' presentation of this erroneous $761 figure "skew[ed] the

18   damages horizon for the jury." *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320

19   (Fed. Cir. 2011). The Court should accordingly grant JMOL, or alternatively a new trial, on

20   damages, given the prejudice that resulted from presenting such erroneous numbers to the jury.

21          **C.     Plaintiffs' Erroneous Lost Profits Case Skewed Damages**

22          Finally, evidence at trial proved Plaintiffs were not entitled to lost profits for infringement

23   of the '794 or '430 patents. By waving astronomical lost profits numbers (to which they were not

24   entitled) in front of the jury, Plaintiffs again improperly skewed the damages horizon for the jury.

25          Mr. Malackowski's lost profits opinions were infected with multiple legal errors. First, Mr.

26   Malackowski improperly included Illumina's alleged lost test fees in his lost profits calculations.

27   Trial Tr. 1169:6-9 (stating his lost profits calculations is "made up of three different components

28   of lost profits on sales, test fees, and reagents, and then a residual on royalties"); *id.*, 1181:2-20

1   (discussing calculation of lost test fees). These fees should not have been included in the lost

2   profits calculations because Plaintiffs themselves characterized these fees as royalties. *Id.*, 235:24-

3   236:18 (Dr. Bird: test fees presented "royalty opportunity"; "test fee or royalty"; "you could also

4   call it a royalty"); *id.*, 458:23-459:16 (Mr. Naclerio: test fees were "royalty based on sales").

5          As the Federal Circuit specifically held in *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 778

6   F.3d 1365 (Fed. Cir. 2015), "lost royalty payments" are not recoverable as lost profits because

7   "[t]o be entitled to lost profits, … the lost profits must come from the lost sales of a product or

8   service the patentee *itself* was selling." *Id.* at 1376. As this Court has already recognized, under

9   *Warsaw*, the profits that a third-party allegedly would have realized and would have remitted to

10  the plaintiff but for the defendant's infringement are not collectable as lost profits. *Warsaw*, 778

11  F.3d at 1376; D.I. 561 at 7-8 ("*Warsaw* appears analogous to the situation here."). That is exactly

12  what Mr. Malackowski included in his opinion with respect to test fees, which are simply amounts

13  that third-party licensees paid to Illumina from their sales of non-invasive prenatal tests. Trial Tr.

14  235:24-236:18 (Dr. Bird); *id.*, 458:23-459:16 (Mr. Naclerio). Whether called "test fees" or a

15  "royalty," these third-party payments, after *Warsaw*, cannot serve as the basis for lost profits. Mr.

16  Malackoswki's opinion based on alleged lost test fees was thus legally erroneous.

17         Second, Mr. Malackowski should not have been permitted to include in his lost profits

18  calculations the amount of downstream revenue from so-called "convoyed" reagent sales to the

19  third parties who compete with Ariosa. Trial Tr. 1169:6-9 (including lost "reagents" costs in lost

20  profits analysis). The convoyed sales doctrine permits a patentee to recover lost revenue for

21  "unpatented components sold with a patented item," only if they "together were considered to be

22  components of a single assembly or parts of a complete machine, or they together constituted a

23  functional unit." *Am. Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1268 (Fed. Cir. 2008). In

24  *Warsaw*, the Federal Circuit held that the patentee could not recover lost sales of "fixations" as

25  convoyed sales because "Warsaw never presented testimony that the fixations it sold . . . had no

26  independent function—that is, that they would not work as well in other surgeries not involving

27  the patented technologies." *Warsaw*, 778 F.3d at 1376. Here, Plaintiffs similarly did not present

28  evidence that Illumina's reagents have no function independent of the patented products. To the

1  contrary, Illumina's entire argument at trial was that those sequencing reagents do not even

2  "pertain" to Illumina's '794 patent. Trial Tr. 1917:14 (Plaintiffs' closing) ("The '794 wouldn't fall

3  into that category. It doesn't pertain to the Goods. It's not about the sequencer.").

4      Finally, Mr. Malackowski's lost profits calculations improperly include an amalgamation

5  of revenues from corporate entities not limited to the patentee itself, along with a collection of

6  downstream IP "fees" and "reagent sales" based on sales allegedly lost by third-parties. *Id.*,

7  1203:19-1204:5 (lost profits based on Ariosa "tak[ing] a test from Illumina or its partners"); *id.*,

8  1211:18-23; *id.*, 1220:10-12; *id.*, 1169:6-9. For example, Mr. Malackowski erroneously included

9  in his lost profits opinion profits allegedly lost by Plaintiffs' foreign subsidiaries. *Id.*, 1214:19-23.

10 Because a substantial portion of the alleged lost sales Plaintiffs relied on in their lost profits

11 theories were foreign, Plaintiffs presented no evidence at trial that these sales would be been lost

12 by the ***domestic*** Illumina or Verinata entities that were parties to this action. *See Mars, Inc. v. Coin*

13 *Acceptors, Inc.*, 527 F.3d 1359, 1366-67 (Fed. Cir. 2008) (sales lost by patentee's subsidiaries are

14 not "lost profits"); *Warsaw*, 778 F.3d at 1376 (rejecting as a matter of law lost profits claim for

15 lost fees from licensees as "lost profits must come from the lost sales of a product or service the

16 patentee itself was selling"). These amounts never should have been presented to the jury.

17     By improperly including the foregoing categories in his lost profits opinion,

18 Mr. Malackowski presented the jury with a bloated damages demand that "skew[ed] the damages

19 horizon for the jury." *Uniloc USA, Inc.*, 632 F.3d at 1320; *Waymo LLC v. Uber Techs., Inc.*, No.

20 17-00939 WHA, 2017 WL 5143890, at *3 (N.D. Cal. 2017) (excluding plaintiff's damages expert

21 for offering opinion that was "a transparent attempt to skew the damages horizon and desensitize

22 the jury to the enormity of what Waymo is seeking"). For this reason, too, the Court should grant

23 JMOL on Plaintiffs' damages claim, or alternatively grant a new trial on damages.

24 **IV.    CONCLUSION**

25     The jury verdict on infringement and damages is not supported by substantial evidence and

26 at minimum is against the great weight of the evidence. It was also tainted by Plaintiffs' improper

27 arguments and violations of this Court's orders. The Court should grant Ariosa JMOL of non-

28 infringement and damages, or alternatively grant a new trial on those issues.

1

Dated:  February 26, 2018

Respectfully submitted,

2

IRELL & MANELLA LLP

3

4

By:   /s/ David I. Gindler

Attorneys for Defendant and Counterclaim-
Plaintiff ARIOSA DIAGNOSTICS, INC.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28