EDWARD R. REINES (Bar No. 135960)
edward.reines@weil.com
DEREK C. WALTER (Bar No. 246322)
derek.walter@weil.com
WEIL, GOTSHAL & MANGES LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA  94065
Telephone: (650) 802-3000
Facsimile: (650) 802-3100

ROBERT T. VLASIS III (admitted *pro hac vice*)
robert.vlasis@weil.com
WEIL, GOTSHAL & MANGES LLP
Washington DC Office
2001 M Street, NW, Suite 600
Washington, DC  20036
Telephone: (202) 682-7000
Facsimile: (202) 857-0940

Attorneys for Plaintiffs and Counterclaim Defendants
ILLUMINA, INC. and VERINATA HEALTH, INC.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| VERINATA HEALTH, INC., <br><br> and <br><br> THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY <br><br> Plaintiffs and Counterclaim-Defendants, <br><br> v. <br><br> ARIOSA DIAGNOSTICS, INC., <br><br> and <br><br> LABORATORY CORPORATION OF AMERICA HOLDINGS, <br><br> Defendants and Counterclaim-Plaintiffs. <br><br> ILLUMINA, INC., <br><br> Plaintiff, <br><br> v. <br><br> ARIOSA DIAGNOSTICS, INC., <br><br> Defendant. | Case No. 3:12-cv-05501-SI (consolidated with Case No. 3:14-cv-01921-SI and Case No. 3:15-cv-02216-SI) <br><br> **PLAINTIFF ILLUMINA, INC.'S NOTICE OF MOTION AND MOTION FOR A PERMANENT INJUNCTION** <br><br> **PUBLIC REDACTED VERSION** <br><br> Date:  June 8, 2018 <br> Time: 10:00 A.M. <br> Courtroom: 1, Floor 17 <br> Judge:  Hon. Susan Illston |

| | |
|---|---|
| 1 | ILLUMINA, INC., |
| 2 | Plaintiff, |
| 3 | v. |
| 4 | ARIOSA DIAGNOSTICS, INC., AND ROCHE MOLECULAR SYSTEMS, INC., |
| 5 | Defendants. |

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................ 2

II. A PERMANENT INJUNCTION IS WARRANTED .......................................................... 4

    A. Roche's Expanding Infringement Causes Irreparable Harms ................................ 5

    B. Monetary Damages Are Inadequate To Compensate Illumina ............................... 9

    C. The Balance Of The Harms Favors An Injunction ................................................ 11

    D. The Public Interest Favors An Injunction .............................................................. 12

    E. A Permanent Injunction Against Harmony Is Warranted ..................................... 12

III. CONCLUSION .................................................................................................................. 12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Apple Inc. v. Samsung Elecs. Co.*,
  809 F.3d 633 (Fed. Cir. 2015) .................................................................................................. 4, 12

*Apple, Inc. v. Samsung Elec. Co., Ltd.*,
  Civ. A. No. 12-cv-00630-LHK (N.D. Cal. Jan. 18, 2016) .......................................................... 5

*Asetek Danmark A/S v. CMI USA, Inc.*,
  Civ. A. No. 13-cv-00457-JST, 2015 WL 5568360 (N.D. Cal. Sept. 22, 2015) (same),
  *vacated in part on other grounds*, 852 F.3d 1352 (Fed. Cir. 2017) ............................................ 5

*Broadcom Corp. v. Emulex Corp.*,
  732 F.3d 1325 (Fed. Cir. 2013) .................................................................................................. 4, 5

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,
  Civ. A. No. 10-cv-03428-PSG, 2013 WL 140039 (N.D. Cal. Jan. 10, 2013) .............................. 5

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
  664 F.3d 922 (Fed. Cir. 2012) .................................................................................................... 3

*Douglas Dynamic, LLC v. Buyers Prods. Co.*,
  717 F.3d 1336 (Fed. Cir. 2013) .................................................................................................. 9

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) .................................................................................................................. 4, 5

*Edwards Lifesciences AG v. CoreValve, Inc.*,
  699 F.3d 1305 (Fed. Cir. 2012) .................................................................................................. 4, 11

*Genband US LLC v. Metaswitch Networks Corp.*,
  861 F.3d 1378 (Fed. Cir. 2017) .................................................................................................. 9

*Illumina, Inc. v. Qiagen, N.V.*,
  207 F.Supp.3d 1081 (N.D. Cal. 2016) ........................................................................................ 6

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
  702 F.3d 1351 (Fed. Cir. 2012) .................................................................................................. 4, 5

*Radware, Ltd. v. F5 Networks, Inc.*,
  Civ. A. No. 13-cv-02024-RMW, 2016 WL 4427490 (N.D. Cal. Aug. 22, 2016) ....................... 5

*Rite-Hite Corp. v. Kelley Co.*,
  56 F.3d 1538 (Fed. Cir. 1995) .................................................................................................... 12

*TEK Global, S.R.L. v. Sealant Sys., Int'l, Inc.*,
  Civ. A. No. 11-cv-00774-VC (N.D. Cal. Aug. 11, 2017) ........................................................... 5

*TransPerfect Global, Inc. v. MotionPoint Corp.*,
  Civ. A. No. 10-cv-02590-CW, 2014 WL 6068384 (N.D. Cal. Nov. 13, 2014) .......................... 5

*Trebro Mfg., Inc. v. Firefly Equip., LLC*,
  748 F.3d 1159 (Fed. Cir. 2014) .................................................................................................. 5

Case 3:12-cv-05501-SI   Document 660   Filed 03/16/18   Page 5 of 18

*Windsurfing Int'l, Inc. v. AMF, Inc.*,
    782 F.2d 995 (Fed. Cir. 1986) .......................................................................................... 11

**Legislative**

U.S. CONST. art. I, § 8, cl. 8 ................................................................................................... 4

**Statutes and Regulations**

U.S.C. § 283 ............................................................................................................................ 4

PLAINTIFF ILLUMINA'S MOTION FOR
A PERMANENT INJUNCTION
iii
CASE NO. 12-CV-05501-SI
CASE NO. 14-CV-01921-SI
CASE NO. 15-CV-02216-SI

# NOTICE OF MOTION AND MOTION

TO DEFENDANT ROCHE MOLECULAR SYSTEMS, INC.[1] AND ALL ATTORNEYS OF RECORD, PLEASE TAKE NOTICE that on June 8, 2018, plaintiff Illumina, Inc. ("Illumina") will move the Court for an order granting it a permanent injunction enjoining Roche from making, selling, offering to sell, using and importing the Harmony test in the United States. Roche should also be further enjoined from otherwise infringing, directly or indirectly, U.S. Patent No. 7,955,794 (the "'794 Patent").

This motion is based on the following Memorandum, the supporting materials, the pleadings in this action, and any other matters the Court deems proper.

The relief requested is an order enjoining Roche from making, selling, offering to sell, using and importing the Harmony test in the United States, as well as enjoining it from otherwise infringing, directly or indirectly, the '794 Patent.

---

[1] Roche has largely phased out Ariosa Diagnostics, Inc. ("Ariosa") now that it has absorbed the Ariosa business. To match the nomenclature with reality, this motion refers to Roche as the current infringer. Pursuant to stipulation, the Court has Ordered that the Ariosa entity within Roche "is responsible" for all of Roche's infringing acts regardless of the particular entity within the Roche conglomerate. D.I. 375-3 at ¶ 1.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

A permanent injunction is warranted because, rather than desisting in its infringing conduct in the face of the jury's verdict, Roche is *escalating* its infringement in the emerging NIPT marketplace at a critical juncture.

Illumina has expended hundreds of millions of dollars to centralize the intellectual property relevant to its non-invasive prenatal testing ("NIPT") technology platform so it could proliferate its health-saving technology to all sorts of new users, such as medical centers, specialty labs, and beyond. Because Illumina has invested so much in the healthy foundation of its NIPT program, Roche's continuing infringement promises to cause serious irreparable harm. Roche is doing so by exploiting its imposing presence in the clinical lab marketplace and undercutting prices because it does not pay for the intellectual property it infringes.

Roche's growing unauthorized use of the '794 Patent misappropriates library preparation technology that is foundational Illumina technology. *See* Trial Tr. (1/10/2018) at 590:5-7 (Flatley) ("[I]t's a very robust assay methodology that we've employed in a broad variety of cases and applications."). Roche's own website still trumpets that the infringing DANSR technology is key to its successful competition with Illumina: "DANSR technology significantly improves assay efficiency, reduces overall test cost and provides for optimally streamlined workflow." *See* Declaration of Christopher Lavin in Support of Plaintiffs' Motion (the "Lavin Decl."), ¶ 1, Ex. A. Roche also publicly (and wrongly) claims that the infringing technology makes its test more accurate than Illumina's NIPT technology: "Only the Harmony test uses a unique targeted approach (DANSR™ and FORTE™) to more accurately assess the chromosomes of interest." *See id.*, ¶ 2, Ex. B.

Roche's strategy documents ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See id.*, ¶ 3, Ex. C. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



*See id.* ¶ 3, Ex. C ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮");
Lavin Decl., ¶ 4, Ex. D ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *id.* ¶ 5, Ex. E ▮▮▮▮▮▮▮▮▮

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). Roche has a broad menu of medical tests and
2  related equipment and reagents that it already sells to clinical labs. *See id.*, ¶ 6, Ex. F; Declaration
3  of Jeff Eidel in Support of Motion (the "Eidel Decl."), ¶ 6.  Indeed, Roche announced that the
4  Ariosa purchase "gives them the competitive advantage of our experience in bringing technology
5  into the clinical diagnostics space, as well as our broad commercial reach in clinical diagnostics."
6  *See* D.I. 313-3 at 2.

7  As Illumina's Jeff Eidel explains in his supporting declaration, Roche's expanding
8  infringement expands the irreparable harm suffered by Illumina.  Now that Roche has absorbed
9  Ariosa, and now that clinical labs are broadly bringing NIPT in-house, the infringing Harmony
10 test has the full marketing might of Roche behind it.  With its infringing test, Roche competes
11 directly with Illumina causing lost business opportunities, including lost customers and sales. *See*
12 Eidel Decl., ¶¶ 8-13 (explaining the losses with examples).  Such losses tarnish Illumina's brand
13 as the most efficacious test, emasculates the exclusivity that is the promise of the patent grant,
14 frustrates the quantification of losses because sales accounts tend to be "sticky" so lost sales have
15 long-lasting adverse consequences, wrongly interferes with relationships with clinical labs as they
16 expand into genetic testing in earnest, and result in price undercutting because Roche can unfairly
17 compete without paying for the intellectual property it uses.  This is the classic irreparable harm
18 caused by infringing competition. *See, e.g., Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922,
19 930 (Fed. Cir. 2012) ("Price erosion, loss of goodwill, damage to reputation, and loss of business
20 opportunities are all valid grounds for finding irreparable harm.")

21 Roche announced publicly that it acquired the infringing test with its "eyes wide open" as
22 to the risks of losing this case. *See* D.I. 313-3.  And it received a discount when it bought Ariosa
23 in view of this case and other protections for the litigation risk it knowingly assumed.  The
24 equities do not favor permitting on-going competitive infringement by a calculating infringer such
25 as that.  A permanent injunction should be entered.

26
27
28

## II. A PERMANENT INJUNCTION IS WARRANTED

The Constitution provides inventors an "*exclusive* right to their respective…discoveries." U.S. Const. art. I, § 8, cl. 8.[2] Pursuant to this Constitutional Grant of exclusive rights, Congress specifically authorized injunctions to stop patent infringement, authorizing courts to "grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." *See* 35 U.S.C. § 283. Because it is difficult to enforce a right to exclude with monetary damages, "historically courts have 'granted injunctive relief upon a finding of infringement in the vast majority of patent cases.'" *Apple Inc. v. Samsung Elecs. Co*., 809 F.3d 633, 639 (Fed. Cir. 2015) (*quoting eBay Inc. v. MercExchange, L.L.C*., 547 U.S. 388, 395 (2006)).

Although the facts of each case must be evaluated, normally an injunction is entered against a competitor that is a proven infringer. *See Edwards Lifesciences AG v. CoreValve, Inc.*, 699 F.3d 1305, 1314 (Fed. Cir. 2012) ("Absent adverse equitable considerations, the winner of a judgment of validity and infringement may normally expect to regain the exclusivity that was lost with the infringement."); *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1338 (Fed. Cir. 2013) ("The courts have a long history of remedying trespass on property rights—including patent rights—by removing the trespasser."); *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.,* 702 F.3d 1351, 1362 (Fed. Cir. 2012) (holding that a proper *eBay* analysis "proceeds with an eye to the 'long tradition of equity practice' granting 'injunctive relief upon a finding of infringement in the vast majority of patent cases,'" and noting that "the axiomatic remedy for trespass on property rights is removal of the trespasser").

The four-factor *eBay* test for a permanent injunction is well-established. *eBay*, 547 U.S. at 391 (2006). To obtain a permanent objection, a plaintiff must demonstrate:

(1) that it has suffered an irreparable injury;

(2) monetary damages are inadequate to compensate for that injury;

---

[2] Emphasis supplied unless otherwise specified.

(3) the balance of hardships between the plaintiff and defendant support an injunction; and

(4) the public interest would not be disserved by a permanent injunction.

*Id.*

These factors support an injunction as established below.

### A. Roche's Expanding Infringement Causes Irreparable Harms

Direct competition alone strongly suggests the potential for irreparable harm. *See Presidio Components.*, 702 F.3d at 1363 (overturning denial of permanent injunction, explaining "[d]irect competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm"); *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1164 (Fed. Cir. 2014) (overturning denial of preliminary injunction and *quoting Presidio Components* "[d]irect competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm"). In *Broadcom*, the Federal Circuit confirmed that direct competition establishes irreparable harm when market share is taken: "The district court determined that Broadcom and Emulex were competitors and that Broadcom lost market share while Emulex gained it—thus Broadcom established irreparable harm." 732 F.3d at 1338.

Courts in this District regularly enjoin infringing competitors. *See, e.g., TEK Global, S.R.L. v. Sealant Sys., Int'l, Inc.*, Civ. A. No. 11-cv-00774-VC (N.D. Cal. Aug. 11, 2017) (granting permanent injunction); *Radware, Ltd. v. F5 Networks, Inc.,* Civ. A. No. 13-cv-02024-RMW, 2016 WL 4427490, at *13-*14 (N.D. Cal. Aug. 22, 2016) (same); *Apple, Inc. v. Samsung Elec. Co., Ltd.,* Civ. A. No. 12-cv-00630-LHK (N.D. Cal. Jan. 18, 2016) (same); *Asetek Danmark A/S v. CMI USA, Inc.,* Civ. A. No. 13-cv-00457-JST, 2015 WL 5568360, at *13-*17 (N.D. Cal. Sept. 22, 2015) (same), *vacated in part on other grounds*, 852 F.3d 1352 (Fed. Cir. 2017); *TransPerfect Global, Inc. v. MotionPoint Corp.,* Civ. A. No. 10-cv-02590-CW, 2014 WL 6068384, at *6-*7 (N.D. Cal. Nov. 13, 2014) (same); *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.,* Civ. A. No. 10-cv-03428-PSG, 2013 WL 140039, at *3-*4 (N.D. Cal. Jan. 10, 2013) (same).

Here, the irreparable harm is exacerbated by the emerging and expanding nature of the marketplace. It is well-established that infringement in an emerging marketplace causes

1  irreparable harm in particular.  In *Illumina, Inc. v. Qiagen, N.V.*, 207 F.Supp.3d 1081, 1093 (N.D.
2  Cal. 2016), Judge Alsup entered a preliminary injunction in favor of Illumina because he found the
3  market for desk top DNA sequencers in clinical labs was emerging so Qiagen's infringement
4  caused particularly irreparable harm.  This case is no different except that infringement has
5  already been established at trial and thus this case presents an even more compelling basis for an
6  injunction.

7  Roche is using its purchase of the Harmony test to build on its broad menu of products for
8  clinical labs, such as medical centers and specialty labs, with its NIPT offering.  Illumina's NIPT
9  platform, which is now employed by around 80 NIPT testing partners, is creating a robust and
10 competitive marketplace where medical centers and specialty labs develop and perform their own
11 NIPT tests and major testing companies such as Labcorp offer their tests as well.  *See* Trial Tr.
12 (1/16/2018) at 1111:8-13 (Eidel) ("the total number of licensees that we've done now is up to
13 about 80 around the world…[we] accomplished and continue to accomplish our goal of getting
14 this technology, you know, widely available to our customers").  The clinical lab marketplace is
15 emerging because those labs are increasingly interested in purchasing technology from Illumina
16 and Roche to develop their own tests in-house.  *See* Eidel Decl., ¶ 8; *see also id.*, ¶ 10 ▮
17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

19 The competition between Illumina and Roche is at an "inflection point" because as many
20 "third-party test centers are set up and validated, customers have incurred sunk costs they may lose
21 by switching to another technology."  *See id.*, ¶¶ 8-10.  And Roche has a "built-in advantage"
22 because it has pre-existing relationships with clinical customers given its broad menu of clinical
23 tests.  *Id.*  Roche is also much larger with broader sales and marketing channels for its clinical
24 tests.  *Id.*

1  Roche's own documents show it is attempting to invade that marketplace with its
2  formidable marketing might, by undercutting price due to infringement and using its big
3  reputation with clinical customers. *See, e.g.* Lavin Decl., ¶ 4, Ex. D █████████
4  ████████████████████████████████████████████████████████████████████████
5  ███████████████████████████████████████; *id.*, ¶ 3, Ex. C; *id.* ¶ 4, Ex.
6  D; *id.* ¶ 5, Ex. E.
7  ████████████████████████████████████████████
8
9
10
11
12
13
14
15
16
17  *See* Lavin Decl., ¶ 7, Ex. G (████████████████████████████████████
18  █████████████ ████ █████████████████████████████████████████
19  ██████████████████████████ *id.*, ¶ 3, Ex. C (███████████████████
20  ██████████████████████; *id.*, ¶ 8, Ex. H ██████████████████████
21  ████████████████████████████████████████████████████████████████████████
22  █████████████████.

23  When Roche purchased Ariosa it stated that it planned to launch a version of the Harmony
24  test on a sequencing platform of its own in the future. *See* D.I. 313-2. It specifically identified its
25  recently purchased Genia sequencer as the expected new platform for its infringing Harmony
26  test. *Id.* ████████████████████████████████████████████████████
27
28
---
[3] 1 CHF (Swiss Franc) = $1.06 (U.S. Dollars) (as of Mar. 14, 2018). *See* Lavin Decl., ¶ 16, Ex. P.

1 ▮▮▮▮▮.[4] ▮▮▮▮▮

2 ▮▮▮▮▮.[5] ▮▮▮▮▮

3 ▮▮▮▮▮"[6]  Roche's grand plans for the infringing Harmony test underline
4 the scope of the irreparable harm.

5     Illumina is losing important NIPT sales to Roche already -- with more losses threatened.
6 *See* Eidel Decl., ¶¶ 8-13.  This includes potential losses at clinical laboratories adopting NIPT
7 technology for the first time to bring in-house their own tests.  *See, e.g., id.*, ¶ 11.  Such losses
8 create long term lost business opportunities of undefinable proportion.  *See id.*  Once a laboratory
9 adopts a technology to develop its own NIPT test and that test is verified, it can be difficult to
10 convince that laboratory to switch technologies.  *See id.*, ¶ 10.  These long term losses are
11 difficult to quantify and have ancillary effects on other customers and other tests that these clinical
12 labs can perform.  *See id.*, ¶ 10.  ("These test centers encourage other customers and end-users to
13 adopt the proven technology based on reputation and results.").  Illumina loses out on
14 relationships with customers that are prime candidates for broader relationships in cancer,
15 reproductive health and complex diseases.  *See* Eidel Decl., ¶ 10.  Illumina also loses out on
16 related NIPT opportunities such as testing for microdeletions.  *Id.*

17     Roche is also undercutting the prices for NIPT tests, promoting itself as lower cost.  *See*
18 Lavin Decl., ¶ 1, Ex. A. ("DANSR technology significantly improves assay efficiency, reduces
19 overall test"); Eidel Decl., ¶ 13 ("Roche has continued to promote its product as being lower
20 priced").  Roche is able to undercut prices because, by infringing and thus not paying for the

---

[4] *See* Lavin Decl., ¶ 3, Ex. C ▮▮▮ *id.*, ¶ 7, Ex. G ▮▮▮ *id.*, ¶ 8, Ex. H ▮▮▮

[5] *See* Lavin Decl., ¶ 7, Ex. G ▮▮▮ *id.*, ¶ 3, Ex. C (▮▮▮.

[6] *See* Lavin Decl., ¶ 3, Ex. C; *see also id.*, ¶ 7, Ex. G ▮▮▮ ; *id.*, ¶ 9, Ex. I ▮▮▮

1  technology it uses, its costs are considerably lower. *Id.* It bragged at trial that its home-brew
2  DANSR assay is far cheaper than paying for Illumina's products. *See* Trial Tr. (1/17/2018) at
3  1277:5-7 (Song) ("the targeted approach is what allowed us to be not just more efficient, but that
4  efficiency translated into a much lower cost structure"); Trial Tr. (1/8/2018) at 155:14-21
5  (Ariosa's Opening Statement) (the infringing targeted approach reduced costs tremendously); Trial
6  Ex. 493-025 ██████████████████████ In addition, Roche sells clinical labs a
7  host of products. By also supplying its NIPT offering, Roche is able to promote sales of its other
8  products. *See* Eidel Decl., ¶ 13 ("Roche is motivated to initiate and grow relationships with
9  clinical customers so that it can cross-sell other diagnostic tests it is developing and sells. This
10 helps explains Roche's pricing."). This allows it to offer NIPT at lower prices that can be made up
11 with other sales. *See id.*

12     Roche's artificially low pricing ripples throughout the market, irreparably harming
13 Illumina in a broad, on-going, and growing way.[7] *See id.* Mr. Eidel provides concrete examples
14 of how Roche's pricing has undercut prices and is causing irreparable harm with reference to
15 specific customers. *See, e.g., id.*, ¶¶ 11(a), (b), (c), and 12(a) and (b).

16     **B.   Monetary Damages Are Inadequate To Compensate Illumina**

17     The Federal Circuit has recognized that, where a patentee has a history of not licensing the
18 infringed patents to maintain market exclusivity, the right to exclude is viewed as "an intangible
19 asset that is part of a company's reputation" which is "under attack by [the defendant's]
20 infringement. *Douglas Dynamic, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir.
21 2013). Damage to this reputation as an innovator and the exclusive source is properly considered
22 irreparable harm. *Id.* This is especially true given that Roche contends its targeted sequencing
23 using DANSR is better than the Illumina NIPT technology. *See* Lavin Decl., ¶ 2, Ex. B. ("Only

---

[7] The irreparable harm to Illumina has a "causal nexus" to the infringement because Roche emphasizes the advantages of DANSR and how it lowers cost through the infringing technology. *See Genband US LLC v. Metaswitch Networks Corp.*, 861 F.3d 1378, 1384 (Fed. Cir. 2017). This lower cost is how it promotes its product and that is made possible by its infringement. Indeed, the "causal nexus" is conclusively established by Ariosa's inability to design around the '794 Patent even when it attempted to do so with its Harmony V2 test redesign.

1   the Harmony test uses a unique targeted approach (DANSR™ and FORTE™) to more accurately
2   assess the chromosomes of interest.").

3   Illumina's Nick Naclerio explained at trial that Illumina has not licensed the '794 Patent
4   and that it would not do so to allow someone to make a home-brew version for their own use:

> Generally, we like to make great products that people want to buy, and make our money by selling them the products; and then use our IP to prevent other people from copying our products.
>
> So I think if -- if someone had approached us and said we want to use your patents in order to make a kit that does the same thing your kit does, we would say, "Well, why don't you just buy our kit?"
>
> And so to my knowledge those patents have never been licensed.

Trial Tr. (1/10/2018) at 458:2-11 (Naclerio); *see also* Eidel Decl., ¶ 4 ████████████████████
████████████████████████████████████████████████████████████████████████████████████████
████████████████. The '794 Patent is not part of the NIPT patent pool, precisely because it is foundational Illumina technology that is not NIPT-specific.

At trial, Mr. Eidel confirmed that Illumina would ***not*** license Roche its patents to create a competing NIPT platform. *See* Trial Tr. (1/17/2018) at 1151:13-22 (Eidel); *see also* Eidel Decl., ¶ 4 ████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████.

Damage to Illumina's reputation as a company that ████████████████████████████
████████████████████████████████████████████████████████████████ is not compensable with monetary damages. Potential infringers eager to enter the NIPT marketplace using Illumina's technology without authorization will have the wrong incentives if Illumina's exclusivity continues to be infringed by Roche, notwithstanding the jury verdict of infringement. Infringers may conclude that, rather than license necessary technology, they can simply risk an infringement suit and at worst pay what the dozens of existing NIPT licensees are voluntarily paying.

1          Even aside from this irreparable reputational injury, money cannot adequately compensate Illumina for all the harm of having to compete directly with a powerful infringer such as Roche. *Douglas*, 717 F.3d at 1345 ("[M]ere damages will not compensate for a competitor's increasing share of the market, a market which Douglas competes in, and a market that Douglas has in part created with its investment in patented technology."). This extensive harm is documented in Mr. Eidel's declaration and the trial record more generally. Such harm includes lost customers that may be locked-in to Roche technology and the Roche marketing machine for years. It includes the loss of related sales for other tests and technology that might be earned from new clinical customers. It includes the undercutting of NIPT pricing by virtue of Roche not having to pay for key intellectual property it uses. And, finally, it includes the additional marketing and sales costs of facing an infringing competitor.

None of these harms are adequately compensated by damages. That is why infringing competition such as this is normally enjoined. *See, e.g., Edwards Lifesciences*, 699 F.3d at 1314 ("Absent adverse equitable considerations, the winner of a judgment of validity and infringement may normally expect to regain the exclusivity that was lost with the infringement.").

### C.    The Balance Of The Harms Favors An Injunction

As Roche's senior executive Dan Zambrowski acknowledged, Roche purchased Ariosa "with our eyes wide open" as to this litigation. *See* D.I. 313-3. Accordingly, Roche purchased the Harmony test business well aware of the risk of injunction and, at a corresponding discount and with indemnity for litigation risk and whatever other provisions it thought it needed to protect it in view of this case. *See* Lavin Decl., ¶ 16, Ex. 400. The equities do not favor Roche at all. Moreover, it is axiomatic that "[o]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n. 12 (Fed. Cir. 1986).

On the other hand, given the irreparable harm documented with this motion and at trial, Illumina will be harmed seriously if on-going infringement is permitted.

1       **D.      The Public Interest Favors An Injunction**

2       The public interest nearly always favors an injunction, absent some compelling reason to

3 the contrary. *Apple Inc. v. Samsung Elecs. Co.,* 809 F.3d 633, 647 (Fed. Cir. 2015). Only "in rare

4 instances" have courts "exercised their discretion to deny injunctive relief in order to protect the

5 public interest." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1547 (Fed. Cir. 1995).

6       Here, Illumina has licensed approximately 80 different licensees and demonstrated an

7 unrelenting interest in proliferating NIPT. *See* Trial Tr. (1/10/2018) at 610:6-14 (Flatley)

8 ("because we were hopeful to supply sequencers to many companies in the space, it was our

9 objective to try to work to resolve all of the intellectual property disputes, if we were capable of

10 doing that"); Trial Tr. (1/10/2018) at 417:5-6 (Naclerio) ("it was really an enablement strategy to

11 grow the – to grow the field"). Illumina has every motivation to proliferate its NIPT technology

12 because the more NIPT tests, the more sequencer and reagent sales it will gain. *See id.* There is

13 no question that there is ample capacity to serve the market in the event of an injunction with tests

14 based on Illumina technology with quality and accuracy that has never been challenged.

15      It is in the public interest for patent rights to be respected.

16      **E.      A Permanent Injunction Against Harmony Is Warranted**

17      Based on the consideration of all factors, Roche should be enjoined from making, selling,

18 offering to sell, using and importing the Harmony test in the United States. It should also be

19 enjoined from otherwise infringing, directly or indirectly, the '794 Patent. The form of the

20 permanent injunction is submitted with this motion.

21 **III.   CONCLUSION**

22      The motion should be granted.

23

24

25

26

27

28

| | | |
|---|---|---|
| 1 | Dated: March 16, 2018 | Respectfully submitted, |
| 2 | | */s/ Edward R. Reines* |
| 3 | | EDWARD R. REINES (Bar No. 135960) |
| | | edward.reines@weil.com |
| 4 | | DEREK C. WALTER (Bar No. 246322) |
| | | derek.walter@weil.com |
| 5 | | WEIL, GOTSHAL & MANGES LLP |
| 6 | | Silicon Valley Office |
| | | 201 Redwood Shores Parkway |
| 7 | | Redwood Shores, CA  94065 |
| | | Telephone: (650) 802-3000 |

ROBERT T. VLASIS III (admitted *pro hac vice*)
robert.vlasis@weil.com
WEIL, GOTSHAL & MANGES LLP
Washington DC Office
2001 M Street, NW, Suite 600
Washington, DC  20036
Telephone: (202) 682-7000
Facsimile: (202) 857-0940

*Attorneys for Plaintiff*
ILLUMINA, INC.